**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ALEJANDRO DURAN, et al.,          )
                                  )
            Plaintiffs,           )
                                  )
            v.                    )     No. 01 C 6858
                                  )
TOWN OF CICERO et al.,            )
                                  )
            Defendants.           )

<u>**MEMORANDUM OPINION**</u>

Before the court are three motions.  For the reasons explained below, (1) the motion of defendants Robert DeCianni and William Peslak for summary judgment with respect to the plaintiffs in Group I is denied; (2) the motion of certain defendants for summary judgment with respect to the plaintiffs in Group II is granted; and (3) the joint motion of the individual police officer defendants for partial summary judgment is granted in part and denied in part.

<u>**BACKGROUND**</u>

This case is a civil rights action brought by nearly eighty plaintiffs against the Town of Cicero (the "Town") and seventeen Cicero police officers.  It arises out of an incident occurring on September 2, 2000, at the home of Alejandro and Maria Concepcion

Duran,[1] who were having a party to celebrate their daughter's baptism. Plaintiffs are the Durans and their guests at the party.[2]

We will briefly outline the facts of this case. Party guests began arriving at the Durans' home in Cicero in the late afternoon of September 2, 2000. At about 8:00 p.m., there were as many as seventy people at the party, which was in the back yard of the home. The Durans provided food and drink for their guests, including beer and wine, and some guests brought their own beer as well. Around 9:30 p.m., the Cicero Police Department (to which we will refer as the "Town") received a telephone call complaining about the party. Officers Waldemar Cruz and Robert DeCianni were sent to check on the party; they arrived at the Durans' home and asked that cars be moved from the alley and that the volume of the music be turned down. The officers then left.

---

[1] Alejandro and Maria Duran lived at the home, but the home was owned by Alejandro's brother, plaintiff Gonzalo Duran. There is conflicting evidence on` whether Gonzalo was living in the home at the time as well.

[2] The other plaintiffs are as follows: Jaquelin Duran, Armando Duran, Anna Maria Duran, Armando Duran Jr., Yonathan Duran, Adolfo Duran, Adolfo Duran Jr., Gonzalo Duran, Amada Duran, Gonzalo Duran Jr., Concepcion Duran, Kevin Duran, Jaime Duran, Luz Maria Pineda, Daniel Pineda, Ignacio Rodriguez, Alma Rodriguez, Ana Rodriguez, Kathy Bonilla, Basilisa Pineda, Javier Rodriguez, Rene Moreno Sr., Lisbeth Moreno, Rene Moreno Jr., Maria Alicia Moreno, Ruben Pineda, Silvia Pineda, Anabell Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda, Florina Pineda, Joel Uribe, Esther Meraz, Heriberto Uribe Sr., Juan Carlos Uribe, Dudbeth Uribe, Heriberto Uribe Jr., Jose Manuel Uribe Jr., Juana Maribel Escareno, Graciela Torres, Kassandra Torres, Diego Torres, Graciela Pineda, Serafin Rios, Jair de la Cruz, Norma de la Cruz, Julia de la Cruz, Juan Jose de la Cruz, Kevin de la Cruz, Lorena Paredes, Jose Refugio Paredes, Amanda Paredes, Alondra Paredes, Jose Paredes, Jorge Enrique Perez Sr., Florentina Perez (adult), Florentina Perez (child), Isela Perez, Jorge Enrique Perez Jr., Sergio Duran, Alberto Duran Pineda, Joel Rico Duran, Maria Marisol Rico Duran, Joel Rico Duran Jr., Jesus Rico Duran, Maria M. Hernandez, Jesus Uribe, Manuel Uribe Palacios, Juana Soto Uribe, Imelda Uribe, Jose Manuel Uribe, Raquel Uribe, Jose Adrian Moreno, Ismael Torres, Jessica Perez, and Jose Martin Uribe.

Shortly thereafter, the Town received a second telephone call from a neighbor of the Durans complaining about the party. DeCianni responded to the call from the police radio dispatcher by returning to the Durans' home. At this time there were approximately eighty or ninety people at the party. When DeCianni arrived, people in the front yard began arguing with him. Alejandro Duran argued that the music was not too loud and stated that he had a right to have guests at his house. DeCianni radioed the dispatcher and asked for additional officers to come to the house, stating that the owner was being uncooperative.

Officer Michael McMahon was sent to the house. He became involved in arguments with the party guests as well, so DeCianni radioed the dispatcher to send a supervisor and other officers because people were "getting unruly." Officer Anthony Lewandowski arrived in a police wagon, followed by Officers David Richert and Jason Stroud, then Officers Dino Vitalo and Rhonda Gross, and then Sergeant Thomas Krummick (the aforementioned supervisor). In front of the house, several verbal confrontations occurred between the officers and the party guests, some of whom had moved from the back yard to the front yard. There is no dispute that there was shouting and use of profanities by both the officers and the party

guests;[3] however, it is disputed whether the officers or the party guests were the aggressors.

According to DeCianni, Gonzalo Duran threw a can at him, and DeCianni so informed Krummick upon his arrival. A short time later, Gross yelled into her police radio that "all units" should come to the scene immediately. The dispatcher stated that there was an emergency and called for every Town officer to go to the Durans' home, in addition to requesting assistance from the Berwyn and Chicago police departments for a "gang fight." (When and by whom the term "gang fight" was first used is unclear.) At some point, Officer Cruz returned to the home, and others arrived: Detective Attilio Fiordirosa and Officers Rudy Sirgedas, Michael Kirby, Scott Harris, William Peslak, Miguel Jimenez, and Thomas Kratochvil, as well as other officers who are not defendants in this case.

The situation escalated into what the parties have referred to as a "melee" or a "riot." Some plaintiffs claim that they were hit, hit with asps (batons), shoved, knocked down, punched, pushed, kicked, grabbed, and/or that they had food thrown at them by the officers. Many plaintiffs contend that they were sprayed with

---

[3] For example, there is evidence from plaintiffs that the officers called them "Mexican shit," "fucking cowboys," and "fucking Mexicans." There is also evidence from defendants that plaintiffs told the officers to "get the fuck out of here," "leave us the fuck alone," and "this is our fucking home."

pepper spray[4] and that officers "verbally abused" them with, among other things, ethnic slurs. Many plaintiffs also contend that they were forced into the Durans' home and that pepper spray was then sprayed into the home.

The officers maintain that they were attempting to control and calm an angry crowd--not just the party guests, but also various neighbors of the Durans who had come out of their houses into the street. Various officers concede that they used their asps and pepper spray but argue that it was for the purpose of controlling plaintiffs who were attacking, biting, resisting, and struggling with them. Defendants concede that the officers were trying to direct party guests into the house but dispute that any officer sprayed pepper spray directly into the house. The discrete confrontations between plaintiffs and the officers are too numerous to describe here. Instead, we will set forth the relevant facts where necessary <u>infra</u> in our discussion.

There are two existing videos of some of the events.[5] One was filmed by Onofre Barajas, a neighbor who lived across the street from the Durans. Barajas was sitting outside on his front porch when the officers arrived at the Durans' home. After the officers

---

[4] The parties use the terms "pepper spray" and "mace" interchangeably to refer to one substance that was used by police officers at the Durans' home. We will use the term "pepper spray" because that is the term that the officers themselves use in their deposition testimony, and, unless it becomes an issue, we will assume their terminology is accurate.

[5] According to plaintiffs, at least one other videotape was confiscated by the officers, and defendants failed to preserve it.

told neighbors and onlookers to go inside their homes, Barajas went inside and then began videotaping, from his window, the events occurring outside on the street, on the sidewalk, and in the Durans' front yard. The video is of insufficient quality or brightness to discern much detail other than the fact that there was a lot of activity and people milling about. It depicts a number of squad cars arriving at the home and several officers coming into the yard, where there were several party guests. At one point officers can be seen directing people into the back yard alongside the house, and someone can be heard shouting, "Move! Move! Move! Move! Let's go! Move!" There is a lot of shouting, screaming, and use of profanity; not much can be heard clearly, except for the officers' directions to people to "get inside the house," "get the fuck inside," "get the fuck in the house," "go inside," and "get inside the house." Some officers enter the house and then exit again shortly thereafter, some of whom are escorting arrestees.

The other video was filmed by Luis Castaneda, who was the professional videographer hired by the Durans to film the day's events. Most of the video has little relevance because it depicts the baptism and the pre-police-arrival party events. The party scenes are of guests eating and drinking in the back yard in the afternoon and evening. At 1:48:11, after a scene of the cake-cutting in the back yard, a scene begins of officers standing

outside the front fence speaking to one of the plaintiffs. Several party guests are standing around in the front yard and on the front porch. It is very noisy, but not many individual sounds can be heard. After about a minute, an officer is overheard telling Castaneda, who is standing on the sidewalk outside the yard, that he must leave. Castaneda gets into his car but continues to film for a couple of minutes (not capturing much of anything but guests on the front porch). At 1:52, Officer Lewandowski opens the car door and demands that Castaneda give him the videotape. Soon thereafter, the tape ends.

After the situation had calmed down somewhat, the officers arrested seven of the plaintiffs--Alejandro Duran, Armando Duran, Adolfo Duran, Gonzalo Duran, Joel Uribe, Heriberto Uribe, and Juan Carlos Uribe--and brought them to the Town police station. Armando Duran alleges that the jail keeper at the Cicero police station lockup, defendant Walter Wirack, physically and verbally abused him. It is alleged that Wirack also directed racial slurs at the other plaintiffs who had been taken to the jail.

Juan Carlos Uribe was released (evidently without being charged), and while criminal misdemeanor complaints were signed against Heriberto Uribe and Joel Uribe for obstructing a peace officer, plaintiffs state that those charges were not prosecuted. The four Durans, however, were prosecuted on charges of battery and

obstructing or resisting a peace officer; the case was tried to a jury, and they were found not guilty.

The complaint in this case has gone through several incarnations. The current complaint on file is the Fourth Amended Complaint, which alleges the following claims: § 1983 excessive force, false arrest, and denial of equal protection, brought by all plaintiffs against the individual defendants (Counts I-III); a Monell policy claim brought by all plaintiffs against the Town (Count IV); violation of the Illinois Hate Crime Act, brought by all plaintiffs (except for Alberto Duran Pineda, Sergio Duran, Joel Rico Duran, Maria Marisol Rico Duran, and Maria M. Hernandez (the "Pineda Group")) against all defendants (Count V); malicious prosecution, brought by plaintiffs Alejandro Duran, Armando Duran, Adolfo Duran, Gonzalo Duran, Heriberto Uribe Sr., Joel Uribe, and Juan Carlos Uribe against the individual defendants (Count VI); battery and intentional infliction of emotional distress, brought by all plaintiffs except the Pineda Group against the individual defendants (Counts VII and VIII); spoliation of evidence and respondeat superior claims, brought by all plaintiffs except the Pineda Group against the Town (Counts IX and X); and an indemnification claim brought by all plaintiffs against the Town (Count XI). Plaintiffs seek compensatory and punitive damages as well as reasonable attorney's fees and costs.

The individual defendants have filed three motions for summary judgment or partial summary judgment, which we now discuss. Two of the motions refer to plaintiffs in certain "groups" on the "List of Potential Trial Plaintiffs and Defendants" (the "List"). The List was created by defendants at the court's request in order to simplify the analysis of summary judgment motions. The List divides the plaintiffs into four Groups that have claims against corresponding individual defendants. Group I consists of plaintiffs who claim they were inside the Durans' house and experienced ill effects from the pepper spray allegedly sprayed by Officers DeCianni and Peslak. Group II consists of plaintiffs who claim that they were inside the yard and were sprayed and defendants who were initially gathered outside the yard and are alleged to have used pepper spray, regardless of whether it can be shown which plaintiff they sprayed. Group III consists of plaintiffs who claim that they were assaulted by a particular defendant in some manner other than the use of pepper spray and the corresponding defendants. Group IV consists of plaintiffs who claim false arrest and the defendants alleged to have caused the arrests.

Prior to defendants' filing of the List, plaintiffs had filed two Tables: "Plaintiffs' Table of Plaintiffs and the Defendants Responsible for Certain of Plaintiffs' Injuries" and "Plaintiffs' Table of Defendants and the Plaintiffs They Damaged." The Tables

further clarify plaintiffs' claims by specifying exactly which plaintiffs are pursuing exactly which claims against the individual defendants. We will refer to some of the details of the Tables where appropriate.

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

We will first address the status of the briefing of defendants' motions. Defendants' current summary judgment motions were filed in October 2004. Plaintiffs then filed a motion to strike defendants' motions on the ground that the briefs were too voluminous. We denied that motion and told plaintiffs they could

file one response to all the motions (if they wished), the length of which would not be limited. We indicated that plaintiffs' counsel should use whatever format they believed would render their responses most intelligible to the court. We set a February 18, 2005 due date for plaintiffs' responsive brief or briefs.

Thereafter, plaintiffs moved three times for extensions of time to submit their responses. In view of the complicated nature of the case and the multiple issues involved, each motion was granted. The latest due date for the response was June 30, 2005. That date passed without any brief from plaintiffs, and no motion for another extension of time was filed. In early August 2005, chambers staff contacted plaintiffs' counsel, who indicated that plaintiffs intended to move for another extension of time. Chambers staff informed plaintiffs' counsel that the next date the court would be hearing motions would be September 7, 2005, and that the motion for an extension of time should be noticed for that date. September 7 passed without a motion being filed by plaintiffs, as well as our next three motion hearings on September 14, 21, and 28, 2005.

We have gone out of our way to give plaintiffs every opportunity to respond meaningfully to the motions, and they have failed to do so. A district court is entitled to, and indeed must, enforce its deadlines, and it has substantial discretion to manage its docket. See Reales v. Consolidated Rail Corp., 84 F.3d 993,

996 (7th Cir. 1996) (holding that district court did not abuse its discretion in denying plaintiffs a fourth extension of time to respond to summary judgment motion and in proceeding to decision on summary judgment).

Thus, we will now consider the substance of defendants' motions without the benefit of a submission by plaintiffs. Of course, we will fully analyze the merits of defendants' motions before deciding them. See Fed. R. Civ. P. 56(e) (providing that if an adverse party does not respond to a motion for summary judgment, "summary judgment, if appropriate, shall be entered against the adverse party") (emphasis added)). Because plaintiffs have failed to respond to defendants' motions, those facts asserted in defendants' statement of material facts that have been properly supported with evidence are deemed admitted. See N.D. Ill. Local Rule 56.1(b); Waldridge v. American Hoechst Corp., 24 F.3d 918, 922-24 (7th Cir. 1994).

## A. Motion for Summary Judgment on Behalf of Robert DeCianni and William Peslak with Respect to Plaintiffs on List One[6]

The Group I plaintiffs allege that they were inside the house and experienced ill effects from the pepper spray that was purportedly sprayed into the back door of the Durans' house.[7]

---

[6] We will refer to this motion as "Motion No. 1." It is technically a motion for "partial" summary judgment because the arguments do not go to every count of the complaint.

[7] The thirty-four "Group I" plaintiffs are Alejandro Duran, Maria Concepcion Duran, Jaquelin Duran, Armando Duran Jr., Yonathan Duran, Adolfo Duran, Adolfo Duran Jr., Gonzalo Duran Jr., Alma Rodriguez, Ana Rodriguez, Kathy

Officers DeCianni and Peslak move for summary judgment on their claims for resulting injuries.

1.  **Affidavits**

The Officers' first argument is that they are entitled to summary judgment on the facts.  The evidence that DeCianni sprayed into the house comes from a single plaintiff, Jose Refugio Paredes (who is not one of the Group I plaintiffs).  Similarly, the evidence that Peslak sprayed into the house comes from a single plaintiff, Maria Alicia Moreno (who is also not one of the Group I plaintiffs).  No other plaintiff can identify any particular officer as having sprayed into the house.  We will refer to Jose Refugio Paredes as "Paredes" and to Maria Alicia Moreno as "Moreno" in this section for convenience.

The evidence from Paredes and Moreno comes from the affidavits that were filed by several plaintiffs after defendants filed the first round of summary judgment briefs.[8]  Over defendants' objection, we permitted those affidavits to be filed, and we denied defendants' subsequent motions to strike the affidavits.  DeCianni and Peslak contend that the statements in the affidavits of Paredes

---

Bonilla, Edwin Pineda, Florina Pineda, Joel Uribe, Esther Meraz, Heriberto Uribe Sr., Juan Carlos Uribe, Dudbeth Uribe, Heriberto Uribe Jr., Juana Maribel Escareno, Serafin Rios, Norma de la Cruz, Julia de la Cruz, Kevin de la Cruz, Sergio Duran, Jesus Rico Duran, Maria M. Hernandez, Jesus Uribe, Manuel Uribe Palacios, Juana Soto Uribe, Imelda Uribe, Jose Adrian Moreno, Ismael Torres, and Jose Martin Uribe.

[8]/  The first round of briefing did not result in a ruling, for procedural reasons which we need not recount at this time.

and Moreno should not be allowed to create genuine issues of fact on summary judgment because they contradict prior testimony in interrogatories (Paredes) and at deposition (Moreno).

The Seventh Circuit has "long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior" sworn statements. Bank of Illinois v. Allied Signal Safety Restraint Sys., 75 F.3d 1162, 1168 (7th Cir. 1996). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Id. at 1170 (quoting Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984)). The rule "serve[s] an important purpose of weeding out non-meritorious claims for which a trial is not necessary. . . . [but] must be applied with caution." Flannery v. Recording Indus. Ass'n of Am., 354 F.3d 632, 638 (7th Cir. 2004). In light of the jury's role in resolving questions of credibility,

> A definite distinction must be made between discrepancies
> which create transparent shams and discrepancies which
> create an issue of credibility or go to the weight of the
> evidence. . . . To allow every failure of memory or
> variation in a witness's testimony to be disregarded as
> a sham would require far too much from lay witnesses and
> would deprive the trier of fact of the traditional
> opportunity to determine which point in time and with
> which words the witness . . . was stating the truth.
> Variations in a witness's testimony and any failure of

memory throughout the course of discovery create an issue
of credibility as to which part of the testimony should
be given the greatest weight if credited at all.

Bank of Illinois, 75 F.3d at 1169-70 (quoting Tippens v. Celotex

Corp., 805 F.2d 949, 953-54 (11th Cir. 1986)).  Stated a bit

differently, the assessment is "whether a subsequent statement so

squarely contradicts an earlier one as to create only a sham issue

of fact."  Bank of Illinois, 75 F.3d at 1170.  A "contradiction"

exists only when the two statements are "inherently inconsistent"

and not when the later statement merely clarifies an earlier

statement that is ambiguous or confusing or is based on newly

discovered evidence.  See Flannery, 354 F.3d at 638; Bank of

Illinois, 75 F.3d at 1171-72.

We begin with Paredes, whose affidavit states in relevant

part:

> 3.  Defendant Robert DeCianni sprayed me in the face
>     with pepper spray for no reason.  I was holding my
>     son, Jose Paredes, Jr., then age 2, in my arms at
>     the time.  Jose was sprayed with pepper spray.  My
>     daughter, Amanda Paredes, then age 9, was holding
>     onto my leg at the time.  Amanda was sprayed with
>     pepper spray as well.
>
> 4.  I saw Robert DeCianni spray pepper spray into the
>     rear door of the Duran home and then close the
>     door.

(Affidavit of Jose Refugio Paredes, Ex. 135 of Plaintiffs' Exhibits

in Support of Plaintiffs' Table of Defendants.)

Defendants assert that Paredes' earlier answers to interrogatories contradict these statements. Defendants point to Interrogatory No. 12 and the answer, which are as follows:

> **INTERROGATORY NO. 12**: Identify each person you claim to be responsible for causing your injury(ies) . . ., and identify with particularly [sic] how each person acted to cause your injury. If you are unable to identify each person by name, provide a description of the individual, . . . and/or the letter of the photograph depicting the person in the photograph reproductions previously supplied in discovery.
>
> **ANSWER:** I was sprayed, but do not recognize who did it. There were many police officers. Plaintiff relies on identification made by other plaintiffs.

(Plaintiff Jose Refugio Paredes's Responses to the Individual Defendants' Interrogatories, Ex. 35 of Plaintiffs' Exhibits in Support of Plaintiffs' Table of Defendants.) Defendants also point to Paredes's answers to interrogatories on behalf of his son and daughter, Jose and Amanda, in which Paredes stated that he did not know who was responsible for Jose and Amanda's injuries and was relying on identification made by other plaintiffs.

According to defendants, at the time the interrogatories were answered, plaintiffs had access to photographs of the officers as well as the two videotapes of the events on September 2, 2000 (in which DeCianni is visible). Moreover, DeCianni had sat for two videotaped depositions. Defendants contend that the "mysterious identification of Officer DeCianni by someone who could not previously identify him, despite having access to photographs, live

testimony and videotape, renders the testimony dubious and of no weight." (Mem. in Support of Motion No. 1 at 5.)

There are two statements in Paredes's affidavit that must be compared to his prior interrogatory answers: (1) DeCianni sprayed him in the face; and (2) DeCianni sprayed into the house and then closed the door. The second statement is really the only statement that is critical to this particular motion; the first statement goes only to Paredes's own claim against DeCianni and not that of the Group I plaintiffs. Nonetheless, we will have to address the first statement in any event, and might as well do so now.

"I was sprayed, but <u>do</u> not recognize who did it" (emphasis added) is a statement that Paredes, <u>at that particular point in time</u>, was unable to identify who sprayed him. Paredes's later identification of DeCianni as having sprayed him in the face does not strike us as being so "inherently inconsistent" with earlier having been unable to identify DeCianni as to constitute a sham. Identification of the officer who injured him is in part a function of Paredes's memory. In <u>Bank of Illinois</u>, the Seventh Circuit warned against "allow[ing] every failure of memory or variation in a witness's testimony to be disregarded as a sham." 75 F.3d at 1170 (quoting <u>Tippens</u>, 805 F.2d at 953). This variation in testimony creates an issue of credibility that defendants will be free to point out at trial, but it does not rise to the level of an

"inherent inconsistency" that requires it to be disregarded on summary judgment.

Paredes's second statement, which is more important for purposes of this motion, is that DeCianni sprayed into the house. Paredes is not one of the Group I plaintiffs, so he does not claim that he was in the house at the time and he does not claim that he himself was injured by this particular act of spraying into the house. Paredes was asked in Interrogatory Number 12 to identify who caused his particular injuries, not the injuries of others. Therefore, his statement that he did not recognize who caused his injuries does not conflict with his statement that he saw DeCianni spray into the rear door of the house and then shut the door. To the extent that defendants contend that the statements conflict simply because Paredes identified DeCianni as doing something in particular whereas earlier he could not identify him at all, our analysis regarding Paredes's first statement applies.

We move on to Moreno, whose affidavit states in pertinent part:

3.   I was in the backyard holding my son, Jose Adrian Moreno, and I was sprayed indirectly with mace. . . .

5.   Thereafter, I saw William Peslak go up the back stairs and I followed him.  I saw William Peslak open the door that enters on the kitchen and spray mace into the kitchen.  I then heard screams. William Peslak turned to me and sprayed me in the face with mace and told me to get out.  I was holding my son, Jose Adrian Moreno, then one year old, in my arms at the time and he was covered with spray.

(Affidavit of Maria Alicia Moreno, Ex. 132 of Plaintiffs' Exhibits in Support of Plaintiffs' Table of Defendants.)

Defendants argue that the affidavit contradicts Moreno's deposition testimony (which was provided through an interpreter), the relevant portion of which is as follows:

> Q.    Now, you said in your interrogatory answers that you were sprayed with pepper spray, is that correct?
>
> A.    Not directly, but from what was there, I got it and also my child did.
>
> . . .
> Q.    You said that you weren't sprayed directly by spray but that you still had the effects of spray, and just because we want the record clear, could you tell us what you meant by that?
>
> A.    Well, I was in the back in the yard with my child. Because my husband was in the front.  He was looking for the other children.  I don't even know how the policemen got directly throwing the tables.
>       I was sitting down giving cake to my child.  The policeman came behind Gonzalo with the spray.  I heard that the people were screaming.  I heard the people saying that they were throwing spray, and they were crying.  And I know they throwed the spray on Gonzalo maybe because they wanted him to fall down.  I don't know.
>       I was able to put my baby with his head in the back.  It didn't fall on my eyes, but it fell--uh-huh--it didn't fall directly.  I closed my eyes.  I went to the side.  If I hadn't covered myself, it would have hit my eyes. . . .  That's how it happened.

(Tr. of Maria Alicia Moreno Dep. at 7-9.)

As with Paredes's affidavit, there are two statements in Moreno's affidavit that must be analyzed separately, and the second statement is more pertinent to the instant motion: (1) Peslak

sprayed her in the face; and (2) Peslak opened the door leading to the kitchen and sprayed into the kitchen.[9]  The first statement squarely contradicts Moreno's earlier deposition testimony.  Moreno was asked if she was sprayed, and she responded, "not directly." When she was again asked what she meant (prefaced by the introductory phrase "you said that you weren't sprayed directly"), she described feeling the effects of pepper spray that had been used in the yard.  Moreno did not say that she was ever sprayed directly in the face, let alone sprayed directly by Peslak. Therefore, the statement that "William Peslak turned to me and sprayed me in the face with mace" will be stricken from Moreno's affidavit and disregarded.

The statement that Peslak sprayed into the kitchen, on the other hand, does not contradict the above-quoted deposition testimony.  It pertains to a completely different subject than the manner in which Moreno was sprayed: what Moreno witnessed that injured <u>others</u>.  Defendants do not point to any follow-up questions they asked Moreno, such as "Did you see anyone else getting sprayed?", and we can find none in the transcript excerpt.

---

[9]/  Defendants frame the issue as having to compare two "stories": "This answer about being indirectly sprayed as she prepared to feed her child cannot possibly be harmonized with the story about following Officer Peslak, watching him spray into the house, and then spraying her directly in the face."  (Mem. in Support of Motion No. 1 at 6.)  We do not believe that the above-cited case law, in which the Seventh Circuit advised application of the sham-issue rule with caution, permits such a sweeping and imprecise comparison.  Comparing "stories" strays too far into the province of the jury--determining credibility and weight of the evidence.  When deciding whether to apply the rule, we analyze specific statements to examine whether there are square contradictions.

Moreno's statement that Peslak opened the door to the kitchen and sprayed into the kitchen will not be stricken.


## 2.  **Qualified Immunity**

Officers DeCianni and Peslak's second argument is that they are entitled to qualified immunity on the excessive force claims for the alleged spraying of pepper spray into the house.  The qualified immunity analysis has two parts.  We consider (1) whether the alleged conduct establishes a constitutional violation; and (2) whether the constitutional standards were "clearly established" at the time of the events.  See Green v. Butler, 420 F.3d 689, 700 (7th Cir. 2005).

As for the "constitutional violation" prong, plaintiffs maintain that the spraying of pepper spray into the house violated the Fourth Amendment.  Defendants argue that the Group I plaintiffs cannot make out a Fourth Amendment claim because they were not seized and that plaintiffs' claims therefore fall under the Fourteenth Amendment.  Plaintiffs have a higher burden under the Fourteenth Amendment analysis because they must prove that the officers' conduct "shocks the conscience"; under the Fourth Amendment, the officers' conduct is assessed by the "objective reasonableness" standard.  See County of Sacramento v. Lewis, 523 U.S. 833 (1998); Graham v. Connor, 490 U.S. 386 (1989).  During

oral argument on defendants' initial motions for summary judgment, we indicated that we were likely to reject defendants' argument that there was no seizure of the Group I plaintiffs and provided our reasoning. Our view has not changed.

Defendants characterize the Group I plaintiffs as falling into three categories: (1) those who were already inside the house when the spraying took place; (2) those who went inside the house when the melee began outside; and (3) those who went inside the house because they heard a police officer tell people to go inside.[10] According to defendants, plaintiffs in the first two categories cannot make out a Fourth Amendment claim because a seizure occurs only when an individual's freedom of movement is terminated by means that are intentionally applied, and neither officer took any action to seize plaintiffs who were already inside the house or who voluntarily went inside the house. (Mem. in Support of Motion No. 1 at 11.) As to the third category of Group I plaintiffs, defendants contend that there is no evidence that DeCianni or Peslak "ordered these Plaintiffs into the house or acted in concert with some other officer who may have ordered the Plaintiffs into the house." (Id.)

A seizure can occur when an officer "by means of physical force or show of authority has in some way restrained the liberty

_____

[10] We would add "or were forced inside" to this third category because of testimony from some plaintiffs that they were not only told to go inside, but were physically forced to go inside.

of a citizen." <u>United States v. Mendenhall</u>, 446 U.S. 544, 552
(1980) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n. 16 (1968)). A
person is "seized" under the Fourth Amendment "only if, in view of
all of the circumstances surrounding the incident, a reasonable
person would have believed that he was not free to leave. Examples
of circumstances that might indicate a seizure, even where the
person did not attempt to leave, would be the threatening presence
of several officers, the display of a weapon by an officer, some
physical touching of the person of the citizen, or the use of
language or tone of voice indicating that compliance with the
officer's request might be compelled." <u>Id.</u> at 554.

Defendants are correct that some of the Group I plaintiffs
were already inside the Durans' home before the officers arrived.
There is evidence that when the officers arrived, several
additional plaintiffs who were outside in the yard were told by
officers to "get inside the house" and "get the fuck inside."
Those commands can be heard on the Barajas videotape. At the time,
there were numerous police officers in the yard, outside the yard,
alongside the house, and entering and exiting the house. In
addition, several plaintiffs, including Juan Carlos Uribe Pineda
and Joel Uribe, testified at deposition that they were told to "get
the fuck inside" and that they complied by going inside. Alejandro
Duran testified at deposition that an officer or officers told
several plaintiffs to go inside, that the plaintiffs did not want

to go inside, and that the officers pushed people into the house.
(Tr. of Alejandro Duran Dep. at 123.)  Other plaintiffs, including
Jesus Uribe, Juana Soto, and Serafin Rios, state in their
affidavits that they were pushed or forced inside the house by
officers.  Officer Miguel Jimenez testified that after he arrived
at the scene and went up the front stairs to the porch, he heard
other officers "asking" people to go inside, and that several
plaintiffs complied.  (Tr. of Miguel Jimenez Dep. at 11-12.)

Once the officers managed to get some of the plaintiffs into
the house, there is evidence that everyone who was inside the house
was instructed to stay in the house.  (Tr. of Alejandro Duran Dep.
at 123; Tr. of Adolfo Duran Dep. at 62.)  Several Group I
plaintiffs (Alejandro Duran, Alma Rodriguez, Juan Carlos Uribe
Pineda, and Heriberto Uribe Sr.) testified at deposition that
shortly thereafter, pepper spray was then sprayed under the back
door.  As discussed <u>supra</u>, Jose Refugio Paredes and Maria Alicia
Moreno have stated in their affidavits that they saw DeCianni and
Peslak spray into the back door (and, in DeCianni's case, then shut
the door).

We have no doubt that those plaintiffs who were ordered or
forced inside the house were seized.  Their liberty was restrained,
and there is evidence that several of the <u>Mendenhall</u> factors were
present: the threatening presence of numerous police officers; the
physical pushing of some of the plaintiffs into the house; and the

officers' use of a tone of voice and profanity, which indicated that compliance with their orders might be compelled.

Furthermore, given the existence of evidence that the Group I plaintiffs were instructed by officers to <u>remain</u> inside the house, whether they were told to go inside or whether they had gone inside earlier of their own accord, there is no need to categorize the Group I plaintiffs into three groups as defendants have done. All of the Group I plaintiffs were seized when they were told to stay inside, regardless of how the plaintiffs got there. The plaintiffs who had already been in the house likely could hear what was going on outside and could see what was happening with the plaintiffs who were ordered inside. In view of all the circumstances, a reasonable person in the plaintiffs' shoes would not have believed that he or she was free to leave the house. We are not persuaded by defendants' contention that the Group I plaintiffs were "just being moved away from the scene." (Mem. in Support of Motion No. 1 at 12.) The interior of the Duran house was <u>part</u> of the "scene."

The spraying of pepper spray into the house, a small, enclosed space, constituted another seizure. It was another means of physical force and a show of authority that restricted plaintiffs' movement. <u>See</u> <u>Yelverton v. Vargo</u>, Nos. 3:04CV556-T(WO) & 3:04CV562-T(WO), 2005 WL 2179784, at *2 (M.D. Ala. Sept. 7, 2005) (holding that police officer's act of pepper-spraying a suspect constituted a seizure because it was an application of physical

force to restrain movement).  A reasonable jury could conclude from
the evidence that the spraying was for the purpose of keeping the
plaintiffs at bay inside the house.  (Another conclusion could be
that it was a deliberate action intended to cause harm; that
determination would meet the Fourteenth Amendment standard, see
Lewis, 523 U.S. at 848.)  There is evidence that, after the
spraying, the plaintiffs did not leave the house until instructed
by officers to leave or told by officers that they were free to
leave.

Alternatively, the spraying of pepper spray into the house
could be characterized as an act of force that occurred during a
seizure and thus still must be evaluated under the Fourth
Amendment.  Defendants contend that there is no evidence that
DeCianni or Peslak themselves ordered anyone into the house or knew
that other officers had ordered people inside the house.  However,
viewing the evidence in the light most favorable to plaintiffs, a
reasonable jury could conclude that the officers were aware that
the Group I plaintiffs had been ordered into the house.  At least
one plaintiff, Alma Rodriguez, states that Peslak and DeCianni were
present when she was pushed into the house.

We conclude that plaintiffs have made a showing that the
spraying of the Group I plaintiffs with pepper spray occurred in
the context of a seizure and constituted a violation of the Fourth
Amendment.

DeCianni and Peslak contend that even if plaintiffs' allegations, if true, establish a constitutional violation, there was no violation of a clearly established right. (Or, in other words, it would not be clear to the reasonable officer that his conduct was unlawful.) Defendants assert that "there is no clearly established law that spraying pepper spray in the doorway to deter egress during a riot violates the Fourteenth Amendment." (Mem. in Support of Motion No. 1 at 15.)

First, we are analyzing plaintiffs' claim under the Fourth Amendment, not the Fourteenth, so defendants' conduct is evaluated for objective reasonableness. Moreover, defendants' framing of the "clearly established law" inquiry is much too narrow. (Defendants' characterization of the events as a "riot," moreover, would likely be disputed by plaintiffs.) "The salient question is not whether there is a prior case on all fours with the current claim but whether the state of the law at the relevant time gave the defendants fair warning that their treatment of the plaintiff was unconstitutional." Green, 420 F.3d at 701 (7th Cir. 2005) (quoting McGreal v. Ostrov, 368 F.3d 657, 683 (7th Cir. 2004)). At the time of the events in this case, it was clearly established that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." Clash v. Beatty, 77 F.3d 1045, 1048 (7th Cir. 1996). Pepper-spraying is a type of "assault."

A clearly-established constitutional right can be demonstrated not only by pointing to a closely analogous case that established a right to be free from the type of force the police officers used on plaintiffs, but also by "showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." Id. Here, the facts could support a finding that defendants used plainly excessive force by assaulting plaintiffs with pepper spray without justification (when those plaintiffs were confined in the house and not provoking the officers). Under the facts, there was no reason for the officers to believe that spraying into the house was justified. We therefore conclude that Officers DeCianni and Peslak are not shielded by qualified immunity from the Group I plaintiffs' claim of excessive force in spraying into the Durans' house.

**B.    Motion for Summary Judgment on Behalf of Individual Police Officer Defendants with Respect to Plaintiffs on List Two**

Ten officers--Dino Vitalo, Waldemar Cruz, Robert DeCianni, Michael McMahon, David Richert, Jason Stroud, Rhonda Gross, Anthony Lewandowski, Thomas Krummick, and Scott Harris--move for summary judgment on the "failure to intervene" claim of the Group II plaintiffs. (These are the all of the defendants against whom the Group II plaintiffs assert failure to intervene claims, see Plaintiffs' Table of Defendants and the Plaintiffs They Damaged.) The Group II plaintiffs--Alejandro Duran, Anna Maria Duran, Gonzalo

Duran, Luz Maria Pineda, Ana Rodriguez, Lisbeth Moreno, Ruben
Pineda, Silvia Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda,
Lorena Paredes, Jorge Enrique Perez, Sr., and Armando Duran--are
those who claim that they were pepper-sprayed when officers first
entered the yard of the Durans' home.  The Group II plaintiffs
allege that they were sprayed, but they cannot identify their
assailant; the Group II defendants are those officers who were in
the yard.

     "An officer who is present and fails to intervene to prevent
other law enforcement officers from infringing the constitutional
rights of citizens is liable under § 1983 if that officer had
reason to know: (1) that excessive force was being used, (2) that
a citizen has been unjustifiably arrested, or (3) that any
constitutional violation has been committed by a law enforcement
official; and the officer had a realistic opportunity to intervene
to prevent the harm from occurring." Yang v. Hardin, 37 F.3d 282,
285 (7th Cir. 1994).

     Defendants contend that the only evidence is that they were in
the vicinity when alleged constitutional violations were taking
place and that there is no evidence that any of them were in a
position to prevent the violations from occurring.  Defendants
point out that the front yard of the Durans' home is extremely
small and was teeming with people--as many as seven police officers
and over twenty party guests--which makes it even less likely that

any officer was in a position to know that another officer was infringing or about to infringe one of the plaintiffs' constitutional rights and had a realistic opportunity to intervene to prevent the harm from occurring.

As with DeCianni & Peslak's motion, we previously indicated to the parties our view of this argument. We agree with defendants. We recognize that the intervention issue is generally an issue for the jury, see <u>Lanigan v. Village of East Hazel Crest</u>, 110 F.3d 467, 478 (7th Cir. 1997), but the lack of evidence here (considering that we are treating defendants' statement of material facts as having been admitted) is such that no reasonable jury could conclude that any particular one of these officers had a realistic ability and opportunity to intervene to prevent any particular alleged spraying. There is no evidence that any of the spraying of any plaintiff occurred for anything other than a very short period of time--seconds--which reduces the window of time available for a reasonable opportunity to intervene to almost none. More importantly, there is no evidence regarding exactly where any given officer was positioned when a particular plaintiff was purportedly sprayed. There simply is no evidence regarding <u>who</u> failed to intervene with respect to <u>whom</u>.

The Group II defendants are entitled to summary judgment on the Group II plaintiffs' failure to intervene theory.

**C.  Motions of Individual Police Officer
    <u>Defendants for Partial Summary Judgment</u>**

Each of the individual police officers moves for summary judgment on certain claims which, in their view, are insufficient to be tried and/or on which they argue qualified immunity applies.[11] The following claims of the Fourth Amended Complaint are asserted against the individual defendants: Counts I (excessive force), II (false arrest), III (equal protection), V (Hate Crime Act), VI (malicious prosecution), VII (battery), and VIII (intentional infliction of emotional distress, or IIED).[12] Plaintiffs' Table of Defendants, however, effectively (and considerably) narrows which and whose claims are being asserted against which defendants, and we have relied on that Table.[13] The Table, however, is not part of the Fourth Amended Complaint, which alleges all of the above-listed claims against all of the individual defendants. We still need to make summary judgment determinations regarding those claims.

Plaintiffs' Table does not contain a column for claims for violation of the Illinois Hate Crime Act. We are unsure if the omission signifies that plaintiffs intend not to pursue the claim. Giving plaintiffs the benefit of the doubt, and in an abundance of caution, we will examine the evidence regarding the individual

---

[11] Defendant Wirack, the jail keeper, did not file a motion for summary judgment.

[12] Counts IV, IX, X, and XI are brought against the Town only.

[13] Plaintiffs' Table also lists the failure to intervene claims, which we will not mention further because we have already addressed them supra.

defendants' conduct and determine if it creates a genuine issue for trial as to any plaintiff on the Hate Crime Act claims.

Before addressing each of the individual defendants' motions, we will first turn to an issue that applies to all defendants against whom state-law battery and intentional infliction of emotional distress claims are asserted. Defendants maintain that these claims are "odd" in that plaintiffs allege: "The defendants acted in concert with a common purpose and contributed to the same indivisible injuries sustained by plaintiffs." (Fourth Amended Complaint, ¶¶ 157, 162.)

In the court's view, part of this allegation, contained in Counts VII and VIII, must be stricken as immaterial pursuant to Federal Rule of Civil Procedure 12(f).[14] "Immaterial" matter is that which has no essential or important relationship to the claim for relief. See Chicago Printing Co. v. Heidelberg USA, Inc., No. 01 C 3251, 2001 WL 1646567, at *1 (N.D. Ill. Dec. 21, 2001) (Grady, J.). Plaintiffs did not sustain "indivisible injuries"; each individual plaintiff allegedly sustained his or her individual injury allegedly inflicted by one or more particular individual defendants. The allegation that defendants "contributed to the same indivisible injuries sustained by plaintiffs" has no essential relationship to the battery or IIED claims. It constitutes

---

[14]/ Federal Rule of Civil Procedure 12(f) states that "upon the court's own initiative at any time, the court may order stricken from any pleading . . . any redundant, immaterial, impertinent, or scandalous matter."

surplusage that serves only to confuse matters. It is therefore stricken from Paragraphs 157 and 162 of the Fourth Amended Complaint.

As for the "acting in concert" component of the allegation, there is no evidence that the defendants were consciously acting <u>in concert</u> to injure any particular plaintiff. Therefore, summary judgment for the individual defendants and against the plaintiffs will be granted as to the allegations in Paragraphs 157 and 162 (the battery and IIED claims) that defendants "acted in concert with a common purpose."

## 1. **Detective Attilio Fiordirosa**

There is no evidence supporting any plaintiff's claim against Fiordirosa for excessive force, false arrest, denial of equal protection, violation of the Illinois Hate Crime Act, battery, or IIED. Accordingly, summary judgment will be entered in favor of Fiordirosa and against all plaintiffs[15] on Counts I, II, III, V, VII, and VIII.

As for Count VI, malicious prosecution, plaintiffs' Table reflects that only Gonzalo Duran is asserting a claim against Fiordirosa for malicious prosecution. Therefore, summary judgment

---

[15]/ We recognize that, according to the Fourth Amended Complaint, <u>all</u> plaintiffs are not asserting Hate Crime Act, malicious prosecution, battery, and IIED claims (the Pineda Group does not assert Hate Crime Act, battery, or IIED claims, and only seven plaintiffs assert malicious prosecution claims), but we will use the term "all plaintiffs" throughout the opinion to refer to all plaintiffs who assert the particular claim.

will be entered in favor of Fiordirosa and against the other plaintiffs asserting malicious prosecution claims in Count VI.

The elements of a malicious prosecution claim under Illinois law are as follows: (1) plaintiff was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendant instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury. See Reed v. City of Chicago, 77 F.3d 1049, 1051 (7th Cir. 1996).

Gonzalo Duran's testimony is that after he was brought to the police station, he was interrogated in English, which he did not understand, so he just kept saying "yes." He was not advised of his rights in Spanish, nor was a right-to-counsel waiver form provided in Spanish, nor was a translator provided. Detective Fiordirosa and Officer Sirgedas asked him to sign a typed statement (in English) about the evening's events, and Gonzalo signed the statement: "He brought it to me. He told me sign it here, and I did. I didn't see what it said. I don't know how to read English. So why would I read it for. I just signed it. He told me to sign it here, and I did. That's it." (Tr. of Gonzalo Duran Dep. at 127.) (It appears that when Gonzalo says "he," he is referring to Fiordirosa.)

The statement signed by Gonzalo reads in part: "Det's R. Sirgedas/Fiordirosa had the opportunity to interivew [sic] a one

Gonzalo Duran . . . in regards to the incident . . . . Gonzalo stated that he didn't want to be arrested so he pushed [an] officer and then started fighting with him. During the altercation another officer assisted the officer in attempting to place Gonzalo in cuffs. Gonzalo related that that [sic] during the struggle he bit both officers on their arms trying to stop from being arrested." (Individual Defendants' Exhibit WW.)

Thereafter, Gonzalo was prosecuted for battery to and resisting a police officer. The case was tried to a jury, and Gonzalo was found not guilty. It appears that the statement he signed was entered into evidence at the trial; defendants point out that no motion was made to suppress the statement. At the trial, Gonzalo testified. Among other things, he stated that he struggled with two officers and that he bit one of the officers. (He denies biting the other officer.)

Fiordirosa was not the arresting officer, nor did he testify at the criminal trial. The battery was alleged to have been committed on another officer or officers, so Fiordirosa was not the complainant. He is simply alleged to have told Gonzalo to sign a statement containing admissions, which Gonzalo claims he signed without reading. Plaintiffs characterize the conduct as having "drafted a false confession" and "fraudulently inducing" or "coercing" Gonzalo to sign it. In light of Gonzalo's testimony at the criminal trial, the only relevant parts of the statement that

could be "false" are the admissions of pushing an officer and
biting one of the officers.

Even assuming that Gonzalo has demonstrated evidence of a
"false confession," though, there is no evidence that the statement
was "coerced" or "fraudulently induced." The fact of custody alone
"has never been enough in itself to demonstrate a coerced
confession." United States v. Bernitt, 392 F.3d 873, 877 (7th Cir.
2004). And there is no evidence that Fiordirosa physically or
psychologically pressured Gonzalo to sign the statement or that he
promised Gonzalo anything in exchange for his signature. As for
"fraudulent inducement," we infer that this characterization
somehow refers to the lack of Spanish interpretation or translation
provided to Gonzalo for the waiver-of-counsel form, interrogation,
and the typed statement. There is no evidence that Gonzalo asked
for such services, though, or even that he told Fiordirosa that he
did not understand the waiver form, the questioning, or what had
been typed on the statement form.

Even if Gonzalo could demonstrate a genuine issue that his
statement was coerced, "it is not clear that coercing a confession
constitutes malicious prosecution on the part of the police.
Prosecutors prosecute; police and detectives may participate in the
prosecution, but they do not engineer the proceedings." Sneed v.
Rybicki, 146 F.3d 478, 481 (7th Cir. 1998) (citation omitted).

There is insufficient evidence to demonstrate a genuine issue of material fact as to whether Fiordirosa "instituted or continued judicial proceedings" at all, let alone maliciously. Accordingly, summary judgment in favor of Fiordirosa and against Gonzalo Duran on Count VI will be granted.

### 2.  Officer Rudy Sirgedas

There is no evidence supporting any plaintiff's claim against Sirgedas for false arrest, denial of equal protection, or violation of the Illinois Hate Crime Act. Accordingly, summary judgment will be entered in favor of Sirgedas and against all plaintiffs on Counts II, III, and V.

According to plaintiffs' Table, only Gonzalo Duran is asserting claims for excessive force, malicious prosecution, battery, and IIED against Sirgedas. Summary judgment will therefore be entered in favor of Sirgedas and against all other plaintiffs on Counts I, VI, VII, and VIII.

The evidence regarding the force Sirgedas used on Gonzalo Duran comes entirely from Sirgedas himself. Sirgedas testified that after he arrived at the Durans' home, he heard Officer DeCianni tell Officer Vitalo that Gonzalo Duran had to be arrested. From the limited deposition transcript excerpts we have been provided, it is difficult to tell exactly what Sirgedas saw or did next. Thereafter, when Vitalo "attempted to place Gonzalo Duran into custody," Gonzalo "got on top of Officer Vitalo and started

kicking him, punching him." Sirgedas then tried to help Vitalo by hitting Gonzalo's leg once with his asp and by punching Gonzalo once in the head with a closed fist before handcuffing Gonzalo. (Tr. of Rudy Sirgedas Dep. at 25, 28, 39-40.)

As noted supra, at his criminal trial, Gonzalo admitted that he was aware that certain officers wanted to arrest him and that he "walked fast" into the back yard to get away from them. Gonzalo admitted that he struggled with two officers (apparently Vitalo and DeCianni). Gonzalo denies that he bit Vitalo, but admits that he bit DeCianni because DeCianni was choking him and he could not breathe. Evidently, Gonzalo also denies that he hit or kicked Vitalo.

Sirgedas argues that he is entitled to qualified immunity on Gonzalo's excessive force claim. Sirgedas apparently concedes that Gonzalo was seized and that Sirgedas's conduct is thus evaluated under the Fourth Amendment "objective reasonableness" standard. The Fourth Amendment standard for an excessive force claim requires a jury to decide whether the force used was objectively reasonable without regard to the officer's underlying intent or motivation. Graham, 490 U.S. at 397. "In excessive force claims, the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving-- about the amount of force that is necessary in a particular

situation." <u>Abdullahi v. City of Madison</u>, No. 04-4114, 2005 WL
2179827, at *5 (7th Cir. 2005) (citation omitted). The
reasonableness of a particular use of force must be judged from the
perspective of a reasonable officer on the scene, rather than in
hindsight. <u>Id.</u> at *5.

Sirgedas admits that he hit Gonzalo in the leg with an asp and
punched Gonzalo in the head with a closed fist. Gonzalo does not
admit that he resisted arrest to the extent described by the
officers involved, but he does admit that when he realized that
officers wanted to arrest him, he evaded them by walking away and
then struggled with officers and bit one of them when they were
attempting to arrest him. Gonzalo's position, though, is that
there was no probable cause to arrest him or use force against him
in the first place.

"[S]ince the <u>Graham</u> reasonableness inquiry nearly always
requires a jury to sift through disputed factual contentions, and
to draw inferences therefrom . . . summary judgment or judgment as
a matter of law in excessive force cases should be granted
sparingly." <u>Abdullahi</u>, 2005 WL 2179827, at *9 (citation omitted).
Here, the factual particulars of the struggle require determination
and are not entirely clear to us because we have not been provided
all of Sirgedas's testimony. We do not agree with Sirgedas's
argument that "there are enough undisputed material facts to
justify the officer's conduct objectively." (Sirgedas's Memorandum

at 3.)  The nature of Sirgedas's use of force--in particular his admitted punching of Gonzalo in the head with a closed fist-- requires a jury determination of reasonableness.  Viewing the facts in the light most favorable to Gonzalo, we are unable to say that a reasonable jury could not find Sirgedas's conduct to be unreasonable.  Accordingly, Sirgedas's motion for summary judgment will be denied as to Gonzalo Duran's claim for excessive force in Count I.

On Gonzalo's battery claim, Sirgedas maintains that under the Illinois Tort Immunity Act, Gonzalo must show that Sirgedas's conduct was "willful and wanton," i.e., intentional or showing an utter indifference to the safety of others.  In Sirgedas's view, Gonzalo has not made a sufficient showing to go to trial.  We disagree.  This intent can reasonably be inferred from the alleged conduct.  Sirgedas's motion for summary judgment is denied as to Gonzalo Duran's claim for battery in Count VII.

The motion for summary judgment will also be denied as to Gonzalo's claim for IIED in Count VIII.  Sirgedas contends that Moreno does not demonstrate evidence of severe emotional distress. We believe that it can reasonably be inferred from the nature of the alleged conduct that such distress resulted.

That leaves Gonzalo's claim for malicious prosecution.  The evidence on this claim is the same as the evidence on the malicious prosecution claim asserted by Gonzalo against Detective Fiordirosa,

described <u>supra</u>.  For the same reasons expressed <u>supra</u> with respect
to Fiordirosa, there is insufficient evidence to demonstrate a
genuine issue of material fact as to whether Sirgedas "instituted
or continued judicial proceedings" against Gonzalo at all, let
alone maliciously.  Accordingly, summary judgment in favor of
Sirgedas and against Gonzalo Duran on Count VI will be granted.

###    3.    <u>Officer Anthony Lewandowski</u>

There is no evidence supporting any plaintiff's claim against
Lewandowski for false arrest, denial of equal protection, or
malicious prosecution.  Accordingly, summary judgment will be
entered in favor of Lewandowski and against all plaintiffs on
Counts II, III, and VI.

Summary judgment will also be entered in favor of Lewandowski
and against all plaintiffs except for Florina Pineda, Manuel Uribe
Palacios, and Raquel Uribe on Counts I, V, VII, and VIII because
there is no evidence supporting these claims.

According to plaintiffs' Table, there is evidence supporting
excessive force, battery, and intentional infliction of emotional
distress (IIED) claims against Lewandowski by plaintiffs Florina
Pineda, Manuel Uribe Palacios, and Raquel Uribe.  The Table does
not have a column relating to the claim in Count V for violation of
the Illinois Hate Crime Act, but that count alleges that the
individual defendants "did commit an assault and battery upon
plaintiffs by reason of their ethnicity."  (Fourth Amended

Complaint, ¶ 144.)  Because a battery claim is being asserted by these plaintiffs against Lewandowski, we will presume that the Hate Crime Act claim is being asserted as well.

Raquel Uribe states in her affidavit in pertinent part:

> 4.    Thomas Krummick entered the house with Dino Vitalo, Anthony Lewandowski and other officers.  Dino Vitalo and Anthony Lewandowski sprayed me, my mother, Florina Pineda, my father, Manuel Uribe Sr., with pepper spray.

(Affidavit of Raquel Uribe, Ex. 156 of Plaintiffs' Exhibits in Support of Plaintiffs' Table of Defendants.)

Lewandowski contends that Raquel Uribe's affidavit should be disregarded because in her earlier answers to interrogatories, when asked to identify each person she claimed to be responsible for her injuries, Uribe stated that she relied on identification made by other plaintiffs.  As with the affidavit of Jose Refugio Paredes, the statement in Uribe's affidavit is not a square contradiction of her earlier reliance on other plaintiffs' identification.  Rather, it goes to her credibility and the weight of the evidence. Lewandowski's argument is rejected.

Lewandowski also argues that the affidavit is a contradiction of a "judicial admission" made in the first round of summary judgment briefing.  This argument is also rejected.  According to Lewandowski, he "had alleged that no Plaintiffs had evidence that he used excessive force that night and they admitted this was true."  (Lewandowski's Memorandum at 4.)  This statement is a

mischaracterization of what was admitted, namely, that no plaintiff who had responded to Interrogatory Number 12, which asked plaintiffs to identify who was responsible for their injuries, had identified Lewandowski, and that no plaintiff had testified at deposition and had identified Lewandowski as having used excessive force. Defendants did not ask plaintiffs to admit that "no plaintiffs had evidence that [Lewandowski] used excessive force that night," and plaintiffs made no such admission.

The affidavit of Raquel Uribe is evidence creating a genuine issue of material fact on the claims of plaintiffs Florina Pineda, Manuel Uribe Palacios, and Raquel Uribe against Anthony Lewandowski for excessive force and battery. Lewandowski contends that battery requires proof of intent to cause harm and that there is no evidence of such intent. However, we believe that a reasonable jury could infer the intent from the alleged conduct. Therefore, Lewandowski's motion for summary judgment is denied as to those plaintiffs on Counts I and VII.

To demonstrate a violation of the Illinois Hate Crime Act, 720 ILCS 5/12-7.1, plaintiffs must show that the alleged battery was committed by reason of their, inter alia, race, color, creed, ancestry, or national origin. (Plaintiffs allege that it was by reason of their "ethnicity," which could encompass any of these concepts. We will refer to "ethnicity" for simplicity.) There is no evidence that the purported battery by Lewandowski on these

three plaintiffs was motivated by plaintiffs' ethnicity; there is no evidence that Lewandowski used racial slurs or otherwise referred to plaintiffs' ethnicity (as other defendants are alleged to have done). Summary judgment in favor of Lewandowski and against plaintiffs Florina Pineda, Manuel Uribe Palacios, and Raquel Uribe on the Hate Crime Act claim will be granted.

Florina, Manuel, and Raquel also claim IIED against Lewandowski. The elements of an intentional infliction of emotional distress claim under Illinois law are: (1) extreme and outrageous conduct by the defendant; (2) the defendant's intent for his conduct to inflict severe emotional distress or knowledge that there was a high probability that his conduct would do so; and (3) severe emotional distress caused by the defendant's conduct. See Rekosh v. Parks, 735 N.E.2d 765, 772 (Ill. App. Ct. 2000). Lewandowski asserts that no plaintiff presents evidence of severe emotional distress. We believe that it can reasonably be inferred from the nature of the alleged conduct that such distress resulted. Lewandowski's motion for summary judgment against Florina Pineda, Manuel Uribe Palacios, and Raquel Uribe on Count VIII is thus denied.

### 4. Officer Thomas Kratochvil

There is no evidence supporting any plaintiff's claim against Kratochvil for false arrest, denial of equal protection, or malicious prosecution. Accordingly, summary judgment will be

entered in favor of Kratochvil and against all plaintiffs on Counts II, III, and VI.

Plaintiffs' Table reflects that only Alejandro Duran and Rene Moreno Jr. are asserting claims against Kratochvil for excessive force and battery (and, by inference, for violation of the Illinois Hate Crime Act) and IIED. Thus, summary judgment will be entered in favor of Kratochvil and against all other plaintiffs on Counts I, V, VII, and VIII.

We cannot discern what evidence supports Alejandro Duran's claims against Kratochvil. The only reference to Kratochvil in Alejandro Duran's Statement of Facts in Support of Plaintiffs' Table of Defendants is Eduardo Gudino's testimony that he witnessed Kratochvil "in the entrance to the [Durans'] house--in the entryway, and he was like keeping everybody in the house so they wouldn't get out."[16] (Tr. of Eduardo Gudino Dep. at 24.) (Gudino was not asked a follow-up question regarding what movements Kratochvil was actually making, how he was standing, or why Gudino concluded that he was "keeping everybody in.") This evidence is insufficient to create a genuine issue for trial on Alejandro Duran's claims against Kratochvil. Summary judgment in favor of

---

[16]/ Eduardo Gudino was a neighbor of the Durans and became part of the incident when he went outside with his video camera to see and record what was happening. Plaintiffs' spoliation claim is based in part on their allegation that Gudino's videotape was confiscated by police officers and then lost or destroyed. Gudino is a plaintiff in related litigation against some of the same defendants.

Kratochvil and against Alejandro Duran on Counts I, V, VII, and VIII will be granted.

As for Rene Moreno Jr., he was eleven years old at the time of the incident. He states in his answers to interrogatories and in his affidavit that when he was standing at the bottom of the stairs to the front door, Kratochvil sprayed him in the face with pepper spray--primarily in his eyes-and that Kratochvil would not let him go to an ambulance. Rene Moreno Jr. was not deposed.[17]

This evidence creates a fact issue on Moreno's battery claim. Kratochvil argues that under the Illinois Tort Immunity Act, Moreno must show that Kratochvil's conduct was "willful and wanton," i.e., intentional or showing an utter indifference to the safety of others. In Kratochvil's view, Moreno has not made a sufficient showing to go to trial. We disagree. This intent can reasonably be inferred from the alleged conduct. Kratochvil's motion for summary judgment is denied as to Rene Moreno Jr.'s claim for battery in Count VII.

The motion for summary judgment will also be denied as to Moreno's claim for IIED in Count VIII. Kratochvil contends that Moreno does not demonstrate evidence of severe emotional distress. We believe that it can reasonably be inferred from the nature of the alleged conduct that such distress resulted.

---

[17]/ We limited defendants to taking twenty depositions.

The evidence does not, however, create an issue of fact on Moreno's Hate Crime Act claim (assuming he is asserting one). There is no evidence that Kratochvil's alleged conduct was motivated by Moreno's ethnicity. Summary judgment in favor of Kratochvil and against Moreno on Count V will be granted.

Kratochvil contends that he is entitled to qualified immunity on Moreno's excessive force claim. We are unpersuaded. The facts alleged, taken in the light most favorable to Moreno, show that Kratochvil violated Moreno's Fourteenth Amendment right to be free from the use of excessive force.[18] Under the Fourteenth Amendment substantive due process standard, we ask whether the alleged conduct "shocks the conscience." Lewis, 523 U.S. at 846. Whether conduct shocks the conscience depends on the particular factual circumstances of the case. "In situations where actual deliberation is possible, conduct that is 'deliberately indifferent' may in certain circumstances 'shock the conscience'; in emergency situations (such as high-speed chases), however, conduct 'shocks the conscience' only if there was intent to cause harm." Carter v. Simpson, 328 F.3d 948, 952 (7th Cir. 2003) (citing Lewis, 523 U.S. at 849). Kratochvil maintains that he was confronted with a "riot," a "rapidly evolving, fluid, and potentially dangerous predicament" and that therefore Moreno must

---

[18]/ Under the facts, Moreno was not seized, so we analyze the excessive force claim under the Fourteenth Amendment rather than the Fourth Amendment.

show "intent to cause harm." (Kratochvil's Memorandum at 5.)

Even assuming that Moreno has the higher burden of demonstrating "intent to cause harm" rather than "deliberate indifference," Kratochvil is not entitled to qualified immunity. Here, we allegedly have an eleven-year-old standing at the foot of the front stairs who was sprayed in the eyes with pepper spray and told he could not seek help from an ambulance. In our view, a reasonable jury could find on these facts that Kratochvil's alleged conduct was done only to cause harm. Accordingly, Kratochvil's motion for summary judgment is denied as to Rene Moreno Jr.'s claim for excessive force in Count I.

### 5.  **Officer David Richert**

There is no evidence supporting any plaintiff's claim against Richert for false arrest or malicious prosecution. Accordingly, summary judgment will be entered in favor of Richert and against all plaintiffs on Counts II and VI.

Plaintiffs' Table reflects that as for excessive force and battery (and, by extrapolation, for violation of the Illinois Hate Crime Act), only Adolfo Duran is asserting a claim against Richert. Therefore, summary judgment will be entered in favor of Richert and against all other plaintiffs on Counts I, V, and VII.

The Table also reflects that only Alejandro Duran and Adolfo Duran are asserting IIED claims against Richert. Summary judgment

will therefore be entered in favor of Richert and against all other plaintiffs on Count VIII.

Adolfo Duran himself did not testify that Richert used force against him. The only evidence cited by Adolfo on his excessive force, battery, and IIED claims against Richert is the testimony of Florentina Perez that Richert was spraying people, but that she could not identify whom he was spraying and that Richert "went to help [Officer Peslak] with Adolfo." (Tr. of Florentina Perez Dep. at 70-71.) (Florentina had testified that Peslak was hitting and kicking Adolfo and put handcuffs on him.) This evidence is insufficient to create a genuine issue of fact that Richert used any force on, or battered, Adolfo (and thus as to whether Richert engaged in conduct that would form a basis for a "hate crime" as defined in the Illinois Hate Crime Act) or engaged in any extreme and outrageous conduct that caused Adolfo emotional distress. Accordingly, summary judgment in favor of Richert and against Adolfo Duran on Counts I, V, VII, and VIII will be granted. In view of our holding, we need not reach Richert's qualified immunity argument.

According to Plaintiffs' Table, Alejandro Duran asserts an IIED claim against Richert. The claim is evidently based on Richert's alleged use of racial slurs. At his deposition, however, Alejandro did not identify Richert as one of the officers who had used racial slurs. Because there is no evidence of conduct by

Richert that would form the basis of an IIED claim, summary judgment for Richert and against Alejandro Duran will be granted on Count VIII.

Plaintiffs' Table states that the remaining claim asserted against Richert is an equal protection claim by plaintiffs Alejandro Duran, Luz Maria Pineda, Lisbeth Moreno, Ruben Pineda, Silvia Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda, Lorena Paredes, and Jorge Enrique Perez Sr. The basis for this claim is unclear. Because these plaintiffs constitute a majority of the Group II plaintiffs, we surmise that it is based on the alleged failure to intervene and/or Richert's alleged use of force on unspecified plaintiffs, in conjunction with the alleged use of racial slurs by some officers. We have granted defendants summary judgment on the failure to intervene claim. Moreover, there is no evidence that Richert used force on any particular person or used any racial slurs. Summary judgment in favor of Richert and against all plaintiffs on the equal protection claim, Count III, will be granted.

### 6. **Officer Jason Stroud**

There is no evidence supporting any plaintiff's claim against Stroud for excessive force, false arrest, violation of the Illinois Hate Crime Act, malicious prosecution, or battery. Accordingly, summary judgment will be entered in favor of Stroud and against all plaintiffs on Counts I, II, V, VI, and VII.

As for denial of equal protection, plaintiffs' Table states that this claim is asserted against Stroud by plaintiffs Alejandro Duran, Luz Maria Pineda, Lisbeth Moreno, Ruben Pineda, Silvia Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda, Serafin Rios, Lorena Paredes, and Jorge Enrique Perez Sr. These plaintiffs were outside in the yard and are the same plaintiffs who assert this claim against Officer Richert, with the addition of Serafin Rios. It appears that the claim is based on Stroud's admission that he used pepper spray on unidentified people and hit unidentified people with his asp. (No witness identifies Stroud as having hit or sprayed particular people.) The claim is evidently also based on Alejandro Duran's testimony that Stroud called him a "Mexican shit" and other plaintiffs in the yard "Mexican shits." (Tr. of Alejandro Duran Dep. at 143.) Because there is no evidence that Stroud hit or sprayed any particular plaintiff, and because we have entered summary judgment for defendants on the failure to intervene claim, there is no factual predicate for an equal protection claim against Stroud. "[D]erogatory references to racial or ethnic background by themselves . . . do not rise to the level of a deprivation of constitutional rights." Bell v. City of Milwaukee, 746 F.2d 1205, 1259 (7th Cir. 1984), overruled on other grounds by Russ v. Watts, 414 F.3d 783 (7th Cir. 2005). Summary judgment for Stroud and against all plaintiffs will be entered on Count III.

The sole plaintiff asserting an IIED claim against Stroud is Alejandro Duran.  Therefore, summary judgment will be entered in favor of Stroud and against all other plaintiffs on Count VIII.

The basis for Alejandro's IIED claim is evidently that Stroud allegedly called him a "Mexican shit."  Given the great show of authority by the officers at the Duran party, whether Stroud's alleged conduct rises to the level of truly "extreme and outrageous" conduct required for an IIED claim under Illinois law is a close question.  See generally Jackson v. Local 705, Int'l Bhd. of Teamsters, No. 95 C 7510, 2002 WL 460841, at *16 (N.D. Ill. Mar. 26, 2002) (discussing IIED claims based on racial slurs and noting that outrageousness must be determined in view of all the facts surrounding use of a slur).  In any event, Alejandro must demonstrate that he suffered severe emotional distress caused by Stroud's alleged conduct.  Unlike the alleged acts of pepper-spraying, we do not believe that severe emotional distress can be inferred simply from the alleged conduct.  Because there is no evidence that Alejandro suffered severe emotional distress as a result of what Stroud allegedly said, summary judgment in favor of Stroud and against Alejandro Duran on Count VIII will be granted.

### 7.  **Officer Scott Harris**

There is no evidence supporting any plaintiff's claim against Harris for denial of equal protection or malicious prosecution.

Accordingly, summary judgment will be entered in favor of Harris and against all plaintiffs on Counts III and VI.

According to plaintiffs' Table, only Armando Duran is asserting claims against Harris for excessive force and battery (and, by extrapolation, for violation of the Illinois Hate Crime Act), false arrest, and IIED.  Therefore, summary judgment will be entered in favor of Harris and against all other plaintiffs on Counts I, II, V, VII, and VIII.

The only evidence cited by Armando Duran in support of his claims against Harris is that Harris testified that he "attempt[ed] to assist" fellow officers in a "scuffle" between officers and party guests that occurred on the front porch by pushing people away from the officers.  (Tr. of Scott Harris Dep. at 15-16, 20.) Plaintiffs do not provide any evidence that Harris, as opposed to other officers, used force on or battered Armando, or any other particular plaintiff, for that matter.  There also no evidence that Harris participated in the arrest of Armando or, for that matter, engaged in any conduct with respect to Armando specifically.[19]  Accordingly, summary judgment for Harris and against Armando Duran will be granted on Counts I, II, V, VII, and VIII.  In view of our holding, we need not reach Harris's qualified immunity argument.

_____

[19]/  Plaintiffs claim that Harris assisted in the arrest of a person on the porch and cite excerpts from Harris's testimony.  This characterization misstates Harris's testimony.

**8. <u>Officer Miguel Jimenez</u>**

There is no evidence supporting any plaintiff's claim against Jimenez for denial of equal protection or malicious prosecution. Accordingly, summary judgment will be entered in favor of Jimenez and against all plaintiffs on Counts III and VI.

According to plaintiffs' Table, only Armando Duran is asserting claims against Jimenez for excessive force and battery (and, by extrapolation, for violation of the Illinois Hate Crime Act), false arrest, and IIED. Therefore, summary judgment will be entered in favor of Jimenez and against all other plaintiffs on Counts I, II, V, VII, and VIII.

As the basis for his claims against Jimenez, Armando Duran relies solely on the testimony of Jimenez and Officer McMahon. The only relevant testimony from Jimenez is that he went up to the front porch of the Duran house after he arrived at the scene, stayed briefly, and then went to the back yard. As for McMahon, he testified at the criminal trial that he was struggling with Armando on the front porch, fell into the front window with Armando, and sprayed Armando with pepper spray. He stated that Officers Jimenez and Kirby were on the front porch with him at the time of this struggle.

This evidence, which is basically that Jimenez was merely on the front porch while McMahon was struggling with Armando, does not create a genuine issue on any of Armando's claims against Jimenez.

There is no evidence that Jimenez engaged in any conduct that would form the basis of an excessive force, battery, violation of the Hate Crime Act, IIED, or false arrest claim. Summary judgment in favor of Jimenez and against Armando Duran will be granted on Counts I, II, V, VII, and VIII.

### 9.  Officer Michael Kirby

There is no evidence supporting any plaintiff's claim against Kirby for denial of equal protection or malicious prosecution. Accordingly, summary judgment will be entered in favor of Kirby and against all plaintiffs on Counts III and VI.

Plaintiffs' Table states that only Armando Duran is asserting claims against Kirby for excessive force and battery (and, by extrapolation, for violation of the Illinois Hate Crime Act), false arrest, and IIED. Therefore, summary judgment will be entered in favor of Kirby and against all other plaintiffs on Counts I, II, V, VII, and VIII.

Armando Duran claims that, like Jimenez, Kirby was on the front porch while McMahon was struggling with him. To the extent Armando's claims are based on this conduct, it does not form a basis for any of the claims, and summary judgment in favor of Kirby and against Armando is appropriate.

Armando alleges that Kirby engaged in additional conduct as well. Kirby testified that during the course of events, he saw a man, identified by others as Armando, throw a beer can at McMahon.

At some point, Armando put his hands on his hips as if he were going to draw a weapon, so Kirby "found cover" by stepping next to a tree and then drew his gun. The man pulled out a cell phone and started laughing, and Kirby then returned his gun to his holster. (Tr. of Michael Kirby Dep. at 43-44.)

Armando's account is different. His testimony is that he yelled, "Why are you doing that?" at one of the officers after Armando's wife was sprayed with pepper spray, and the officer then started following him with pepper spray. Armando then tried to go up the front stairs to go inside the house, and before two other officers handcuffed him, Kirby "told me to raise my hands aiming at me with the gun like this and said put your hands up or I kill you. . . . With his two hands like this, he raised the gun at me. So I raised my hands. I didn't offer resistance of any kind." (Tr. of Armando Duran Dep. at 67.) Armando denies that he threw anything at the officers, had anything in his hands, or reached for anything.

Under Illinois law, a battery is defined as the unauthorized touching of the person of another. See Curtis v. Jaskey, 759 N.E.2d 962, 964 (Ill. App. Ct. 2001). There is no evidence that Kirby touched Armando. Thus, summary judgment in favor of Kirby and against Armando will be granted on Count VII.

To demonstrate a violation of the Hate Crime Act, a simple assault can be shown. However, a plaintiff also has to show that

the assault was committed by reason of another person's ethnicity. There is no evidence that Kirby was so motivated in committing the alleged conduct. Summary judgment in favor of Kirby and against Armando Duran on Count V will therefore be granted.

Viewing the allegations in the light most favorable to Armando, it appears that his testimony is that the gun-pointing occurred in the context of a seizure--that Kirby pointed the gun at him without provocation and then other officers handcuffed and arrested him. He has thus made a showing that Kirby's conduct occurred in the context of a seizure and constituted a violation of the Fourth Amendment. Kirby contends that he is entitled to qualified immunity, but we disagree. At the time of the alleged use of force, it was clearly established that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." Clash, 77 F.3d at 1048. It was also clear that "[a]n officer's use of deadly force to apprehend a suspect is unreasonable, absent probable cause that the suspect is dangerous or has committed a violent crime." McDonald v. Haskins, 966 F.2d 292, 294-95 (7th Cir. 1992). Under this law and the evidence cited by plaintiffs, it was unreasonable for Kirby to have pointed a gun at Armando when Armando was unarmed, had nothing in his hand, and Kirby had no reason to suspect that Armando was a dangerous criminal. We conclude that Kirby is not shielded by qualified immunity from Armando's claim of

excessive use of force. Kirby's motion for summary judgment will be denied as to Armando Duran's claim for excessive force in Count I.

We are left with Armando's IIED claim. Kirby argues that the evidence does not show that Kirby intended to or did cause him severe emotional distress. We believe that it can be inferred from the alleged conduct that severe emotional distress resulted. As for the intent necessary to prove an IIED claim under Illinois law, knowledge "that there was a high probability that" certain conduct would cause severe emotional distress is sufficient. Rekosh, 735 N.E.2d at 772. On the facts as alleged by Armando, we believe that it could be reasonably inferred by a jury that Kirby knew that there was a high probability that his conduct would cause such distress. Kirby's motion for summary judgment on Armando Duran's IIED claim in Count VIII is therefore denied.

Kirby contends in a single sentence that he is entitled to summary judgment on Armando's claim for false arrest, but fails to explain why. Kirby's motion for summary judgment on Armando Duran's false arrest claim in Count II is therefore denied.

## 10. **Officer Rhonda Gross**

There is no evidence supporting any plaintiff's claim against Gross for malicious prosecution. Accordingly, summary judgment will be entered in favor of Gross and against all plaintiffs on Count VI.

Plaintiffs' Table states that the following nine plaintiffs assert excessive force claims against Gross:   Daniel Pineda, Graciela Pineda, Florentina Perez (adult), Florentina Perez (child), Isela Perez, Jorge Enrique Perez Jr., Jessica Perez, Maria Alicia Moreno, and Maria Marisol Rico Duran.   Summary judgment will be entered in favor of Gross and against all other plaintiffs on Count I.

The first seven of the above-listed plaintiffs maintain that Gross (or a female officer, and Gross was evidently the only female officer present) sprayed them with pepper spray without justification.[20]  Maria Alicia Moreno states that when she tried to go into the garage, Gross "pulled" her and ordered her to remain in the back yard and to "shut up, otherwise I'll arrest you."[21]  (Tr. of Maria Alicia Moreno Dep. at 12.)   Maria Marisol Rico Duran asserts that Gross pushed her and yelled at her.

Gross contends that she is entitled to qualified immunity on these excessive force claims.   We are unpersuaded, for the same reasons expressed in our discussion regarding Officer Kratochvil.

_____

[20]/  We reject Gross's argument that we should disregard those statements in plaintiffs' answers to interrogatories simply identifying "a female officer." The evidence is that Gross was the only female officer at the scene.   Therefore, it can reasonably be inferred that those plaintiffs who allege that a female officer sprayed them are alleging that Gross sprayed them.

[21]/   In her answers to interrogatories, Maria Alicia Moreno identified Officers Peslak and Gross as having sprayed her.   However, in her affidavit, Moreno identifies only Peslak as having sprayed her directly, and states that in the yard, she was not sprayed directly but merely felt the effects of pepper spray indirectly.   It does not appear that when deposed, Moreno identified Gross as having sprayed her directly.   Accordingly, we will consider Moreno's prior allegation that Gross sprayed her directly as having been abandoned.

The facts alleged show that plaintiffs' Fourteenth Amendment rights were violated, and plaintiffs must show that Gross's conduct shocked the conscience.[22]  And assuming that plaintiffs must show that Gross intended to cause them harm rather than deliberate indifference, we believe that Gross is not entitled to qualified immunity.  These plaintiffs, who are mostly women and children, were standing the yard, and Gross allegedly sprayed them in the face with pepper spray, or pushed or grabbed them.  In the court's view, a jury could reasonably find on these facts that Gross's conduct was done to cause harm.  Gross's motion for summary judgment is denied as to these plaintiffs' claims for excessive force in Count I.

According to plaintiffs' Table, only these plaintiffs (except for Maria Marisol Rico Duran) are asserting battery and IIED claims against Gross.  Summary judgment will be entered in favor of Gross and against all other plaintiffs on Counts VII and VIII.

On the battery and IIED claims, Gross maintains that this group of eight plaintiffs cannot demonstrate intent to cause harm or that severe emotional distress resulted from her alleged conduct.  We disagree; such intent and such resulting distress can be inferred from the alleged conduct.  Gross's motion for summary

---

[22]/  The facts alleged by Maria Alicia Moreno (that she was "pulled" and ordered to remain in the back yard) may constitute a seizure and thus a Fourth Amendment violation, but we will assume for purposes of analyzing the qualified immunity issue that Moreno can demonstrate only a Fourteenth Amendment violation.

judgment on these plaintiffs' claims for battery and IIED in Counts VII and VIII will be denied.

Daniel Pineda is the only plaintiff asserting an equal protection claim against Gross, and we presume that he is the only plaintiff asserting a Hate Crime Act claim against Gross as well. Summary judgment will be entered in favor of Gross and against all other plaintiffs on Counts III and V.

It appears that Daniel's claim against Gross is not based on anything Gross said, but rather that Officer Vitalo called Daniel a "Mexican motherfucker" and that Gross then sprayed him in the face. We do not believe that <u>Vitalo's</u> alleged comment bears on the motivations of <u>Gross</u>, nor are we aware of any precedent that would allow us to impute the comment to Gross. Summary judgment will be entered in favor of Gross and against Daniel Pineda on Counts III and V.

As for false arrest, only Joel Uribe and Heriberto Uribe Sr. are asserting claims against Gross. Therefore, summary judgment will be entered in favor of Gross and against all other plaintiffs on Count II. Gross does not move for summary judgment on Joel Uribe and Heriberto Uribe Sr.'s false arrest claims.

**11. <u>Officer Waldemar Cruz</u>**

There is no evidence supporting any plaintiff's claim against Cruz for false arrest or malicious prosecution. Accordingly,

summary judgment will be entered in favor of Cruz and against all plaintiffs on Counts II and VI.

Plaintiffs' Table states that the following six plaintiffs assert excessive force claims against Cruz: Gonzalo Duran Jr., Jose Manuel Uribe Jr., Jose Manuel Uribe, Julia de la Cruz, Joel Rico Duran, and Jesus Rico Duran. Summary judgment will be entered in favor of Cruz and against all other plaintiffs on Count I.

All of the above-listed plaintiffs allege that Cruz sprayed them with pepper spray. We are unpersuaded by Cruz's first argument that we should disregard the affidavits of the plaintiffs who allege that Cruz sprayed them. Our analysis of the affidavit of Jose Refugio Paredes, which is discussed <u>supra</u> regarding Motion No. 1, applies. A later identification of Cruz as having sprayed plaintiffs does not strike us as being so "inherently inconsistent" with an earlier inability to identify Cruz as to constitute a sham.

Cruz contends that he is entitled to qualified immunity on the excessive force claims. We reject this argument for the same reasons we rejected Officer Gross's qualified immunity argument. A jury could reasonably find on the facts that Cruz's spraying of plaintiffs was done to cause harm. Cruz's motion for summary judgment is denied as to the above-listed plaintiffs' claims for excessive force in Count I.

The same plaintiffs, except for Joel Rico Duran, are also asserting battery claims against Cruz. Summary judgment will be

entered in favor of Cruz and against all other plaintiffs on Count VII. The same plaintiffs who assert battery claims, with the addition of Alejandro Duran, assert IIED claims against Cruz. Summary judgment will be entered in favor of Cruz and against all other plaintiffs on Count VIII.

With regard to Alejandro Duran's IIED claim, it appears that it is based on Cruz allegedly calling Alejandro a "fucking Mexican" and/or a "Mexican shit." (Tr. of Alejandro Duran Dep. at 142.) Our analysis of Alejandro's IIED claim against Officer Stroud applies to his IIED claim against Cruz. Because there is no evidence that Alejandro suffered severe emotional distress as a result of what Cruz allegedly said, summary judgment in favor of Cruz and against Alejandro Duran on Count VIII will be granted.

Cruz contends that the rest of the plaintiffs who assert battery and IIED claims against him cannot demonstrate intent to cause harm or that severe emotional distress resulted from his alleged conduct. We disagree; such intent and such resulting distress can be inferred from the alleged conduct. Cruz's motion for summary judgment on the above-listed plaintiffs' claims for battery and IIED in Counts VII and VIII will be denied.

Plaintiffs' Table states that the following plaintiffs assert an equal protection claim against Cruz, and we presume that they are the only plaintiffs asserting Hate Crime Act claims against Cruz as well: Alejandro Duran, Gonzalo Duran Jr., Luz Maria

Pineda, Lisbeth Moreno, Ruben Pineda, Silvia Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda, Jose Manuel Uribe Jr., Julia de la Cruz, Lorena Paredes, Jorge Enrique Perez Sr., Joel Rico Duran, Jesus Rico Duran, Manuel Uribe Palacios, and Jose Manuel Uribe. Summary judgment will be entered in favor of Cruz and against all other plaintiffs on Counts III and V.

Alejandro Duran, Luz Maria Pineda, Lisbeth Moreno, Ruben Pineda, Silvia Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda, Lorena Paredes, and Jorge Enrique Perez, Sr. are all Group II plaintiffs. The conduct underlying those plaintiffs' equal protection and Hate Crime Act claims against Cruz is an alleged failure to intervene. We have granted defendants' motion for summary judgment on the failure to intervene claims, so summary judgment in favor of Cruz and against these plaintiffs on Counts III and V will be granted.

That leaves the following plaintiffs with claims against Cruz in Counts III and V: Gonzalo Duran Jr., Jose Manuel Uribe Jr., Julia de la Cruz, Joel Rico Duran, Jesus Rico Duran, Jose Manuel Uribe, and Manuel Uribe Palacios. The conduct underlying the first six plaintiffs' claims is the alleged pepper-spraying. The conduct underlying Manuel's claim is his allegation that he was "sprayed indirectly" with pepper spray; he does not even allege that Cruz was the "sprayer." Accordingly, summary judgment in favor of Cruz and against Manuel Uribe Palacios on Counts III and V is granted.

Regarding the other six plaintiffs, the issue is whether there is evidence from which a reasonable jury could conclude that Cruz allegedly sprayed plaintiffs because of their ethnicity. The only evidence offered by plaintiffs is Alejandro Duran's testimony that Cruz called him a "fucking Mexican" or a "Mexican shit." There is no evidence that the alleged comments were made while Cruz was allegedly pepper-spraying the six plaintiffs or standing by those plaintiffs. The alleged comments directed at Alejandro are not evidence of Cruz's intent regarding his treatment of the other plaintiffs. Accordingly, summary judgment in favor of Cruz and against Gonzalo Duran Jr., Jose Manuel Uribe Jr., Julia de la Cruz, Joel Rico Duran, Jesus Rico Duran, and Jose Manuel Uribe will be granted on Counts III and V.

## 12. **Sergeant Thomas Krummick**

There is no evidence supporting any plaintiff's claim against Krummick for malicious prosecution. Summary judgment will therefore be entered in favor of Krummick and against all plaintiffs on Count VI.

Plaintiffs' Table states that the following fourteen plaintiffs assert excessive force claims against Krummick: Gonzalo Duran, Amada Duran, Concepcion Duran, Kevin Duran, Jaime Duran, Ana Rodriguez, Joel Uribe, Heriberto Uribe Sr., Juan Carlos Uribe, Dudbeth Uribe, Heriberto Uribe Jr., Juana Maribel Escareno, Jesus

Uribe, and Raquel Uribe. Summary judgment will be entered in favor of Krummick and against all other plaintiffs on Count I.

These fourteen plaintiffs are the only plaintiffs asserting equal protection (and presumably Hate Crime Act), battery, and IIED claims against Krummick. Summary judgment in favor of Krummick and against all other plaintiffs will be entered on Counts III, V, VII and VIII.

First, we reject Krummick's arguments that we should disregard various plaintiffs' affidavits because they contradict earlier "judicial admissions" of failing to identify Krummick, in answers to interrogatories, as having caused their injuries. As explained supra, a later identification does not "squarely contradict" an earlier failure to identify.

Seven of the fourteen plaintiffs' claims for excessive force, denial of equal protection, battery, and IIED against Krummick fail because there is no evidence that Krummick used force on these plaintiffs or did anything except tell them to go inside the house. The evidence as to Ana Rodriguez, Joel Uribe, Heriberto Uribe Sr., Juan Carlos Uribe, Dudbeth Uribe, Heriberto Uribe Jr., and Juana Maribel Escareno is that Krummick told them to go inside the house or "get the fuck inside the house." There is no evidence that Krummick touched these plaintiffs in any way or that Krummick knew that, once plaintiffs had gone into the house, any other officer would spray pepper spray into the house. Thus, the evidence is

insufficient to create a factual issue on the excessive force, equal protection, Hate Crime Act, and battery claims. Furthermore, the direction to these plaintiffs to get inside the house does not rise to the level of extreme and outrageous conduct necessary for an IIED claim. Summary judgment in favor of Krummick and against these seven plaintiffs will be entered on Counts I, III, V, VII, and VIII.

Krummick lumps the evidence as to plaintiff Jesus Uribe with the evidence as to the above-listed seven plaintiffs, but Jesus is different in that he alleges that Krummick "pushed" him into the house. A pushing is a sufficient basis for an excessive force claim, and we assume that Krummick would argue that he is entitled to qualified immunity. We would reject such an argument. We have already found that those plaintiffs who were forced inside the house were seized, so Krummick's conduct would be assessed under the objective reasonableness standard. As noted <u>supra</u>, at the time of the events in this case, it was clearly established that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." <u>Clash</u>, 77 F.3d at 1048. Under plaintiff's version of the facts, there was no reason for Krummick to believe that pushing Jesus Uribe into the house was justified. Krummick's motion for summary judgment is denied as to Jesus Uribe's excessive force claim in Count I.

Jesus Uribe brings four other claims against Krummick.  As for battery and IIED, intent to cause harm and resulting severe emotional distress can be inferred from the alleged conduct. Krummick's motion for summary judgment is denied as to Jesus Uribe's claims in Counts VII and VIII.

On the equal protection and Hate Crime Act claims, there is no evidence that the alleged pushing was motivated by Jesus's ethnicity.  Heriberto Uribe Sr. states in his affidavit that Krummick "referred to us as 'fucking Mexicans' when he was telling others to get inside the house." (Affidavit of Heriberto Uribe Sr., Ex. 150 of Exhibits in Support of Plaintiffs' Table of Defendants, ¶ 4.)  Absent an indication that Krummick specifically called Jesus a racially derogatory name, or any evidence as to what Krummick was physically doing when he allegedly used the epithet, this evidence is insufficient to create a factual issue as to Krummick's motivation for pushing Jesus.  Summary judgment in favor of Krummick and against Jesus Uribe will be entered on Counts III and V.

Raquel Uribe states in her affidavit that Krummick broke down or pushed in the front door of the Durans' home and entered with Officers Lewandowski and Vitalo.  At some point, Officers Vitalo and Lewandowski then sprayed Raquel and her family.  This evidence is insufficient to create a factual issue on any of Raquel's claims against Krummick.  Summary judgment in favor of Krummick and

against Raquel Uribe will be entered on Counts I, III, V, VII, and VIII.

Amada Duran states in her affidavit that Krummick sprayed her in the neck with pepper spray and that she was either holding her children, Concepcion, Kevin, and Jaime, or that they were holding on to her at the time, so that they were also sprayed. Krummick's argument that Amada's affidavit contradicts her earlier failure to identify him is rejected. The analysis of these four plaintiffs' claims for excessive force, battery, and IIED is the same as our analysis of other plaintiffs' claims that are premised on pepper-spraying. (For example, those of Rene Moreno Jr. against Officer Kratochvil.) Therefore, Krummick's motion for summary judgment will be denied as to the claims of Amada Duran, Concepcion Duran, Kevin Duran, and Jaime Duran in Counts I, VII, and VIII. There is no evidence that Krummick's alleged conduct regarding these four plaintiffs was motivated by reason of their ethnicity, so Krummick's motion for summary judgment will be granted on their equal protection and Hate Crime Act claims in Counts III and V.

The remaining plaintiff is Gonzalo Duran, who is also the only plaintiff asserting a false arrest claim against Krummick. Summary judgment in favor of Krummick and against all other plaintiffs will be entered on Count II.

There is evidence from several plaintiffs that after officers pursued Gonzalo as he "walked fast" from the front yard to the back

yard, Krummick participated in the scuffle and arrest of Gonzalo (described in part in our discussion of Officer Sirgedas's motion) by hitting Gonzalo with an asp and kicking him. We rejected Sirgedas's qualified immunity argument, and we similarly reject Krummick's. There are factual issues involved in the reasonableness determination. For that reason, Krummick's motion for summary judgment is denied as to Gonzalo's excessive force claim in Count I. Because intent to harm and resulting severe emotional distress can reasonably be inferred from the alleged conduct, Krummick's motion for summary judgment is denied as to Gonzalo Duran's claims for battery and IIED in Counts VII and VIII. There is no evidence that Krummick's alleged conduct with respect to Gonzalo was motivated by reason of Gonzalo's ethnicity. Krummick's motion for summary judgment will therefore be granted on Gonzalo's equal protection and Hate Crime Act claims in Counts III and V.

Gonzalo also asserts a false arrest claim against Krummick. Krummick argues that he is entitled to qualified immunity on this claim because it was objectively reasonable to arrest Gonzalo in light of the fact that he "was told that Gonzalo Duran had thrown a bottle or can at [DeCianni] and that [DeCianni] wanted him arrested." (Krummick's Memorandum at 12.) Gonzalo denies that he threw a bottle or can at DeCianni. He also denies that DeCianni even claimed at the time that he was struck by a bottle or can;

rather, he states that DeCianni merely told Krummick that the music
was too loud.  Like the excessive force claim, there are factual
issues involved in the reasonableness determination on the false
arrest claim.  For that reason, Krummick's motion for summary
judgment is denied as to Gonzalo Duran's false arrest claim in
Count II.

**13.** **Officer Dino Vitalo**

Plaintiffs' Table states that the following eight plaintiffs
assert excessive force and battery claims against Vitalo:
Alejandro Duran, Gonzalo Duran, Daniel Pineda, Javier Rodriguez,
Florina Pineda, Julia de la Cruz, Manuel Uribe Palacios, and Raquel
Uribe.  Summary judgment will be entered in favor of Vitalo and
against all other plaintiffs on Counts I and VII.

Like various other defendants, Vitalo argues that we should
disregard the affidavits of certain plaintiffs, such as Raquel
Uribe, Julia de la Cruz, and Daniel Pineda, who identify Vitalo as
having caused their injuries after failing to identify him in
answers to interrogatories.  We reject this argument for the same
reasons we rejected other defendants' similar arguments.

The eight plaintiffs listed above allege that Vitalo used
force against them without provocation in a number of different
ways.  Raquel Uribe alleges that Vitalo sprayed her, Florina
Pineda, and Manuel Uribe Palacios with pepper spray while they were
inside the house.  Alejandro Duran alleges that Vitalo pushed him

and called him a "fucking Mexican" while inside the house.  Julia de la Cruz alleges that Vitalo's push to Alejandro caused Alejandro to fall on her and injure her arm.  Daniel Pineda alleges that Vitalo pointed a gun at him, grabbed him, and called him a "Mexican motherfucker."  As for Gonzalo Duran, Vitalo admits that he tackled Gonzalo and, evidently, that he hit Gonzalo with his fists and with an asp when attempting to subdue and arrest him.  Javier Rodriguez alleges that Vitalo was "with" Officer Peslak when Peslak allegedly hit him.

Except as to Javier Rodriguez, these allegations are sufficient to create genuine issues of fact on these plaintiffs' excessive force claims as well as on their battery claims because intent to cause harm can be inferred from the alleged conduct. Javier does not allege that Vitalo used any force on him (nor does he allege that Vitalo failed to intervene to prevent Peslak from hitting him).  Summary judgment in favor of Vitalo and against Javier Rodriguez will be entered on Counts I and VII.

Vitalo contends that he is entitled to qualified immunity. Except for the claim of Julia de la Cruz, we reject this argument for the same reasons we rejected Officer Cruz's qualified immunity argument.  Even considering that the higher Fourteenth Amendment standard applies to the qualified immunity analysis for these plaintiffs (except for Gonzalo, who was seized), we believe that a jury could reasonably find on the facts adduced as to Alejandro,

Gonzalo, Daniel, Florina, Manuel, and Raquel that Vitalo's alleged conduct shocked the conscience because Vitalo either intended to cause them harm or was deliberately indifferent to the risk of causing them harm. Vitalo's motion for summary judgment will be denied as to the excessive force and battery claims of Alejandro Duran, Gonzalo Duran, Daniel Pineda, Florina Pineda, Manuel Uribe Palacios, and Raquel Uribe in Counts I and VII.

Vitalo is, however, entitled to summary judgment on Julia de la Cruz's claim for excessive force. Julia alleges that Vitalo pushed Alejandro, which in turn caused Alejandro to fall and knock her down. This alleged conduct does not "shock the conscience;" a jury could not reasonably find on these facts that Vitalo intended to cause Julia harm or was deliberately indifferent to the risk of causing her harm. And because there is no evidence that Vitalo intended to "touch" Julia, her battery claim also fails. Summary judgment in favor of Vitalo and against Julia de la Cruz will be granted on Counts I and VII.

The same eight plaintiffs, as well as Armando Duran and Ruben Pineda, also assert IIED claims against Vitalo. Summary judgment will be entered in favor of Vitalo and against all other plaintiffs on Count VIII.

Julia de la Cruz and Javier Rodriguez do not allege that severe emotional distress resulted from Vitalo's alleged conduct, nor can such distress be inferred from such conduct. Such

distress, however, can be inferred from the conduct alleged by Alejandro, Gonzalo, Daniel, Florina, Manuel, and Raquel. Summary judgment will be entered in favor of Vitalo and against Julia de la Cruz and Javier Rodriguez on Count VIII. Vitalo's motion for summary judgment is denied as to the IIED claims of Alejandro Duran, Gonzalo Duran, Daniel Pineda, Florina Pineda, Manuel Uribe Palacios, and Raquel Uribe in Count VIII.

Armando Duran's IIED claim is premised on Vitalo allegedly calling him "Mexican trash" and "Mexican shit." Ruben Pineda's IIED claim is based on Vitalo allegedly generally using the phrases "fucking Mexicans," "fucking Mexican shit," and "stupid people." (Pineda does not allege that Vitalo called him any of these names directly.) The analysis of these IIED claims is the same as Alejandro Duran's IIED claim against Officer Stroud: severe emotional distress cannot be inferred simply from the alleged conduct, and there is no evidence that plaintiffs suffered severe emotional distress as a result of what Vitalo allegedly said. Summary judgment will be entered in favor of Vitalo and against Armando Duran and Ruben Pineda on Count VIII.

According to plaintiffs' Table, the following plaintiffs assert equal protection claims against Vitalo, and we presume that they are the only plaintiffs asserting Hate Crime Act claims against Vitalo as well: Alejandro Duran, Armando Duran, Gonzalo Duran, Luz Maria Pineda, Daniel Pineda, Javier Rodriguez, Lisbeth

Moreno, Ruben Pineda, Silvia Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda, Florina Pineda, Julia de la Cruz, Lorena Paredes, Jorge Enrique Perez Sr., Manuel Uribe Palacios, and Raquel Uribe. Summary judgment will be entered in favor of Vitalo and against all other plaintiffs on Counts III and V.

Luz Maria Pineda, Lisbeth Moreno, Silvia Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda, Lorena Paredes, and Jorge Enrique Perez Sr. are all Group II plaintiffs.[23]  The conduct underlying those plaintiffs' equal protection and Hate Crime Act claims against Vitalo is an alleged failure to intervene.  We have granted defendants' motion for summary judgment on the failure to intervene claims, so summary judgment in favor of Vitalo and against these plaintiffs on Counts III and V will be granted.

We are left with the equal protection and Hate Crime Act claims of Alejandro Duran, Armando Duran, Gonzalo Duran, Daniel Pineda, Javier Rodriguez, Ruben Pineda, Florina Pineda, Julia de la Cruz, Manuel Uribe Palacios, and Raquel Uribe.  Of these plaintiffs, only Alejandro Duran and Daniel Pineda allege facts creating a genuine issue as to whether Vitalo's alleged conduct toward them was motivated by plaintiffs' ethnicity. (Alejandro and Daniel allege that Vitalo described them with racial slurs when

_____

[23]/  Alejandro Duran, Gonzalo Duran, and Ruben Pineda are also Group II plaintiffs, but they allege more than just a failure to intervene against Vitalo.

pushing and grabbing them.)[24]   Accordingly, summary judgment will be entered in favor of Vitalo and against Armando Duran, Gonzalo Duran, Javier Rodriguez, Ruben Pineda, Florina Pineda, Julia de la Cruz, Manuel Uribe Palacios, and Raquel Uribe on Counts III and V. Vitalo's motion for summary judgment is denied as to the equal protection and Hate Crime Act claims of Alejandro Duran and Daniel Pineda in Counts III and V.

Gonzalo Duran is the only plaintiff who asserts false arrest and malicious prosecution claims against Vitalo.  Summary judgment will be entered in favor of Vitalo and against all other plaintiffs on Counts II and VI.

There is evidence that Vitalo tackled and used force against Gonzalo in an attempt to handcuff and arrest him.  Vitalo argues that he is entitled to qualified immunity on the false arrest claim because "[t]he evidence is unrebutted that he was told that Gonzalo Duran threw a can or bottle that hit Officer DeCianni." (Vitalo's Memorandum at 12.)   As discussed supra with respect to Sergeant Krummick, Gonzalo denies that he threw a bottle or can at DeCianni. He also denies that DeCianni even claimed at the time that he was struck by a bottle or can; rather, he states that DeCianni merely told Krummick that the music was too loud.   There are factual

_____

[24]/  As noted supra, Armando Duran and Ruben Pineda also allege that they heard Vitalo using racial slurs, but they fail to allege any other actions by Vitalo against them that could form the basis for equal protection or Hate Crime Act claims against Vitalo.  Derogatory references to racial or ethnic background by themselves do not constitute a deprivation of constitutional rights.  See Bell, 746 F.2d at 1259.

issues involved in determining whether there was probable cause for Vitalo to arrest Gonzalo. For that reason, Vitalo's motion for summary judgment is denied as to Gonzalo Duran's false arrest claim in Count II.

As for malicious prosecution, Vitalo contends that summary judgment should be entered on this claim because there is no evidence that he "took some steps after the arrest that were improper in order to obtain convictions of the plaintiffs." (Vitalo's Memorandum at 13.) Gonzalo has submitted copies of the criminal complaints against him for aggravated battery and resisting a peace officer, which were signed by Vitalo. Gonzalo contends that those complaints were false, that he was prosecuted on the charges, and that he was found not guilty. This is sufficient evidence to send Gonzalo's malicious prosecution claim against Vitalo to a jury. Accordingly, Vitalo's motion for summary judgment will be denied as to Gonzalo Duran's malicious prosecution claim in Count VI.

### 14. **Officer Michael McMahon**

Plaintiffs' Table states that the following seven plaintiffs assert excessive force, battery, and IIED claims against McMahon: Alejandro Duran, Armando Duran, Anna Maria Duran, Adolfo Duran, Basilisa Pineda, Graciela Torres, and Kassandra Torres. Summary judgment will be entered in favor of McMahon and against all other plaintiffs on Counts I, VII, and VIII.

We reject McMahon's argument that we should disregard the affidavits of certain plaintiffs for the same reasons we rejected other defendants' similar arguments.

These seven plaintiffs allege that McMahon used force against them without provocation in various ways. Armando Duran alleges that after he had been handcuffed by two officers, McMahon sprayed him in his mouth with pepper spray and threw him into the front window of the Durans' home, breaking the window. Anna Maria Duran alleges that McMahon sprayed her and threw her toward the stairs. Adolfo Duran alleges, and McMahon admits, that McMahon sprayed him. Basilisa Pineda alleges that McMahon hit her and sprayed her in the eyes. Graciela Torres alleges that McMahon pushed her into a fence, causing a bruise. Kassandra Torres, who was seven years old at the time of the events, alleges that McMahon pushed her to the ground, causing a scratch on her arm. Alejandro Duran generally alleges that he was sprayed in the yard and that McMahon admits that he sprayed people in the yard.

Except as to Alejandro Duran, these allegations are sufficient to create genuine issues of fact on these plaintiffs' excessive force claims as well as on their battery claims because intent to cause harm can be inferred from the alleged conduct. Alejandro does not allege that McMahon in particular sprayed him. Summary judgment in favor of McMahon and against Alejandro Duran will be entered on Counts I and VII.

McMahon contends that he is entitled to qualified immunity on the claims of Anna Maria, Adolfo, Graciela, and Kassandra. We reject this argument for the same reasons we rejected Officer Vitalo's qualified immunity argument. Even considering that the higher Fourteenth Amendment standard applies to the qualified immunity analysis for these plaintiffs, we believe that a jury could reasonably find from the evidence that McMahon's alleged conduct shocked the conscience because McMahon either intended to cause them harm or was deliberately indifferent to the risk of causing them harm.

McMahon's motion for summary judgment will be denied as to the excessive force and battery claims of Armando Duran, Anna Maria Duran, Adolfo Duran, Basilisa Pineda, Graciela Torres, and Kassandra Torres in Counts I and VII.

The same seven plaintiffs assert IIED claims against McMahon. It can be inferred from the conduct alleged by Armando, Anna Maria, Adolfo, Basilisa, Graciela, and Kassandra that severe emotional distress resulted; therefore, McMahon's motion for summary judgment will be denied as to these plaintiffs' IIED claims in Count VIII. Because Alejandro Duran does not allege that McMahon used force against him in particular, summary judgment in favor of McMahon and against Alejandro Duran will be entered on Count VIII.

According to plaintiffs' Table, these same seven plaintiffs, in addition to nine Group II plaintiffs, assert equal protection

claims against McMahon. We presume that they are the only plaintiffs asserting Hate Crime Act claims against him as well. Summary judgment will be entered in favor of McMahon and against all other plaintiffs on Counts III and V.

Of the seven plaintiffs, only Armando Duran alleges facts creating a genuine issue as to whether McMahon's alleged conduct against them was motivated by plaintiffs' ethnicity. Armando alleges that McMahon called him "Mexican trash," "Mexican shit," and a "Mexican motherfucker." Alejandro Duran claims that McMahon was using the phrase "fucking cowboys," but does not claim that McMahon directed that phrase to anyone in particular. Summary judgment will accordingly be entered in favor of McMahon and against Alejandro Duran, Anna Maria Duran, Adolfo Duran, Basilisa Pineda, Graciela Torres, and Kassandra Torres on Counts III and V. McMahon's motion for summary judgment is denied as to Armando Duran's claims in Counts III and V.

The nine Group II plaintiffs asserting equal protection claims against McMahon are Luz Maria Pineda, Lisbeth Moreno, Ruben Pineda, Silvia Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda, Lorena Paredes, and Jorge Enrique Perez Sr.[25] The conduct underlying their claims is an alleged failure to intervene. We have granted defendants' motion for summary judgment on the failure to intervene

---

[25]/ Alejandro Duran, Gonzalo Duran, and Ruben Pineda are also Group II plaintiffs, but they allege more than just a failure to intervene against Vitalo.

claims, so summary judgment in favor of McMahon and against these plaintiffs on Counts III and V will be granted.

Alejandro Duran, Armando Duran, and Adolfo Duran are the only plaintiffs who assert false arrest and malicious prosecution claims against McMahon.  Summary judgment will be entered in favor of McMahon and against all other plaintiffs on Counts II and VI.

There is evidence that McMahon arrested Armando.  McMahon argues that he is entitled to qualified immunity because a party guest threw a bottle or can at him, and it is "undisputed that another officer, Michael Kirby, pointed out Armando Duran as the person who threw a bottle at McMahon." (McMahon's Memorandum at 6.)  Armando denies that he threw anything at McMahon.  He also denies that Kirby told McMahon that Armando threw something at McMahon.  There are factual issues involved in determining whether McMahon's conduct in arresting Armando was reasonable.  For that reason, McMahon's motion for summary judgment is denied as to Armando Duran's false arrest claim in Count II.

Alejandro and Adolfo also bring false arrest claims, but there does not appear to be any evidence that McMahon arrested them.  Summary judgment will be entered in favor of McMahon and against Alejandro Duran and Adolfo Duran on Count II.

As for malicious prosecution, McMahon maintains that summary judgment should be entered on this claim because there is no evidence that he "took some steps after the arrest that were

improper in order to obtain convictions of the plaintiffs." (McMahon's Memorandum at 7.) Alejandro, Armando, and Adolfo have submitted copies of the criminal complaints against them for aggravated battery and obstructing a peace officer, which were signed by McMahon. The complaints allege that each of the Duran brothers pushed McMahon and became loud and disruptive and failed to obey an order of dispersal. The Durans contend that those charges were false (that they did not push McMahon and that there was no order of dispersal given), that they were prosecuted on the charges, and that they were found not guilty. This is sufficient evidence to send the malicious prosecution claims against McMahon to a jury. Accordingly, McMahon's motion for summary judgment will be denied as to the malicious prosecution claims of Alejandro Duran, Armando Duran, and Adolfo Duran in Count VI.

### 15. **Officer William Peslak**

There is no evidence supporting any plaintiff's claim against Peslak for malicious prosecution. Accordingly, summary judgment will be entered in favor of Peslak and against all plaintiffs on Count VI.

According to plaintiffs' Table, forty plaintiffs assert excessive force and equal protection claims against Peslak, and we presume that they are the only plaintiffs asserting Hate Crime Act

claims against Peslak as well.[26]  Summary judgment will be entered in favor of Peslak and against all other plaintiffs on Counts I, III, and V.

Thirty-four of these forty plaintiffs are Group I plaintiffs (those who claim they were inside the Durans' house and experienced ill effects from the pepper spray allegedly sprayed by Officers DeCianni and Peslak).  We have already rejected supra Peslak's qualified immunity argument regarding the Group I plaintiffs. Peslak's motion for summary judgment will be denied as to the Group I plaintiffs' claims for excessive force in Count I.

There are additional allegations that Peslak used other types of force against certain plaintiffs without justification.  Gonzalo Duran alleges that Peslak hit and kicked him in the attempt to subdue and arrest him.  Ignacio Rodriguez alleges that Peslak hit him with an asp while he was inside the house.  Javier Rodriguez alleges that Peslak hit him with an asp and sprayed him.  Graciela Torres alleges that Peslak sprayed her.  Sergio Duran alleges that Peslak sprayed him in the face.  Ismael Torres alleges that Peslak sprayed him in the eyes.

---

[26]/  The forty plaintiffs are Alejandro Duran, Maria Concepcion Duran, Jaquelin Duran, Anna Maria Duran, Armando Duran Jr., Yonathan Duran, Adolfo Duran, Adolfo Duran Jr., Gonzalo Duran, Gonzalo Duran Jr., Ignacio Rodriguez, Alma Rodriguez, Ana Rodriguez, Kathy Bonilla, Javier Rodriguez, Maria Alicia Moreno, Edwin Pineda, Florina Pineda, Joel Uribe, Esther Meraz, Heriberto Uribe Sr., Juan Carlos Uribe, Dudbeth Uribe, Heriberto Uribe Jr., Juana Maribel Escareno, Graciela Torres, Serafin Rios, Norma de la Cruz, Julia de la Cruz, Kevin de la Cruz, Sergio Duran, Jesus Rico Duran, Maria M. Hernandez, Jesus Uribe, Manuel Uribe Palacios, Juana Soto Uribe, Imelda Uribe, Jose Adrian Moreno, Ismael Torres, and Jose Martin Uribe.

Adolfo Duran claims that Peslak hit and kicked him; this claim is based on the testimony of Florentina Perez. Peslak argues that we should not credit Florentina's testimony because it was "wild and crazy generally." (Peslak's Memorandum at 2.) We do not resolve issues of credibility on summary judgment.

Maria Alicia Moreno alleges in her affidavit that Peslak sprayed her and her son, Jose Adrian Moreno. As discussed supra, this allegation will be stricken from Moreno's affidavit and disregarded because it contradicts her earlier statement that she was not sprayed directly. Because Maria and her son's claims against Peslak for excessive force, battery, equal protection (and presumably Hate Crime Act), and IIED are not properly supported, summary judgment in favor of Peslak and against these two plaintiffs will be entered on Counts I, III, V, VII, and VIII.

Anna Maria Duran brings excessive force, battery, equal protection (and presumably Hate Crime Act), and IIED claims against Peslak, but fails to allege that Peslak did anything to her in particular. Accordingly, summary judgment will be entered in favor of Peslak and against Anna Maria Duran on Counts I, III, V, VII, and VIII.

Thus, aside from the Group I plaintiffs, seven plaintiffs have an evidentiary basis for their excessive force claims: Adolfo Duran, Gonzalo Duran, Ignacio Rodriguez, Javier Rodriguez, Graciela

Torres, Sergio Duran, and Ismael Torres.[27] Peslak argues that he is entitled to qualified immunity on these claims. We disagree, for the same reasons we rejected Officer McMahon's qualified immunity argument. Even considering that the higher Fourteenth Amendment standard applies to the qualified immunity analysis for these plaintiffs, we believe that a jury could reasonably find from the evidence that Peslak's alleged conduct shocked the conscience because Peslak either intended to cause them harm or was deliberately indifferent to the risk of causing them harm. Peslak's motion for summary judgment will be denied as to the claims of Adolfo Duran, Gonzalo Duran, Ignacio Rodriguez, Javier Rodriguez, Graciela Torres, Sergio Duran, and Ismael Torres in Count I.

As for these plaintiffs' equal protection and Hate Crime Act claims, there is no evidence that Peslak's alleged conduct was motivated by plaintiffs' ethnicity. Summary judgment will be entered in favor of Peslak and against these plaintiffs on Counts III and V.

Thirty-six of the forty plaintiffs listed above assert battery claims against Peslak. (Armando Duran Jr., Yonathan Duran, Edwin Pineda, and Heriberto Uribe Sr. are the four plaintiffs who assert

---

[27] Alma Rodriguez is a Group I plaintiff and may be alleging an additional basis for her claims against Peslak. She states that she was sprayed and pushed down a flight of stairs and that Peslak and DeCianni were nearby at the time. She does not identify Peslak specifically as having sprayed or pushed her, though. Simply being "nearby" is not a basis for an excessive force claim (or an equal protection, Hate Crime Act, battery, or IIED claim, for that matter).

excessive force claims but not battery.) Summary judgment will be entered in favor of Peslak and against all other plaintiffs on Count VII. As for the Group I plaintiffs, intent can be inferred from the alleged conduct of spraying into the house; therefore, Peslak's motion for summary judgment is denied as to these plaintiffs' claims for battery in Count VII. Intent can also be inferred from the conduct alleged by Adolfo Duran, Gonzalo Duran, Ignacio Rodriguez, Javier Rodriguez, Graciela Torres, Sergio Duran, and Ismael Torres; the motion for summary judgment is thus also denied as to these plaintiffs' claims for battery in Count VII.

Thirty-seven of the forty plaintiffs listed above assert IIED claims against Peslak. (Edwin Pineda, Heriberto Uribe Sr., and Sergio Duran are the three plaintiffs who assert excessive force claims but not IIED.) Summary judgment will be entered in favor of Peslak and against all other plaintiffs on Count VIII.

We believe that it can be inferred from the conduct alleged by the Group I plaintiffs, as well as the conduct alleged by Adolfo Duran, Gonzalo Duran, Ignacio Rodriguez, Javier Rodriguez, Graciela Torres, Sergio Duran, and Ismael Torres, that severe emotional distress resulted; therefore, Peslak's motion for summary judgment will be denied as to these plaintiffs' IIED claims in Count VIII.

Gonzalo Duran is the only plaintiff who asserts a false arrest claim against Peslak. Summary judgment will be entered in favor of Peslak and against all other plaintiffs on Count II.

Peslak contends that he is entitled to qualified immunity on Gonzalo's false arrest claim because "his involvement in the arrest was simply to help fellow officers of whom he had no reason to suspect they [sic] were not entitled to arrest someone" and thus, his conduct was objectively reasonable. (Peslak's Memorandum at 11.) Peslak points to no particular evidence in support of his argument. His motion for summary judgment on Gonzalo Duran's claim for false arrest in Count II is therefore denied.

### 16. __Officer Robert DeCianni__

According to plaintiffs' Table, fifty-seven plaintiffs assert excessive force claims against DeCianni.[28] Summary judgment will be entered in favor of DeCianni and against all other plaintiffs on Count I.

We reject DeCianni's argument that we should disregard the affidavits of certain plaintiffs for the same reasons we rejected other defendants' similar arguments.

Thirty-four of these fifty-seven plaintiffs are Group I plaintiffs (those who claim they were inside the Durans' house and

---

[28]/ The fifty-seven plaintiffs are Alejandro Duran, Maria Concepcion Duran, Jaquelin Duran, Anna Maria Duran, Armando Duran Jr., Yonathan Duran, Adolfo Duran, Adolfo Duran Jr., Gonzalo Duran, Amada Duran, Gonzalo Duran Jr., Concepcion Duran, Kevin Duran, Jaime Duran, Ignacio Rodriguez, Alma Rodriguez, Ana Rodriguez, Kathy Bonilla, Javier Rodriguez, Rene Moreno Sr., Lisbeth Moreno, Ruben Pineda, Silvia Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda, Florina Pineda, Joel Uribe, Esther Meraz, Heriberto Uribe Sr., Juan Carlos Uribe, Dudbeth Uribe, Heriberto Uribe Jr., Juana Maribel Escareno, Diego Torres, Serafin Rios, Norma de la Cruz, Julia de la Cruz, Kevin de la Cruz, Lorena Paredes, Jose Refugio Paredes, Amanda Paredes, Alondra Paredes, Jose Paredes, Jorge Enrique Perez Sr., Sergio Duran, Joel Rico Duran, Maria Marisol Rico Duran, Joel Rico Duran Jr., Jesus Rico Duran, Maria M. Hernandez, Jesus Uribe, Manuel Uribe Palacios, Juana Soto Uribe, Imelda Uribe, Ismael Torres, and Jose Martin Uribe.

experienced ill effects from the pepper spray allegedly sprayed by Officers DeCianni and Peslak). We have already rejected supra DeCianni's qualified immunity argument regarding the Group I plaintiffs. DeCianni's motion for summary judgment will be denied as to the Group I plaintiffs' claims for excessive force in Count I.

There are additional allegations that DeCianni used other types of force against certain plaintiffs without justification. Gonzalo Duran alleges that DeCianni beat and choked him in the attempt to subdue and arrest him. Amada Duran, Concepcion Duran, Kevin Duran, Jaime Duran, Lisbeth Moreno, Silvia Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda, Julia de la Cruz, Jose Refugio Paredes, Amanda Paredes, Alondra Paredes, Jose Paredes, Jorge Enrique Perez Sr., Joel Rico Duran, Maria Marisol Rico Duran, Joel Rico Duran Jr., and Jesus Rico Duran allege that DeCianni sprayed them. Diego Torres alleges that DeCianni sprayed him and told him to "move the fuck out of the way, you little brat." Ignacio Rodriguez alleges that DeCianni sprayed him, kicked him, and said, "See what you Mexicans get?" Javier Rodriguez and Rene Moreno Sr. allege that DeCianni hit them with an asp and sprayed them. Ruben Pineda alleges that DeCianni grabbed him, ripped his shirt, punched him, sprayed him, threw him down some stairs, and told him, "Motherfucker, I'm gonna kill you." Silvia Pineda alleges that DeCianni's treatment of Ruben caused her to fall down when Ruben

fell into her. Lorena Paredes alleges that DeCianni pushed and sprayed her.

Anna Maria Duran brings excessive force, battery, equal protection (and presumably Hate Crime Act), and IIED claims against DeCianni, but fails to allege that DeCianni did anything to her in particular. Similarly, Sergio Duran brings excessive force, battery, and equal protection (and presumably Hate Crime Act) claims against DeCianni, but fails to allege that DeCianni did anything to him in particular. Accordingly, summary judgment will be entered in favor of DeCianni and against Anna Maria Duran on Counts I, III, V, VII, and VIII, and in favor of DeCianni and against Sergio Duran on Counts I, III, V, and VII.

Thus, aside from the Group I plaintiffs, twenty-six plaintiffs have an evidentiary basis for their excessive force claims: Gonzalo Duran, Amada Duran, Concepcion Duran, Kevin Duran, Jaime Duran, Lisbeth Moreno, Silvia Pineda, Marlene Pineda, Edwin Pineda, Kalyn Pineda, Julia de la Cruz, Jose Refugio Paredes, Amanda Paredes, Alondra Paredes, Jose Paredes, Jorge Enrique Perez Sr., Joel Rico Duran, Maria Marisol Rico Duran, Joel Rico Duran Jr., Jesus Rico Duran, Diego Torres, Ignacio Rodriguez, Javier Rodriguez, Rene Moreno Sr., Ruben Pineda, and Lorena Paredes.[29]

---

[29] Alma Rodriguez is a Group I plaintiff and may be alleging an additional basis for her claims against DeCianni. She states that she was sprayed and pushed down a flight of stairs and that Peslak and DeCianni were nearby at the time. She does not identify DeCianni specifically as having sprayed or pushed her, though. Simply being "nearby" is not a basis for an excessive force claim (or an equal protection, Hate Crime Act, battery, or IIED claim, for that

DeCianni argues that he is entitled to qualified immunity on these claims (except as to the claims of Ruben Pineda and Gonzalo Duran). We disagree for the same reasons we rejected Officer Peslak's qualified immunity argument, except as to Silvia Pineda's claim to the extent it is based on the allegation that DeCianni knocked Ruben down, causing her to fall.[30] Even considering that the higher Fourteenth Amendment standard applies to the qualified immunity analysis for these plaintiffs, we believe that a jury could reasonably find from the evidence that DeCianni's alleged conduct shocked the conscience because DeCianni either intended to cause these plaintiffs harm or was deliberately indifferent to the risk of causing them harm.  DeCianni's motion for summary judgment will be denied as to these twenty-six plaintiffs' claims in Count I, except that the motion is granted as to Silvia Pineda's excessive force claim to the extent it is based on the "falling down" allegation.

The same fifty-seven plaintiffs with excessive force claims, plus Luz Maria Pineda and Armando Duran, assert equal protection (and, we presume, Hate Crime Act) claims against DeCianni.

It appears that Luz Maria Pineda alleges that she overheard racial slurs being used by officers in general, but she does not

---

matter).

   [30]/  DeCianni is entitled to summary judgment on Silvia Pineda's excessive force claim, to the extent it is based on this allegation, for the same reasons we expressed regarding Julia de la Cruz's excessive force claim against Officer Vitalo.

specifically allege that DeCianni used any.  Therefore, summary judgment will be entered in favor of DeCianni and against Luz Maria Pineda on Counts III and V.

Armando Duran alleges that DeCianni called him "Mexican trash" and a "Mexican shit."  The problem with his equal protection claim, though, is that Armando alleges no other conduct by DeCianni that denied him equal protection.  Derogatory references to racial or ethnic background by themselves do not constitute a deprivation of constitutional rights.  See Bell, 746 F.2d at 1259.  Summary judgment will therefore be entered in favor of DeCianni and against Armando Duran on Counts III and V.

Of the other plaintiffs asserting equal protection and Hate Crime Act claims against DeCianni, only Ignacio Rodriguez alleges facts creating a genuine issue as to whether DeCianni's alleged conduct against him was motivated by his ethnicity.  Ignacio alleges that DeCianni said, "See what you Mexicans get?" Ruben Pineda and Diego Torres allege that they heard DeCianni using racial slurs, but do not claim that DeCianni directed the slurs at anyone in particular.  Summary judgment will be entered in favor of DeCianni and against all plaintiffs except for Ignacio Rodriguez on Counts III and V.

Fifty-two of the original fifty-seven plaintiffs listed above assert battery claims against DeCianni.  (Armando Duran Jr., Yonathan Duran, Joel Rico Duran, Maria Marisol Rico Duran, and

Maria M. Hernandez are the five plaintiffs who assert excessive force claims but not battery.) Summary judgment will be entered in favor of DeCianni and against all other plaintiffs on Count VII.

As for the Group I plaintiffs, intent can be inferred from the alleged conduct of spraying into the house; therefore, DeCianni's motion for summary judgment is denied as to these plaintiffs' claims for battery in Count VII. Intent can also be inferred from the conduct alleged by Gonzalo Duran, Amada Duran, Concepcion Duran, Kevin Duran, Jaime Duran, Lisbeth Moreno, Silvia Pineda (except for the "falling down" allegations, see supra), Marlene Pineda, Edwin Pineda, Kalyn Pineda, Julia de la Cruz, Jose Refugio Paredes, Amanda Paredes, Alondra Paredes, Jose Paredes, Jorge Enrique Perez Sr., Joel Rico Duran, Maria Marisol Rico Duran, Joel Rico Duran Jr., Jesus Rico Duran, Diego Torres, Ignacio Rodriguez, Javier Rodriguez, Rene Moreno Sr., Ruben Pineda, and Lorena Paredes. The motion for summary judgment is thus also denied as to these plaintiffs' claims for battery in Count VII.

Fifty-three of the original fifty-seven plaintiffs listed above, along with Armando Duran, assert IIED claims against DeCianni. (Sergio Duran, Joel Rico Duran, Maria Marisol Rico Duran, and Maria M. Hernandez are the four plaintiffs who assert excessive force claims but not IIED.) Summary judgment will be entered in favor of DeCianni and against all other plaintiffs on Count VIII.

We believe that it can be inferred from the conduct alleged by the Group I plaintiffs, as well as the conduct alleged by the twenty-six plaintiffs listed two paragraphs <u>supra</u>, that severe emotional distress resulted; therefore, DeCianni's motion for summary judgment will be denied as to these plaintiffs' IIED claims in Count VIII.  As for Armando Duran, his claim is evidently based on DeCianni allegedly calling him "Mexican trash" and a "Mexican shit."  Our analysis of Alejandro Duran's IIED claim against Officer Stroud applies to this claim.  Because there is no evidence that Armando suffered severe emotional distress as a result of what DeCianni allegedly said, summary judgment in favor of DeCianni and against Armando Duran on Count VIII will be granted.

Gonzalo Duran is the only plaintiff who asserts false arrest and malicious prosecution claims against DeCianni.  Summary judgment will be entered in favor of DeCianni and against all other plaintiffs on Counts II and VI.

DeCianni contends that he is entitled to qualified immunity on Gonzalo's false arrest claim because he had probable cause to arrest Gonzalo for either throwing a bottle or can at him or for "failing to shut the party and causing a disturbance" or for "resisting a lawful police order." (DeCianni's Memorandum at 11.) Gonzalo denies that he threw anything at DeCianni; he also denies that there was an order to disperse or that they were causing a disturbance.  Because there are factual issues involved in

determining whether DeCianni's conduct in arresting Gonzalo was reasonable, DeCianni's motion for summary judgment will be denied as to the false arrest claim of Gonzalo Duran in Count II.

As for Gonzalo's malicious prosecution claim, DeCianni argues that summary judgment should be entered on this claim because there is no evidence that he "took some steps after the arrest that were improper in order to obtain convictions of the plaintiffs." (DeCianni's Memorandum at 13.) Gonzalo has submitted copies of the criminal complaints against him for aggravated battery and resisting a peace officer, which were signed by DeCianni. The complaints allege that Gonzalo struck and bit DeCianni "without legal justification" and that he resisted arrest. Gonzalo contends that the arrest and use of force on him was not justified in the first place, that he was prosecuted on the charges, and that he was found not guilty. This is sufficient evidence to send the malicious prosecution claim against DeCianni to a jury. Accordingly, DeCianni's motion for summary judgment will be denied as to the malicious prosecution claim of Gonzalo Duran in Count VI.

A final note. Plaintiffs' Table includes a column titled "Due Process," and the only defendant with an entry in that column is DeCianni. The entry states, "ALL PLAINTIFFS." DeCianni does not address this claim in his motion, and perhaps this is because the Table is not part of the Fourth Amended Complaint and there is no

allegation in the Fourth Amended Complaint[31] that DeCianni violated anyone's right to due process, nor is there a separate count alleging any violation of that right.

## CONCLUSION

For the foregoing reasons, the motion of defendants Robert DeCianni and William Peslak for summary judgment with respect to the plaintiffs in Group I is denied. The motion of certain defendants for summary judgment with respect to the plaintiffs in Group II is granted. The joint motion of the individual police officer defendants for partial summary judgment is granted in part and denied in part.

Counsel for defendants are requested to prepare a draft judgment order in accordance with this opinion. Counsel for defendants are also requested to prepare a chart for the use of the court and the parties (and possibly the jury as well) that sets forth or diagrams all of the claims remaining for trial, showing which plaintiffs are claiming what against which defendants.

Defendants are to submit the draft judgment order and chart to opposing counsel for any objections by October 21, 2005. Plaintiffs' counsel is to confer with defendants' counsel regarding any objections between October 24 and October 31, 2005. Plaintiffs' objections shall be limited to the issue of whether the draft judgment order and chart conform to this opinion. Any

---

[31]/ The due process claim in the Third Amended Complaint was dropped.

unresolved objections shall be submitted to the court in writing by November 11, 2005. Defendants are to submit a final draft judgment order and the final chart to the court within fourteen days after the ruling on any objections.

A status hearing is set for December 14, 2005, at 10:30 a.m. to set a trial date.


DATE:     October 7, 2005


ENTER:    _____

John F. Grady, United States District Judge