01-6858.121                                          April 16, 2012

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ALEJANDRO DURAN, et al.,          )
                                  )
          Plaintiffs,             )
                                  )
          v.                      )      No. 01 C 6858
                                  )
TOWN OF CICERO, et al.,           )
                                  )
          Defendants.             )

### MEMORANDUM OPINION
*(Rulings on Attorneys' Fees and Costs Petitions)*

Petitions for attorneys' fees and costs in this civil rights case have been under advisement awaiting the outcome of the parties' appeals. The appeals have now been decided. The plaintiffs' verdicts challenged by the Town were all affirmed, and the cross-appeals by some of the plaintiffs were rejected.[1] Duran v. Town of Cicero, 653 F.3d 632 (7th Cir. 2011). We will now address the pending petitions for fees and costs.

### BACKGROUND

This is a civil rights action brought pursuant to 42 U.S.C. § 1983, alleging federal false arrest, excessive force, and equal protection violations as well as state-law claims of malicious prosecution, battery, hate crimes, intentional infliction of

---

[1] The judgments were vacated and the case was remanded for entry of amended judgments because of what the Court found to be ambiguity in the form of the judgments. The amended judgments have been entered.

- 2 -

emotional distress and spoliation of evidence. The plaintiffs are 78 persons who were present at a baptismal party held at the home of Alejandro and Maria Concepcion Duran in Cicero, Illinois on September 2, 2000. The defendants are seventeen Cicero police officers and the Town itself.

There were about 100 people at the party, and the Durans provided food and drink for their guests, including beer and wine. At about 9:30 p.m. the Cicero police department received a telephone call from a neighbor complaining about the party. There were several visits to the premises by various police officers who requested that the noise level be reduced. The party guests initially agreed to lower the volume of the music, but when another complaint was made, prompting further visits by the officers, the conversations became heated. Eventually a full-scale riot ensued, initiated, according to the plaintiffs, by the officers' unprovoked use of batons and pepper spray and, according to the officers, by the unprovoked throwing of bottles and other missiles at the officers. A rich exchange of foul language and ethnic slurs resounded throughout the melee.[2]

Some of the plaintiffs alleged that they were beaten and/or pepper sprayed in the yard, without cause. Many of the plaintiffs, including some children, were directed by the officers to go into the Duran house and remain there. Many of the guests in the house

---

[2] A more detailed account of the occurrence appears in the opinion of the Court of Appeals, 653 F.3d at 636-37.

- 3 -

made federal and state claims alleging that two of the officers, William Peslak and Robert DeCianni, sprayed the interior of the house with pepper spray, leaving them gasping for air and causing them extreme physical discomfort and emotional distress.

The officers arrested seven of the plaintiffs and took them to the Town police station. Three of the arrested plaintiffs were not prosecuted, but the four Duran brothers were prosecuted on charges of battery and obstructing or resisting a police officer. The case went to a jury trial, and the Durans were all found not guilty.

The basic position of the defendant officers was that they used no more force than was reasonably necessary to defend themselves against the violent acts of the Durans and their guests and to arrest the plaintiffs who were assaulting them. The defendants Peslak and DeCianni denied that they sprayed the interior of the house.

After the complaint was filed, there was a long period of pretrial discovery, much of it concerned with identification of the officers who allegedly assaulted the plaintiffs. There were numerous discovery disputes. Considerable time was spent on the defendants' motions for summary judgment, and we granted summary judgments to a number of individual defendants on various claims. We denied the individual defendants' motions based on their defenses of qualified immunity, and they took an interlocutory

- 4 -

appeal.   The Seventh Circuit affirmed as to most of the claims, but reversed the denial of qualified immunity as to four claims and remanded the case with instructions to enter judgments accordingly. Duran v. Sirgedas, 240 F. App'x 104 (7th Cir. 2007).

A six-week jury trial took place in January and February 2008.   The jury returned verdicts in favor of some of the plaintiffs on most of their federal and state-law claims and verdicts in favor of the defendants on other federal and state-law claims.   The jury found against the group of plaintiffs whose only claims were that the defendants Peslak and DeCianni had pepper-sprayed them inside the Duran house.

The total amount of all judgments against the individuals and the Town was $4,843,400.00.  Of that amount, the Town has paid $3,073,400.00 plus interest, for a total of $3,163,436.38.   The Town appealed judgments against it totaling $1,770,000, and, as indicated above, the judgments were affirmed.

## PLAINTIFFS' MOTION FOR ATTORNEYS' FEES

The plaintiffs are seeking attorneys' fees in the amount of $2,228,017.50 and costs of $157,901.47 as of July 3, 2008.   The plaintiffs' principal attorney, David A. Cerda, is requesting $1,131,300, a little over fifty percent of the total.  (Parties' Local Rule 54.3 Joint Statement at 1.)

Defendants object to both the fees and costs claimed by the plaintiffs, and the parties have been unable to reach agreement on

- 5 -

the appropriate amounts.  Therefore, they followed the procedure outlined in Local Rule 54.3 and have filed a Joint Statement setting forth their positions, as well as extensive briefs and voluminous exhibits.

### THE CONTINGENT-FEE QUESTION

The plaintiffs' attorneys claim to have had a forty percent contingent-fee agreement (or agreements) with the plaintiffs.  At the time the Town's insurance carrier paid the judgments against the individual defendants, plaintiffs' attorneys collected the sum of $1,040,000 as their claimed forty percent share.  Defendants argue that, having collected this contingent fee, the attorneys are not entitled to anything more.  They point out that under the fee statute, 42 U.S.C. § 1988, the prevailing civil rights party, not the lawyer, is eligible for an award of attorneys' fees. Defendants contend that if the attorneys are seeking the award for the benefit of the clients, that would be appropriate, but if they are seeking it for themselves, that would be an additional fee to which they are not entitled.  Defendants have repeatedly demanded a copy of the contingent-fee agreement, and in fact we ordered it produced.[3]  After initially contending that the Town had no right to see the fee agreement, Mr. Cerda, after being ordered to produce it, stated that it is "missing."  Defendants argue:

Absent the agreement, we do not know if Plaintiff's

---

[3] We say "agreement" rather than "agreements" at this point because the parties have used the singular form in their briefs.

- 6 -

> [sic] counsel is filing this fee petition on behalf
> of the Plaintiffs to reimburse them for the fees
> they have already paid. Alternatively, we do not
> know if Plaintiff's [sic] counsel is seeking a
> double recovery.

(Letter from Defs.' Counsel to Pls.' Counsel, July 31, 2008, Ex. C
to Pls.' Mot. (hereinafter "Defs.' Letter") at 2.)

Mr. Cerda's failure to produce the contingent-fee agreement
is not the problem that the Town believes it is.[4] "The contingent
fee that an attorney earns from his client and the statutory fee
that an attorney recovers from the losing party represent distinct
entitlements." Pickett v. Sheridan Health Care Ctr., 664 F.3d 632,
640 (7th Cir. 2011). "[D]istrict courts . . . should view these
fees as distinct and not allow a contingent fee to influence the
determination of the reasonableness of an hourly rate." Id. at
642.

## THE BASIC LAW CONCERNING § 1988 FEE AWARDS

Both sides refer repeatedly to the case of Hensley v.
Eckerhart, 461 U.S. 424 (1983), and appropriately so, because it is
the Supreme Court case that provides the rules for determining
appropriate fees in civil rights cases:

> The most useful starting point for determining the
> amount of a reasonable fee is the number of hours
> reasonably expended on the litigation multiplied by
> a reasonable hourly rate. This calculation
> provides an objective basis on which to make an
> initial estimate of the value of a lawyer's
> services. The party seeking an award of fees

---

[4] It relates to a quite different problem, which we will discuss below.

should submit evidence supporting the hours worked
and rates claimed.  Where the documentation of
hours is inadequate, the district court may reduce
the award accordingly.
    The district court also should exclude from this
initial fee calculation hours that were not
reasonably expended.  Cases may be overstaffed, and
the skill and experience of lawyers vary widely.
Counsel or the prevailing party should make a good
faith effort to exclude from a fee request hours
that are excessive, redundant, or otherwise
unnecessary, just as a lawyer in private practice
ethically is obligated to exclude such hours from
his fee submission.

Id. at 433-34 (quotation marks and citation omitted).  The specific

issue in Hensley was whether "a partially prevailing plaintiff may

recover an attorney's fee for legal services on unsuccessful

claims."  Id. at 426.  The plaintiffs had brought suit against

officials at the forensic unit of a Missouri state hospital and

members of the Missouri Mental Health Commission alleging that

patients in the forensic unit were subjected to treatment and

conditions that violated their federal constitutional rights in

regard to six general areas: physical environment; individual

treatment plans; least restrictive environment; visitation,

telephone and mail privileges; seclusion and restraint; and

finally, staffing, which was alleged to be insufficient.  Id. at

426-28.  After a bench trial, the district court found in favor of

the plaintiffs on the first five general areas, but as to staffing,

found that levels were "minimally adequate" and denied relief as to

that claim.  Id.  The plaintiffs filed a petition for fees under §

1988, and the parties differed as to whether hours spent on the

unsuccessful staffing claim should be deducted in determining the award. The district court sided with the plaintiffs and awarded a fee based on all hours reasonably expended, without deduction for time spent on the staffing claim. The Court of Appeals affirmed, but the Supreme Court reversed and remanded with the following directions to the district court:

> Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of <u>related claims</u>, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

<u>Id.</u> at 440 (emphasis added).

## EXAMINATION OF MR. CERDA'S TIME CHARGES

Because Mr. Cerda is lead counsel and has billed more than fifty percent of the hours for which plaintiffs request compensation, we will begin with an examination of the documentation he has submitted.

Exhibit A to plaintiffs' motion for fees and expenses is a chronological listing of all time charges submitted by the plaintiffs' several attorneys.[5] It consists of 143 pages. The time entries are arranged by date, and to the right of each date

---

[5] Exhibit D is a duplicate of Exhibit A with the Town's objections noted beside each time entry.

appear the initials of the charging attorney ("DAC" for David A. Cerda), a general description of the work done on that date, and the total time spent on the work. Where multiple tasks are listed in an entry, there is never a breakdown as to what portion of the total time was spent on any of the tasks.

We will begin with page one of Exhibit A. The first entry is for 9/6/00, where Mr. Cerda charges 6.9 hours for "consultation with clients; visit site and take photographs." The defendants, in Exhibit D, make the following objection to this entry:

> Block-billing entries are vague as to amount of time spent on each task. Client names are not identified and indeterminable as to whether the "client" was a prevailing party.

We believe this objection is not well taken. This was early in the case, and Mr. Cerda was collecting basic information about a complicated occurrence involving an extraordinary number of clients with whom, for the most part, he presumably had had no prior acquaintance. Inspection of the site was important, as illustrated by the fact that a large of amount of trial time was spent by both sides on questions such as who would have been able to see what from various vantage points. The 6.9 hours seems an appropriate amount of time, and we have no reason to be skeptical about it.

Mr. Cerda's next entry is for 6.4 hours on 9/11/00 and reads:

> Telephone call to Lopez, Joseph R.; telephone call to De Leon, John R.; telephone call from De Leon, John R.; meet with clients.

- 10 -

Messrs. Lopez and De Leon were Mr. Cerda's co-counsel in the case, and, although the subject matter of the telephone calls is not indicated, it is quite credible that the attorneys would be spending a substantial amount of time discussing their investigation of the facts. Also, "meet with clients" is obviously appropriate at this early stage of the case. The failure to specify how much of the 6.4 hours was spent on the telephone calls and how much time was spent on the meeting with clients and what was discussed at the meeting is not a problem so shortly after the occurrence of September 2, 2000, because, whatever the breakdown was, and whatever was discussed at the meeting, there is no reason to question the necessity of any of it.

Similar time entries were made by Mr. Cerda on numerous dates throughout the rest of September, October, November and December of 2000. (Ex. A at 1-3.) Most of the entries list telephone calls without describing what the calls were about. Again, however, the calls were mostly to and from co-counsel. The entries are mostly for 12 or 18 minutes. We think the documentation is sufficient because it is reasonable to believe that at this point in the case the calls were necessary and time was not being wasted. This pattern continued from January 2001 through August 2001. (Ex. A at 3-5.) There is an entry for 8/27/01 claiming 8 hours time for "Review documents and notes and begin drafting Complaint; teleconference calls w/ Lopez and De

Leon; complete draft of correspondence." It is true that we are unable to tell how much of the 8 hours was spent on drafting, how much on reviewing documents and notes, and how much on telephone calls. However, the drafting of the complaint in this case was a major project in itself, and conferring with co-counsel, who would share responsibility for it, was necessary. We have no reason to question the 8 hours.

The complaint was filed in this court on August 31, 2001. By that time, counsel should have had a pretty good knowledge of the case. It was, after all, almost a year after they had been retained. While we have been willing to cut them considerable slack for the period up to the filing of the complaint due to the large number of plaintiffs and the obvious need for an extensive investigation, the filing date marks a rational point of departure. Counsel who expected to petition the court for fees in the event their clients prevailed should have started keeping time in a manner that would enable the court to determine the necessity and reasonableness of their claimed hours. It was time, in other words, for counsel to comply with Hensley:

> The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

461 U.S. at 433. Beginning in September 2001 (Ex. A at 5), Mr. Cerda has a number of entries claiming 12 minutes of time for

correspondence with co-counsel, without giving any indication of
the subject matter.  Then there is an entry for 9/26/01 that
states:

> Trial preparations;[6] Telephone call to Van Sickler,
> Kim; Telephone call from Van Sickler, Kim;
> Telephone call to Van Sickler, Kim; Telephone call
> to Lopez, Alejandro; Telephone call to Van Sickler,
> Kim; Telephone call from Lopez, Joseph R.

(Ex. A at 5.)  Four and a half hours are claimed for this work.
The entry gives us no idea what was discussed in these
conversations or how long each conversation should reasonably have
taken, assuming it was necessary at all.  One way to handle this,
of course, would be to continue assuming that all was well, that
everything claimed was necessary.  But that would be ignoring what
Hensley requires a district judge to do.

On 1/2/02, Mr. Cerda billed 2 hours and 6 minutes for
various telephone calls and preparation of correspondence to
opposing counsel, with no indication of what the calls or
correspondence concerned.  (At Mr. Cerda's requested hourly rate of
$450, that entry totals $945.00.)  On 1/4/02, there is a 4.5-hour
charge by Mr. Cerda for the following work:

> Telephone call to Duran, Amada; Telephone call to
> De Leon, John R.; Telephone call to Lopez, Joseph
> R; conduct legal research; Draft Amended Complaint;
> Telephone call to Spevack, Barry A.; Prepare
> correspondence to De Leon and Lopez.

(Ex. A at 7.)  There is no indication of what the telephone calls

---

[6]     The "trial preparations" Mr. Cerda would have been engaged in as
early as 2001 (the trial was in 2008) are by no means apparent.

- 13 -

were about and no indication of what the "legal research" concerned. The first amended complaint, filed on January 10, 2002, added plaintiffs and made substantial additions to the allegations of the original complaint. However, we still should know how much of the time claimed for January 4 was spent on the amended complaint, because Mr. Cerda included additional unspecified time related to the drafting of the amended complaint in his six-hour block entry of 1/10/02. (Ex. A at 7.)

Continuing with Mr. Cerda's charges in Exhibit A, we will cite further examples of entries that are either undifferentiated so as to make impossible any determination of the amount of time he spent on each item of work and/or so vague that we have no way of telling what he did.

On 1/21/02, there is a 2.5-hour entry for "[c]onduct legal research." (Ex. A at 8.) There are numerous entries consisting mostly of telephone calls with no indication of the subjects discussed, or for how long, which make the need for such calls impossible for the court to evaluate. An example is Mr. Cerda's 5.1 hours for 7/22/02 (for which he seeks $2,295.00).

> Telephone call to Lopez, Joseph R.; Telephone call to Castellano, Salvatore; Meeting with Breed re discovery; continue revising interrogatory answers; Prepare correspondence to Sal; Prepare correspondence to De Leon; Telephone call from Seidman, Steven J.; prepare correspondence to Seidman; Telephone call from Lopez, Joseph R.; Prepare correspondence to co-counsel; review Minute Order; Telephone call from Seidman, Steven J.; Telephone call to Seidman, Steven J.; telephone

- 14 -

> call from Spevack's office; Prepare correspondence
> to Seidman; review fax from Seidman; Review Motion
> to Quash; Review correspondence from Geanopoulos;
> Telephone call to De Leon, John R.

(Ex. A at 16.) Rather than quoting further entries in 2002 and 2003, we will simply refer to some examples of dates during those years when Mr. Cerda made time entries of the same kind: 8/5/02--4.1 hrs.; 8/15/02--4.7 hrs.; 8/19/02--12.9 hrs.; 8/27/02--9.4 hrs.; 2/10/03--4.3 hrs.; 3/21/03--6.8 hrs.; 3/31/03--7.6 hrs.; 4/7/03--9.3 hrs.; 6/27/03--2.1 hrs.; 10/7/03--5.8 hrs.; 10/31/03--6.7 hrs.; 12/1/03--6.2 hrs.; 12/4/03--7.1 hrs.; 12/18/03--2.3 hrs. (Ex. A at 17-20, 28, 30, 32-33, 38, 44-45, 48, 50-52.)

The fact that Mr. Cerda's telephone conversations occurred so frequently with co-counsel, such as Messrs. Lopez and De Leon, increases the potential for awarding excessive compensation. As we shall see when we review the time charges of Messrs. Lopez and De Leon, they are charging for these same telephone calls. If in fact the calls were unnecessary, and the court were to award the fees requested, the defendants would be charged triple time for unnecessary work.

There are some instances where the "block billing" is not a problem. In April 2002, there are charges of 7 hours or more for preparation and presentation of some of the plaintiffs for their discovery depositions. It is obvious what this work would be, so it was not necessary to break it down.

Some of the entries for 2003 and 2004 are satisfactory,

especially where one item or a number of items that are clearly interrelated are listed, so that it is not essential to know the time spent on each. This is true, for instance, where Mr. Cerda prepares for the deposition of one of his clients, confers with the client about the deposition, and then attends the deposition with the client. The total time listed for these related events is subject to at least some kind of appraisal by the court for its reasonableness and, of equal importance, it gives the defendant's attorneys an opportunity to state why they believe the time is excessive, based upon their own knowledge of the deposition and the work they did in connection with it.

Similarly, entries consisting mostly of telephone calls, not specifically stating what was discussed, can still pass muster if the context indicates what the calls must have been about and the total length of time claimed does not seem excessive in light of what appears to have been their likely subject. One example is where the calls occur immediately before a hearing on an important contested motion. But where the undefined "legal research," document review, and telephone calls do not occur in a context that indicates their purpose, the court has no basis for an informed opinion as to whether the work was necessary. Moreover, the defendants are afforded no opportunity to question the need for any specific work or to challenge the amount of time claimed for it.

Another consequence of Mr. Cerda's failure to document the

- 16 -

time spent on specific tasks is that it makes it impossible for the court or the defendants to know what time was spent on claims on which the plaintiffs did not prevail. Only 23 of the 78 plaintiffs received favorable jury verdicts, against just 6 of the 12 individual defendants. Partial success is the subject dealt with in Hensley. The Court quoted with approval the following language from Nadeau v. Helgemoe:

> As for the future, we would not view with sympathy any claim that a district court abused its discretion in awarding unreasonably low attorney's fees in a suit in which plaintiffs were only partially successful if counsel's records do not provide a proper basis for determining how much time was spent on particular claims.

461 U.S. at 437 n.12 (quoting 581 F.2d 275, 279 (1st Cir. 1978), abrogated on other grounds by Richardson v. Miller, 279 F.3d 1 (1st Cir. 2002)).

Defendants point out the predominance of unsuccessful over successful claims and argue that "the limited success of Plaintiffs should result in a significant reduction of fees." (Defs.' Letter at 8-11.) Plaintiffs' response to this argument is that all of the claims were interrelated in that they involved a common core of facts and are based on related legal theories. The common core of facts is "about what happened at the Duran home." The legal theories of the prevailing plaintiffs are "related" to those of the plaintiffs who did not prevail, and the plaintiffs who did not prevail "were needed as eye witnesses to the event to support the

claims of prevailing plaintiffs." (Pls.' Mot. for Fees at 37.)

We think the defendants have the better of the argument. Most of the plaintiffs who did not prevail on any claims were those who alleged that they were sprayed inside the house. The jury found in favor of Officers Peslak and DeCianni on those claims. They were the only defendants most of these plaintiffs sued. The determination of whether DeCianni and Peslak were guilty of spraying into the house required a finding by the jury that was quite separate from the findings they had to make concerning whether other plaintiffs were being beaten and sprayed in the yard by entirely different defendants. Granted, the plaintiffs inside the house were claiming that the spraying constituted excessive force and violation of various state laws, the same legal theories asserted by other plaintiffs who complained about events in the yard, but these "related" legal theories were based on completely different facts. As for the plaintiffs in the house being necessary witnesses to what took place in the yard, there were numerous other party guests who testified to what took place in the yard, and we have no specific recollection of any of the plaintiffs inside the house testifying to anything they saw occurring in the yard. Plaintiffs provide no examples. In any event, the testimony would have been cumulative.

Plaintiffs assert:

Other than suggesting that time preparing certain unsuccessful plaintiffs for deposition and trial,

- 18 -

> defendants have not identified briefs or general
> tasks which should be cut from plaintiffs [sic]
> time, nor offered their comparable time as a guide
> to how much time should be cut.

Id. at 37. Plaintiffs' counsel do not appear to understand that the burden of proving what time should not be deducted rests upon them, not the defendants.

We have commented on Mr. Cerda's time entries for the years 2002 and 2003, observing that they are frequently insufficient to indicate what specific work he was doing, whether the work was necessary, how long it reasonably should have taken, and whether it related to unsuccessful claims. We will now undertake a similar analysis of the years 2004, 2005, 2006 and part of 2007.

The same pattern continues, year after year. Occasional entries, where a single task is listed, are adequate. For instance, on 8/13/2004, Mr. Cerda charged one-half hour for "Review the Town's Answer to Plaintiffs' Fourth Amended Complaint." (Ex. A at 68.) This appears to be a reasonable amount of time spent on something that obviously needed to be done. The entry illustrates the fact that the explanation need not be lengthy; usually just a few words will do. But the majority of Mr. Cerda's entries for these years are insufficient to enable the court or defense counsel to determine what was done, how long it should have taken and what it concerned. This is especially true of the multitude of entries that lump together collections of telephone calls without stating their subjects.

- 19 -

Further examples of adequate entries are some of those relating to Mr. Cerda's work on the interlocutory appeal in 2006, where he lists simply "Work on appeal." (See, e.g., Ex. A at 84, 4/24/06 & 5/02/06 entries.) The Town's objection to these entries is uniform: "Vague and non-descriptive as to the nature of the task, the subject matter or its necessity." (Ex. D at 113.) It appears that Mr. Cerda was the principal author of the plaintiffs' brief on certain defendants' appeal of the court's denial of qualified immunity. His time entries are general, but the subject matter of the work is clear enough, and, if the total time he claims to have spent on the appeal appeared to defendants to be excessive, they could have pointed that out. They have not done so.

On July 25, 2007, the court entered an order setting the case for trial on January 7, 2008 and closing discovery on October 31, 2007. At that point, plaintiffs' counsel had over five months to finish discovery and prepare for a complicated trial. Like the initial period up to the filing of the complaint, this five-month period right before trial is unlikely to have involved much wasted time (on either side). The court is therefore inclined to be much more tolerant of time entries for this period that are lacking in specificity. The Town continues to complain of block billing and vague entries that do continue to characterize many, if not most of the entries during this period, but we are disinclined to make any

reductions for the entries from July 25, 2007 to January 7, 2008.

We have the same view of the time entries during the trial, which began on January 7, 2008 and ended on February 15, 2008. Mr. Cerda's time entries for the days on trial typically read "trial preparations; trial" and claim as much as 20 hours of time per day. Defendants continue their "block billing and vague entry" objections to these entries, but the lack of detail is not troublesome. We know what Mr. Cerda was doing because, in large part, we saw him doing it. That he worked long hours before and after the close of each trial day is no surprise; it is what a trial lawyer must to do to be successful, and we have no doubt that he did it. Again, if defendants believed that the total time claimed was excessive, say, in comparison to the amount of time spent by defendants' counsel, that could have been argued.

After trial, there was a busy period of post-trial motions, research and briefing of the motions, preparation of the plaintiffs' bill of costs, and consideration of an appeal. The court is familiar with most of the work referred to in Mr. Cerda's entries during this time in that we considered and ruled on the post-trial motions. Many of the telephone calls and exchanges of correspondence were with defense counsel. We are unable to say that the work was unnecessary or that the claimed time was excessive. Again, defense counsel, essentially working in parallel with plaintiffs' counsel, could attempt to show why the total time

claimed for the post-trial period was excessive, but they have not done so.

The last date for which Mr. Cerda claims compensation in the present fee petition is July 2, 2008.

We will not make any reduction for the period of July 25, 2007 to July 2, 2008.

## TIME CHARGES OF PLAINTIFFS' CO-COUNSEL

We now turn to a consideration of the time claimed by Mr. Cerda's original co-counsel--Messrs. Joseph Lopez and De Leon--and Messrs. Mark Parts and Alejandro Lopez, who joined later as additional counsel.

It will not be necessary for us to describe these attorneys' time entries with the same detail we used regarding Mr. Cerda's entries because an examination of Exhibit A (the chronological listing of all entries by all of plaintiffs' attorneys) shows that the entries follow the same pattern: block entries with no indication of the time devoted to the individual tasks; vague entries, such as "telephone conversations," with no description of the subject matter or duration; "review" of unspecified documents; and research and correspondence, the purpose of which is not stated. There are the same mitigating factors we found in regard to some of Mr. Cerda's entries, as where the context indicates what must have been the purpose and necessity of the work. With respect to Messrs. Joseph Lopez and Parts, who rendered necessary legal

services and participated as trial counsel, we will apply the same leniency for the same designated time periods as we did for Mr. Cerda.

We take a different view of the work claimed by Mr. De Leon. He has billed 197.3 hours at a requested rate of $500 per hour, which comes to $98,650.00, considerably less than the totals requested by each of the other attorneys. Mr. De Leon's practice is primarily criminal defense, and his initial involvement with the Duran plaintiffs was as co-counsel along with Messrs. Cerda and Joseph Lopez in the defense of the criminal cases arising out of the occurrences at the baptismal party. In his affidavit submitted in support of his fee request, Mr. De Leon states: "I worked on preparing this case for trial and coordinated the witnesses with the attorneys on a daily basis. I observed many court proceedings and offered advice to the attorneys during the trial phase." (Pls.' Mot., Ex. K ¶ 6.)

The three attorneys who tried this case for the plaintiffs have all had extensive trial experience. Mr. Cerda and Mr. Parts have specialized for many years in the representation of plaintiffs in § 1983 cases and are familiar with the applicable law. (Pls.' Mot., Exs. I, M.) Mr. Joseph Lopez is primarily a criminal defense attorney with an extensive amount of jury trial experience, and he participated in the preparation and trial of this case. (Pls.' Mot., Ex. L.) Mr. De Leon's statement that he "offered advice to

- 23 -

the attorneys during the trial phase," without any further description, does not persuade us that the advice was necessary, considering the backgrounds of the attorneys who tried the case. Similarly, the phrase "coordinat[ing] the witnesses" fails to inform us about the need for whatever it was Mr. De Leon was doing. It also fails to indicate the need for an attorney to do it. The same is true of his time entries for the pretrial and post-trial phases of the case. Their frequent vagueness, and failure to indicate how much time he was spending on particular tasks, leave us in doubt as to whether his participation in the case was truly necessary.

Mr. Alejandro A. Lopez is an attorney who had very limited involvement in this case. He entered this case in late fall 2007, apparently after we set the January 2008 trial date. Mr. Lopez states in his affidavit:

> After obtaining my law license in 2003, I expanded my role with the firm [Jauregui & Associates] by trying cases before the Illinois Workers Compensation Commission, taking evidence depositions and preparing and presenting clients for their depositions and testimony at trial.
>
> In the late fall of 2007, I began assisting Mr. Cerda with trial preparation of plaintiffs and witnesses in Duran, et al., v. Town of Cicero, et al. I assisted trial counsel, with my bilingual speaking abilities, in the trial preparation of the plaintiffs in the cause of action, providing them with legal explanations and facilitating their understanding of the court proceedings. I completed my work in Duran at the end of the trial.

(Pls.' Mot., Ex. P ¶¶ 7-8.) Mr. Alejandro Lopez's exact role in

- 24 -

the case is difficult to determine, and the need for his services
to supplement that of the other attorneys, Messrs. Cerda, De Leon,
Parts and Joseph Lopez, has not been shown.  Plaintiffs contend in
their motion:

> In this case, Mr. Lopez prepared witnesses for
> trial greatly reducing the work of more senior
> counsel.  Mr. Cerda entrusted Mr. Lopez to prepare
> witnesses with little oversight because of Mr.
> Lopez' understanding of the relevance and
> importance of the facts of the case as well as the
> rules of evidence.  Mr. Lopez is bilingual which
> obviated the need for interpreters further reducing
> the costs of litigating the case.

(Pls.' Mot. at 31-32.)  It is impossible for this court to believe
that the trial lawyers in this case did not meet and confer with
their witnesses before putting them on the stand, but instead left
it to an associate who had entered the case just a few months
earlier and had not been privy to the work that had been done
during the years the case had been pending.  We have given Messrs.
Cerda, Parts and Joseph Lopez full credit for the great number of
hours each of them claim for out-of-court time during the trial
because we assumed that they spent whatever portion of that time
was necessary to confer with their witnesses for the next day.
Alejandro Lopez is said to have been valued because he speaks
Spanish, but so does Joseph Lopez.[7]  Neither Mr. Cerda nor Mr. De
Leon states whether they speak Spanish, but neither do they say

---

[7] Joseph Lopez states: "I assisted counsel in this case with witness
preparation of over 40 witnesses and assisted Mark Parts on occasion with
interpretation since I speak Spanish and many of the witnesses spoke only
Spanish."  (Pls.' Mot., Ex. L ¶ 10.)

- 25 -

that they do not speak Spanish.[8]

Plaintiffs' claim as to Mr. Alejandro Lopez is for 173 hours at $250 per hour for a total of $43,250.00. (Pls.' Mot., Ex. A at 143.) Plaintiffs have not shown the necessity of the services claimed to have been performed by Mr. Alejandro Lopez in addition to those claimed by Messrs. Cerda, De Leon and Joseph Lopez. Therefore, no fees will be allowed for Mr. Alejandro Lopez.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' ARGUMENT REGARDING INSUFFICIENT DOCUMENTATION OF HOURS

In their fee petition, the plaintiffs make two basic arguments in response to defendants' objections regarding vagueness and block billing. The first is that the various attorneys who have represented defendants over the life of this case have submitted the same kind of billing to their clients and have been paid. (Pls.' Mot. at 32-36.) Plaintiffs assert:

> Defendants' contention that plaintiffs' bills are not sufficiently detailed and should be cut globally is offensive because of the double standard defendants seek to impose on plaintiffs and, further, because defendants' counsel billed twice as many attorney hours to the case.

(Pls.' Mot. at 35.) Examples of the billing referred to by plaintiffs are included in Exhibit R to plaintiffs' motion, and some do show vague entries and block billing by the Town's attorneys. But the argument is irrelevant. Our task is not to determine whether bills submitted to the Town were adequately

---

[8] Mr. De Leon states that he "coordinated the witnesses with the attorneys on a daily basis." (Pls.' Mot., Ex. K ¶ 6.)

documented or whether the Town's attorneys billed too much time. We have enough to do to determine what fees were reasonably and necessarily earned on behalf of the plaintiffs and therefore assessable against defendants pursuant to § 1988. Plaintiffs have cited no case in support of their contention that the format of bills submitted to defendants should serve as a guide to what suffices under <u>Hensley</u>, and, of course, there is no such case.

Plaintiffs' other argument is that the Seventh Circuit has indicated in various cases that if "counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not require more." (Pls.' Mot. at 32-33 (quoting, <u>inter alia</u>, <u>In re Synthroid Mktg. Litig.</u>, 264 F.3d 712, 722 (7th Cir. 2001)).) Therefore, according to plaintiffs, since "the level of detail in plaintiffs' bill is satisfactory to paying clients such as the Town of Cicero . . . this Court should not require more detail nor cut globally plaintiffs' billable hours for so called 'block billing'." (Pls.' Mot. at 33.)

We have no problem with the proposition that block billing, and even vague entries, can suffice under some circumstances. In this very opinion we have held this kind of documentation to be adequate when it related to work for reasonable periods on factual investigation, the interlocutory appeal, trial preparation for this complicated case, the trial itself, and post-trial motions. The nature of the work that was required during these periods of time

was fairly obvious and defendants did not point out any time that appeared to be excessive.

Many "paying clients" would not require more documentation than we have for work whose purpose is obvious. And it is also true that there are clients who pay bills even when the purpose of the insufficiently documented work is not apparent and they have no way of assessing whether the work was necessary or that the time was reasonable. Various factors account for this fact. Many clients are simply unsophisticated about fees and do not know that they are entitled to a more informative breakdown than they receive from their attorneys. They may wonder about the bill, but having no knowledge of what they can do about it, they pay it. Another situation where the paying client will often accept a bill in the form submitted by plaintiffs' counsel in this case is where the lawyer and the client have a long-standing relationship, sometimes existing for decades. The client is satisfied with the lawyer's services, trusts the lawyer to do the right thing, and desires to maintain the relationship. That kind of client may be unwilling to risk a breach in the relationship by indicating a distrust of the bill.

But aside from the fact that for these and other reasons, many clients will often pay bills that would never survive a Hensley analysis, there is a growing trend among sophisticated clients, such as publically-held corporations, to demand billing

that specifies exactly what was done and how much time was spent on each task:

> [A]ttorney-client relationships have changed. Clients, who thirty years ago were considered quite docile (paying thousands of dollars for bills lacking any detail other than as compensation "for services provided"), have shifted to demanding detailed accountings as a predicate to payment. Sophisticated clients now scrutinize legal bills to ferret out exorbitant charges and to prevent "padding" through charges for unnecessary work or exaggerated hourly totals.

Dennis Curtin & Judith Resnik, Teaching Billing: Metrics of Value in Law Firms and Law Schools, 54 Stan. L. Rev. 1409, 1412-13 (2002) (book review). See also Gerald F. Phillips, It's Not Hourly Billing, but How It's Abused That Causes the Poor Image of Attorneys, 18 No. 3 Prof. Law. 21 (2007). No appellate court has stated that Hensley is satisfied by a simple trial court finding that the billing in question is similar to billing that "is satisfactory to paying clients," even when the court is unable to tell whether the time billed was reasonably and necessarily expended. The Seventh Circuit's reference to bills "satisfactory" to paying clients in cases such as Synthroid, 264 F.3d at 722, must be given a reasonable interpretation, and certainly the Court has not meant that because a fee petitioner can always cite examples of clients who pay bills with block billing and vague entries that render impossible any determination of what was done, the trial court should automatically approve that kind of billing when

- 29 -

deciding the petition.[9]

If it is not already clear, we wish to emphasize that, with the exceptions we have noted, plaintiffs' vague entries and block billing make it impossible for us to fulfill our obligation to determine what was done, whether it was reasonably necessary, and whether a reasonable amount of time was spent on it. Other courts have expressed the same kind of frustration, disallowing time that is not adequately documented. For instance, in Tomazzoli v. Sheedy, 804 F.2d 93 (7th Cir. 1986), the Court affirmed the trial court's reduction of § 1988 fees. The Court stated that many of the time entries contained only vague descriptions of the legal research that had been performed and "[f]urther, the total number of hours attributable to research alone is uncertain; in some instances [counsel] lists 'research' along with other tasks performed and gives but a single total for the combined work." Id. at 98. Other Courts of Appeals have ruled the same way. See, e.g., Mallinson-Montague v. Pocrnick, 224 F.3d 1224, 1234 (10th Cir. 2000) (to satisfy their burden in applying for attorney's fees in federal civil rights actions, "attorneys must keep and produce meticulous time records which reveal all hours for which compensation is requested and how those hours were allotted to specific tasks") (internal quotation marks and ellipsis omitted);

---

[9] See United States v. Chase, 281 F.2d 225, 229 (7th Cir. 1960) ("[T]he District Courts as well as the Courts of Appeals must follow the decisions and interpretations of our highest court in spite of any individual predil[e]ctions that may exist.").

Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 971 (D.C. Cir. 2004) (commenting that when time records "lump together multiple tasks," it is "impossible to evaluate their reasonableness").

In Delgado v. Village of Rosemont, No. 03 C 7050, 2006 WL 3147695 (N.D. Ill. Oct. 31, 2006), another § 1983 excessive force claim brought by Messrs. Cerda and De Leon, Judge Leinenweber reduced their requested fees for inadequate documentation:

> Specifically, Defendants complain about "block-billing" and vagueness as to particular tasks' nature, subject matter, or necessity. The time entries Plaintiffs have submitted provide little detail and repeatedly block-bill. While Plaintiffs argue that their billing is satisfactory, this court has had no end of trouble attempting to deny Plaintiffs' requested attorneys' fees for clerical tasks due to the attorneys' and paralegals' penchant for block-billing. This Court was unable to ascertain what hours to attribute to the malicious prosecution claim and had to adopt the figure provided by Plaintiffs in their brief. Additionally, the repeated failure of the attorneys and paralegals to indicate what telephone calls and research concerned, even in the most general of terms, has made it impossible for this Court to evaluate whether these fees were reasonably necessary as already noted. As such, this Court is prepared to make a proportionate reduction of the fees for insufficient description.

Id. at *7. State courts have dealt with this problem in a similar fashion. See, e.g., Kaiser v. MEPC Am. Props., Inc., 518 N.E.2d 424, 430 (Ill. App. Ct. 1987) (affirming reduction of $28,228.60 request to $13,729.00) ("[I]t is impossible to determine exactly what amount of time was expended on each task listed because in most instances, the time for all work performed by an attorney on

a given day was aggregated into a single hourly total for that day. Consequently, there is no completely objective manner by which to determine the reasonableness of the charges.").

We reject the plaintiffs' attempt to justify their vague entries and block billing. We will take these deficiencies into consideration when determining what fees we can allow.

Defendants have one additional complaint about the plaintiffs' billing. They object to what they consider secretarial or clerical tasks that were billed at attorneys' rates. Defendants cite Spegon v. Catholic Bishop of Chicago, 175 F.3d 544, 553 (7th Cir. 1999), for the proposition that such work is "easily delegable to non-professional assistance." (Defs.' Letter at 4-5.)

The plaintiffs disagree that the items defendants consider secretarial or clerical are being accurately characterized. And they reiterate their argument that the defendants' attorneys billed at attorneys' rates for the same kind of work. (Pls.' Mot. at 40-43.) What the defendants' attorneys did is irrelevant. But whether the work in question was clerical is, in some instances, debatable. The amount of time involved is small in relation to the total fees claimed. Defendants contend that plaintiffs' counsel seek fees for the following amounts of clerical work: 2.3 hours for Mr. Lopez; 1.4 hours for Mr. De Leon; and 4 hours for Mr. Parts. As for Mr. Cerda, defendants find 12.8 hours of "ascertainable" clerical tasks, and in addition, 76 different block-billed entries

- 32 -

as to which the amount of clerical time involved cannot be ascertained. (Defs.' Letter at 4.)

Because our reductions will be based on a percentage of the total fees claimed, any reduction for clerical work would be so minuscule as to be indiscernible. Accordingly, we do not find it worth the time it would require to examine and analyze each of the alleged clerical entries.

Because of plaintiffs' counsel's deficient documentation-- vague entries, block billing and failure to identify time spent on unsuccessful claims[10]--we must reduce the amount of time for which plaintiffs would be entitled to compensation had their time records been kept in the manner required by Hensley. Because the time records make it impossible to ascertain what specific amounts of time should be excluded as unnecessary, excessive or devoted to unsuccessful claims, we will reduce the requested fees by what we determine to be a reasonable percentage. See Harper v. City of Chicago Heights, 223 F.3d 593, 605 (7th Cir. 2000) ("[W]hen a fee petition is vague or inadequately documented, a district court may either strike the problematic entries or (in recognition of the impracticalities of requiring courts to do an item-by-item accounting) reduce the proposed fee by a reasonable percentage.").

---

[10] Although we have held that the plaintiffs' time entries during certain time periods are sufficient despite their lack of specificity, that has nothing to do with the fact that the records they kept are insufficient to indicate what work they did during those periods on claims which ultimately turned out to be unsuccessful.

- 33 -

A reasonable percentage obviously must be an estimate--our best approximation of the percentage of the total time claimed that is not adequately documented as to its necessity or reasonableness (and not billed during the time periods for which we have held vague entries and block billing to be excusable). We have given the time records the necessary "close look," as directed by Dutchak v. Central States, Southeast and Southwest Areas Pension Fund, 932 F.2d 591, 597 (7th Cir. 1991). In fact, given the nature of the records, we are unaware of what more we could be expected to do.

Defendants argue for a 75 percent overall reduction. That would be excessive. Our best estimate is 30 percent, and that is the percentage we will apply to each of Messrs. Cerda, Lopez and Parts. Because Mr. De Leon has not made a persuasive case that his services were actually needed, and we have considerable doubt about it, we will reduce his hours by a greater percentage, namely, 50 percent. The effect of these reductions is as follows:

| Attorney | Total Number of Hours Billed | Number of Hours Deducted | Number of Hours Allowed |
|---|---|---|---|
| David A. Cerda | 2514 | 754.2 | 1759.8 |
| Joseph R. Lopez | 612.3 | 183.7 | 428.6 |
| Mark Parts | 729.1 | 218.7 | 510.4 |
| John R. De Leon | 197.3 | 98.7 | 98.6 |
| Alejandro Lopez | 173 | 173 | 0 |

- 34 -

## HOURLY RATES

We will now discuss appropriate hourly rates, which are "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). A reasonable hourly rate is "derived from the market rate for the services rendered." Denius v. Dunlap, 330 F.3d 919, 930 (7th Cir. 2003).

A threshold issue is whether there will be a single hourly rate for each attorney for all of the years covered by the billing, as plaintiffs desire, or a different hourly rate for each of the nine years, as the defendants suggest. We believe the plaintiffs' approach is preferable. They point out that they have had to wait many years for payment of their fees and argue that the use of hourly market rates for 2008 would be an appropriate way to compensate for the delay in payment, citing Smith v. Village of Maywood, 17 F.3d 219, 221 (7th Cir. 1994), and Lightfoot v. Walker, 826 F.2d 516, 523 (7th Cir. 1987). Plaintiffs' proposal has the advantage of greater simplicity, and we see nothing unfair about it. Market rates for the year 2008 will be the reference point for determining the appropriate rates for the plaintiffs' attorneys. In addition, since the "current rates" used in the plaintiffs' fee petition are four years old, we will award interest on plaintiffs' fee award at the annual average of the prime rate, compounded annually, from July 3, 2008 through the date of our fee award. See

- 35 -

In re Cont'l Illinois Secs. Litig., 962 F.2d 566, 571 (7th Cir. 1992) (if the district court uses current rates, it must make some provision for the interval between the "current" period and the date of the fee award); Dupuy v. McEwen, 648 F. Supp. 2d 1007, 1018-19 (N.D. Ill. 2009).

Fees in § 1983 cases that are tried to a favorable verdict are not paid by clients, but by court order, such as the one we will be entering at the conclusion of this opinion. The cases are, like this one, handled on a contingent-fee basis. The hourly rates cited to the court are, in part, hourly rates approved by other judges who relied in part on the decisions of still other judges. The petitioning attorneys often provide affidavits of other attorneys who state what they or other attorneys have charged in similar cases and sometimes offer their opinions as to the appropriate rates for the petitioners. These "third party affidavits are a better way to prove market rates . . . ." Spegon, 175 F.3d at 556.

In support of his proposed $425 rate, Mr. Parts has submitted the Declaration of Michael A. Lawson, a (now-retired) partner in the firm of Skadden, Arps, Slate, Meagher and Flom. (Pls.' Mot., Ex. M.) This declaration is actually a copy of one that Mr. Lawson submitted in 2005 in a case pending before a Special Master in the Central District of California. Mr. Parts spent six years as an associate with the Skadden firm, and Mr.

- 36 -

Parts's argument is that the declaration therefore supports the rate he seeks here. In describing his own work, Mr. Lawson states that he has "provided advice in the context of financings, cross-border transactions, private investment company matters and merger and acquisition transactions." His experience "also includes advising clients with respect to the structuring and offering of investment vehicles to pension plans and other institutional investors . . . ." (Lawson Decl. ¶¶ 3-4.) Attached to the declaration is a copy of Skadden's "standard hourly time charge schedule," dated September 1, 2005. It shows that the rates for "partners and of counsel" range from $575 to $835 per hour. The relevance of Mr. Lawson's declaration is limited. The kind of work he does is not the same as federal court trial work in § 1983 cases. We do not mean to say that one kind of work is more important or difficult than the other, but the fact that it is radically different work makes us question whether the hourly rates for one can be taken as a standard for rates in the other. Our reservation extends to the Skadden hourly rate schedule. We are unable to tell what rates apply to what types of work. The lowest rate--$575--exceeds any rate allowed in a § 1983 case in this court, as far as we are aware.

Exhibit N to plaintiffs' motion is the affidavit of Melvin L. Brooks, a partner with the law firm of Cochran, Cherry, Givens, Smith & Montgomery, also submitted in support of Mr. Parts's

- 37 -

request for fees. Mr. Brooks first worked with Mr. Parts in the City of Chicago's Law Department and later recommended that he be hired by the Cochran firm. The firm "has a significant case load of civil rights cases, particularly those involving police misconduct." Mr. Brooks does not give any examples of court-awarded fees that he or his firm have received. Mr. Brooks does say in conclusory fashion that he is "aware of the legal market in our community in this regard" and that he considers Mr. Parts's request of $425 per hour to be "very reasonable" and in fact on the low side. (Pls.' Mot., Ex. N, Aff. of Melvin L. Brooks ¶ 8.) This affidavit is of no help.

Another declaration submitted by Mr. Parts is that of Matthew J. Piers, an experienced litigator who has tried a number of civil rights cases and is familiar with "hourly rates charged by . . . other federal litigators in the Chicago area." Mr. Piers handles other types of litigation as well, and we are not clear whether his statement that his "professional rate for legal services is $550" applies to the § 1983 cases he handles. Mr. Piers cites no examples of any § 1983 awards he has received. He speaks highly of Mr. Parts and opines that Mr. Parts's requested rate of $425 is "reasonable, and lower than the rates of many other attorneys in the Chicago area with [Mr. Parts's] experience and expertise." (Pls.' Mot., Ex. O, Decl. of Matthew J. Piers ¶ 7.) He does not state that the higher rates to which he refers are

rates received by attorneys doing work comparable to that of Mr. Parts. The wording of this declaration makes it difficult to evaluate its weight.

Mr. Parts's own affidavit, Exhibit M, refers to his extensive trial experience, but apparently he has never been granted a § 1988 fee award, because he cites none. Therefore, it appears that we will be the first court to fix his appropriate hourly rate.

In his affidavit, Mr. Cerda refers to a number of § 1983 cases he has settled for large amounts of money, but these cases involved no court determination of an hourly rate, and we assume that he charged his clients the agreed percentage provided for in his contingent-fee contracts. He cites two cases in which a judge determined his hourly rate. One is Delgado, where Judge Leinenweber awarded Mr. Cerda fees at an hourly rate of $375.00. (Pls.' Mot., Ex. I, Aff. of David A. Cerda ¶ 11.) The other case is Torres-Rivera v. Espada-Cruz, Civ. No. 99-1972CCC, 2007 WL 906176 (D.P.R. Mar. 22, 2007). Mr. Cerda states: "The jury returned a verdict in excess of $340,000. The undersigned successfully defended the verdict on appeal. Later, the undersigned successfully argued in favor of reversing the district court's award on [sic] attorney's fees." (Cerda Aff. ¶ 9.) Mr. Cerda omits some important facts. The district court, Judge Cerezo, criticized him for his vague entries and block billing,

- 39 -

pointing out that his total fees had been reduced on that account in Delgado. The court set Mr. Cerda's hourly rate at $200 (the prevailing rate in Puerto Rico, see Torres-Rivera v. Espada-Cruz, Civ. No. 99-1972CCC, 2006 WL 2136640, at *2 (D.P.R. July 27, 2006)) and reduced his fee by 15 percent due to the vague entries and block billing. Id. at *2-3.

Mr. Cerda's statement that he "successfully argued in favor of reversing the district court's award on attorney's fees" is true, but in a way that does not help him here. In Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 340 (1st Cir. 2008), the Court of Appeals affirmed the district court's 15-percent global reduction for vague entries and block billing, stating that "the decision to make the fifteen percent global reduction plainly falls within the range of reasonableness."

The Court of Appeals found, however, that the trial court had erred in two respects. First, it had apportioned the judgment equally against the two defendants despite the fact that most of the time spent on the case was devoted to proving the liability of one of the defendants. The Court of Appeals held that the trial court "should as a matter of law have used the 'time expended' method of apportionment and calculated the approximate time spent in litigating against each defendant." Id. at 339. The second error was the refusal of the district court to grant a supplemental motion for fees for prosecution of the fee petition itself and for

- 40 -

collection efforts.  Id. at 340-41.  For these reasons, the fee
award was vacated and remanded with directions to apportion the
judgments differently and to determine plaintiffs' appropriate fees
for the matters presented in the supplemental motion.[11]

Mr. De Leon's affidavit, Exhibit K, refers to an hourly rate
he charged in a criminal case, but no § 1983 fee awards.  (We know,
however, that in Delgado, where he was co-counsel with Mr. Cerda,
Judge Leinenweber awarded him fees at the rate of $425 per hour
($50 more than Mr. Cerda)).  2006 WL 3147695, at *4-5.

Mr. Lopez's affidavit, Exhibit L, provides an example of his
hourly rates in criminal cases, but this appears to be the first
case in which any court has been called upon to set his hourly rate
in a § 1983 case.

In addition to these declarations and affidavits, plaintiffs
attach as Exhibit E to their fee petition a 2008 National Law
Journal Survey that lists the hourly billing rates of partners and
associates at the nation's 250 largest law firms.  The survey is of
limited relevance.  That partners at Jenner & Block charged from
$525 to $1,000 per hour and those at Winston & Strawn charged from
$400 to $975 per hour is not a basis for awarding the attorneys in
this case any such hourly rates.  We cannot tell from the survey
whether the attorneys from these firms that primarily represent

---

[11]  The district court judge had reduced the hourly rate from $175 to $50
for David Breed, Mr. Cerda's paralegal. 2007 WL 906176 at *2. Apparently, Mr.
Cerda did not appeal this ruling, because it is not mentioned in the Court of
Appeals's opinion.

- 41 -

large corporate clients are doing work that is comparable to the work done by plaintiffs' attorneys in this case.  It is unlikely that the attorneys at Jenner & Block and Winston & Strawn who charge high fees are doing trial work because we know that these large firms are rarely involved in trials.  Plaintiffs maintain that the rates charged by these firms reflect rates "for Chicago attorneys engaged in complex federal litigation," Pls.' Mot. at 17, but there is nothing in the survey that indicates the kind of legal work being performed.  Only the rates are listed.

Plaintiffs do not argue that they should be paid at the top of the ranges shown in the survey; they are seeking rates of $500 (Messrs. De Leon and Lopez), $450 (Mr. Cerda) and $425 (Mr. Parts). Perhaps their point is that the lower rates at the big firms support their claims.  We think that the survey is relevant for that purpose because we can safely assume that much of the work at the lower end of the range at these large firms is related in some way to "litigation," such as propounding and answering discovery requests and reviewing voluminous documents.

Plaintiffs also cite the "Laffey Matrix" and the "Adjusted Laffey Matrix"[12] as support for the reasonableness of their requested hourly rates.  (Pls.' Mot. at 19-21.)  The Matrices are included as Exhibits F and G.  The Laffey Matrix was prepared by the United States Attorney's Office for the District of Columbia.

---

[12]  This Matrix is adjusted to reflect Consumer-Price-Index calculations specific to legal services.  (Pls.' Mot., Ex. G.)

- 42 -

The Matrices show hourly rates charged by Washington, D.C.-area attorneys and paralegals of varying years of experience. The Matrices have been used extensively by judges in the District of Columbia in fee-shifting cases. We will consider the Matrices, even though they are not evidence of rates charged by lawyers in the same "community," see Blum, 465 U.S. at 895 n.11.

The most significant affidavit submitted by Mr. Cerda in support of his requested hourly rate is that of Jon Loevy. (Pls.' Mot., Ex. J.) Mr. Loevy was licensed to practice law in 1994, served as a law clerk to Judge Shadur, and worked for a short time at the firm of Sidley & Austin. He started his own firm, along with this wife and father, in 1997. His practice is "concentrated primarily in civil rights." (Loevy Aff. ¶¶ 1-2.)

Mr. Loevy states that "the most recent adjudication of [his] rate was last year by Judge Lefkow, at $395/hour in Robinson v. City of Harvey, 2008 WL 4534158 (N.D. Ill. Oct 7, 2008)." (Loevy Aff. ¶ 4.) He also states:

> This $395/hour figure was representative of the natural progression of hourly rates. In 2007, Judge Bucklo awarded me $365/hour in Lopez v. City of Chicago, Case No. 01 C 1823, a case where I was not the primary attorney, and earlier in 2008, Judge Shadur awarded me $375/hour in Dominguez v. City of Waukegan, Case No. 04 C 2907.

(Loevy Aff. ¶ 5.) Mr. Loevy also points out that, as of the date of the affidavit,[13] he had a client in a *habeas corpus* case who was

_____

[13] The affidavit is undated, but it was filed with plaintiffs' motion on February 9, 2010.

- 43 -

paying him at the hourly rate of $450.  (Loevy Aff. ¶ 7.)

We will return to Mr. Loevy's affidavit at the conclusion of this discussion of hourly rates.

We have addressed everything submitted by plaintiffs in support of their requested hourly rates.  We will now turn to the defendants' view of plaintiffs' requested fees.  Defendants have taken a constructive approach by suggesting what they believe to be appropriate hourly rates for each of the four attorneys.  Their suggestions are broken down by year, from 2000 through 2008.  (Defs.' Letter at 11-17.)  As we have indicated, however, we are adopting an appropriate rate for the year 2008 as the rate for all years in order to account for the delay in payment.

### Mr. Cerda

Defendants suggest a rate of $300 for Mr. Cerda for the years 2000-2002, $325 for 2003-2004 and $375 for the years 2005-2008.  They rely heavily on fee awards received by Jon Loevy, whom they describe as "a prominent Chicago civil rights plaintiff's attorney."  They also point out that a "fee award of $375.00/hr. is consistent with the fees awarded to Mr. Cerda in 2006 in Delgado."  (Defs.' Letter at 13.)

### Mr. Parts

Defendants point out that Mr. Parts has cited no previous judicial determination of his proper hourly rate and that he has failed to provide any evidence that attorneys with "comparable

experience" have been awarded fees at his requested hourly rate of
$425. Defendants are "unclear as to the extent of Mr. Part[s]'s
experience with federal civil rights claims." They conclude that
for the work Mr. Parts did in 2007 (when he entered the case) and
2008, his hourly rate should be set at $325. (Defs.' Letter at 13-
14.)

### Mr. De Leon

Defendants object to Mr. De Leon's requested hourly rate of
$500, pointing out that he is primarily a criminal defense lawyer
and did not participate in the trial (whereas he did in <u>Delgado</u>,
where he was awarded fees at the hourly rate of $425). Defendants
suggest that, for this case, Mr. De Leon's rate be set at $300 for
2000-2003, $350 for 2004-2006, and $375 for 2007-2008. (Defs.'
Letter at 15.)

### Mr. Joseph Lopez

Commenting on the fact that Mr. Lopez has received no fee
awards in federal civil rights cases and arguing that in their
view, the hourly rates Mr. Lopez charges in criminal cases are not
an appropriate guide for his rates here, defendants make the same
suggestion they made regarding Mr. De Leon: $300 for 2000-2003,
$350 for 2004-2006, and $375 for 2007-2008. (Defs.' Letter at 17.)

We now return to the affidavit of Jon Loevy. Mr. Loevy is
personally known to the undersigned in that he tried the case of
<u>Johnson v. Guevara</u>, No. 05 CV 1042, before us in June 2009. It was

- 45 -

a difficult § 1983 case in which the plaintiff claimed that the defendant police officer had caused his conviction and lengthy incarceration for a murder the defendant had no reason to believe he had committed. The case was well tried and could have gone either way. The jury returned a verdict of $21 million in favor of Mr. Loevy's client. We had no occasion to determine his hourly rate because the case was settled on appeal and no fee petition was filed. Mr. Loevy has another § 1983 case on our calendar that is still in discovery.

Mr. Loevy is well known in this district for having obtained a number of multi-million dollar jury verdicts in § 1983 cases.[14] He clearly qualifies for an hourly rate as high as any other attorney handling § 1983 cases, and probably higher than most. As stated in Mr. Loevy's affidavit, in 2008, the year we are concerned with, Mr. Loevy received fee awards based on hourly rates of $395 and $375 in Robinson v. City of Harvey and Dominguez v. City of Waukegan, respectively. In 2007, he received an award based on an hourly rate of $365 in Lopez v. City of Chicago. The hourly rates fixed for Mr. Loevy in those cases were not as high as the $500, $450, and $425 rates for 2008 that the four attorneys in this case are claiming.

We conclude that the appropriate 2008 hourly rate for

---

[14]    His success continues to the present day; he recently obtained a $25 million jury verdict in a § 1983 wrongful-conviction case. See Jeremy Gorner, $25 Million for Unjust Conviction, Chi. Trib., Jan 25, 2012, § 1, at 11.

Messrs. Cerda, Parts and Lopez is $375.   We see no basis for
distinguishing among them as to their appropriate rates.   All of
them made significant contributions to the partially-successful
result in this case and performed well at the trial.

If it were not for the fact that the defendants themselves
suggest that Mr. De Leon's 2008 rate be the same $375, we would fix
his rate substantially below that, based upon the minimal role he
played.   However, we doubt that it would be appropriate to award
him a lesser rate than the defendants recommend, so we will set his
rate at $375 per hour.

### Mr. Breed

David A. Breed is a paralegal who worked for Mr. Cerda.  He
is also a computer systems administrator and database manager.  He
logged a considerable amount of time on this case for the design
and maintenance of a case-management system and electronic
databases. He also performed paralegal work, such as document
review and assistance in preparing for depositions. (Pls.' Mot.,
Ex. Q, Aff. of David A. Breed.)  (Some of the work seems quite akin
to the practice of law, for which Mr. Breed's academic degrees
would not qualify him.)   Plaintiffs request that fees be awarded
for Mr. Breed's work at an hourly rate of $175 "for paralegal work"
and $245 "for database work."   (Pls.' Mot. at 32.)   They claim
1,916.4 hours at the $175 rate and 14 hours at the $245 rate, for
a total of $338,800.00. (Pls.' Mot., Ex. A.)  Defendants object to

- 47 -

both hourly rates as unreasonable and regard the 14 hours of database work as "clerical," which should be part of Mr. Cerda's overhead instead of being billed separately as paralegal work. Defendants suggest that fees be awarded for Mr. Breed's work at an hourly rate of $100 for 2002-2003 and $125 for 2004-2008, which would total $227,613.00. (Defs.' Letter at 17-18.)

Examining the time entries of Mr. Breed, our conclusion is that most of his activities are appropriately characterized as paralegal rather than clerical. On the other hand, we agree with the defendants that $175 an hour is too high a rate. We believe that Judge Leinenweber was correct in <u>Delgado</u> in finding an appropriate hourly rate for Mr. Breed to be $125, and that is the rate we will authorize in this case. It is also the rate that the defendants suggest for the years 2004-2008. (Defs.' Letter at 18.)

However, there is an important proviso regarding Mr. Breed. In many instances, his time entries are even more vague than the ones for which we have reduced the attorneys' hours. As examples, we will cite just a few entries from 2002:

|       |                                                            | Hrs. |
|-------|------------------------------------------------------------|------|
| 6/26  | Con[tin]ue work on interrogatories                         | 5.50 |
| 6/28  | Continue work on Interrogatory preparation and meet with Sal | 8.50 |
| 7/12  | Revise interrogatory answers; meet with Sal                | 7.00 |
| 7/14  | Continue to revise interrogatory answers and get files up to date | 6.00 |

- 48 -

| 7/15 | continue to Revise interrogatory answers and get files up to date | 7.00 |
| 7/16 | continue to Revise interrogatory answers and database update | 6.50 |
| 7/22 | Review and revise interrogatories with Sal's information | 16.10 |
| 8/6 | Review each plaintiff file for documents and originals and prepare list | 5.00 |
| 8/17 | Prepare for meeting; meet with clients in Cicero; meet with Sal and dac | 9.50 |

(Pls.' Mot., Ex. A, at 13-16, 18-19.)  This type of entry continues all the way up to the end of the billing period in July 2008.  It is not satisfactory proof of what was done, whether it was necessary, or whether the amount of time spent was reasonable.  The entry of August 17, 2002 is illustrative of this recurring problem.  The  9.5 hours billed includes preparation for a meeting with the clients in Cicero.  We have no idea what the preparation consisted of or how long that task took to complete.  The entry does not state what Mr. Breed did at the meeting or indicate in any way why his presence was necessary.  On that same date, Mr. De Leon charged 3.5 hours for "[m]eeting with clients," and Mr. Cerda charged 7.6 hours for "[m]eeting with clients in Cicero; Meeting with assistants."  (Ex. A at 19.)  At the requested hourly rates of Mr. Breed, Mr. De Leon and Mr. Cerda, the requested charges for this meeting total $6,832.50.  (See Ex. A at 20.)

We will reduce Mr. Breed's claimed hours by 60 percent.

## THE FEE AWARD TO PLAINTIFFS

Based on the foregoing analysis, the following fees are awarded to the plaintiffs:

|  | No. of Hours Claimed | No. of Hours Allowed After 30% Reduction | Hourly Rate Allowed | Total Fees Allowed |
|---|---|---|---|---|
| David A. Cerda | 2514 | 1759.8 | $375.00 | $659,925.00 |
| Joseph A. Lopez | 612.3 | 428.6 | $375.00 | $160,725.00 |
| Mark Parts | 729.1 | 510.4 | $375.00 | $191,400.00 |
| John De Leon | 197.3 | 98.6 hours allowed after 50% reduction | $375.00 | $36,975.00 |
| Alejandro Lopez | 173 | 0 | $0 | $0 |
| Paralegal David Breed | 1930.4 | 772.2 hours allowed after 60% reduction | $125.00 | $96,525.00 |

## DEFENDANTS' JOINT MOTION FOR ATTORNEYS' FEES

The Town and the individual defendants have filed their own motion for attorneys' fees under 42 U.S.C. § 1988, arguing that all of the plaintiffs' claims that were unsuccessful were frivolous and without foundation.

The circumstances under which a prevailing defendant is entitled to fees under § 1988 are quite limited. The Supreme Court first announced the law in <u>Christiansburg Garment Co. v. EEOC</u>, 434 U.S. 412, 422 (1978), a Title VII case:

> [A] plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.

The Court later adopted the Christiansburg test for § 1983 cases. Hughes v. Rowe, 449 U.S. 5, 14 (1980) ("The plaintiffs' action must be meritless in the sense that it is groundless or without foundation. The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees.")

Various Seventh Circuit decisions have provided additional guidelines for district courts. A fee award to a successful defendant is not appropriate where the plaintiff survives (or should survive) a motion for directed verdict. Soderbeck v. Burnett Cnty., 752 F.2d 285, 295 (7th Cir. 1985); see also LeBeau v. Libbey-Owens-Ford Co., 799 F.2d 1152, 1159 (7th Cir. 1986); Unity Ventures v. County of Lake, 894 F.2d 250, 255 (7th Cir. 1990).

What appears to be an even stronger statement of the Christiansburg rule is found in Badillo v. Central Steel & Wire Co., 717 F.2d 1160, 1164 (7th Cir. 1983) (citations omitted):

> [T]he courts have been careful to distinguish between claims that were ultimately found to be without merit and those 'frivolous, unreasonable or groundless' claims within the meaning of Christiansburg. As a result fees that have been assessed have been limited to situations where plaintiff's conduct was abusive, or merely a disguised effort to harass or embarrass the defendant.

Badillo was cited with approval in Mustafa v. City of Chicago, 442 F.3d 544, 549 (7th Cir. 2006), for the proposition that "prevailing defendants in civil rights cases [are] only entitled to attorneys'

- 51 -

fees under § 1988 where [the] plaintiff's goal was to harass or embarrass the defendant."

The jury found against 55 of the 78 plaintiffs who filed suit. These were the plaintiffs who claimed to have been sprayed inside the house and a few others who claimed injury as a result of indirect spraying in the yard. The fact that we found the evidence sufficient to submit all of these claims to the jury, denying the defendants' motions for directed verdicts, would seem a sufficient reason to deny the defendants' motion for fees. However, the defendants argue that there was language in the Court of Appeals's opinion on the interlocutory appeal that should have alerted these plaintiffs to the fact that they lacked evidence to support their claims. (Defs.' Mot. at 6-8.) We studied the Court's opinion carefully when it was issued, and, had we thought the Court had indicated that the spraying claims would necessarily fail for a lack of evidence, or that they were insufficient as a matter of law, those claims would not have continued in the case. They did continue, because we thought they presented genuine factual questions for the jury and in no way could be considered groundless or frivolous.[15]

---

[15] The rule that the denial of a directed verdict precludes a later finding that the claim was frivolous makes considerable sense from a practical standpoint. The defendants are now making detailed factual arguments and have submitted portions of the trial transcript in support of their fee motion. This kind of submission would have been appropriate in support of their post-trial motions, which we considered and denied four years ago. A motion for fees is not an appropriate vehicle to retry the case. Perhaps the Supreme Court had similar arguments in mind when it remarked in Hensley that a "request for attorney's fees should not result in a second major litigation." 461 U.S. at 437.

- 52 -

Defendants claim fees for the defense of Kassandra Torres's failure-to-intervene claim against Officer Michael McMahon. We granted McMahon's motion for a directed verdict on this claim at the close of the plaintiffs' case on the basis that there had been no evidence presented to show that McMahon could have done anything to prevent the plaintiff's injury. Counsel for plaintiffs did not argue otherwise. We had previously granted summary judgment on other failure-to-intervene claims on the same basis, but no summary judgment motion had been made as to Kassandra Torres, so her claim was still pending when the case went to trial. However, she did not testify at trial, nor did any other witness testify concerning her claim. (Defs.' Mot. at 8-9.)

The defendants argue that plaintiffs' counsel should have known that Kassandra Torres's claim was in the same category as those as to which summary judgment had been granted and that counsel's proceeding to trial on her claim was therefore in bad faith. We disagree. It appears that Torres remained in the case simply because she was overlooked, both by the plaintiffs _and_ the defendants. No trial time was spent on her claim other than the few minutes it took to present the unopposed directed verdict motion. No fees are appropriate for whatever time defendants spent on Kassandra Torres.

Defendants also seek fees for the time they spent on the Duran brothers' unsuccessful equal protection claims against Walter

- 53 -

Wirack, the lockup keeper at the police station. (Defs.' Mot. at 9-11.) We withdrew those claims from the jury because we found the evidence insufficient to show disparate treatment based on race or ethnicity. This was a close call, and the equal-protection claims were not frivolous. As plaintiffs point out, Pls.' Resp. at 14-16, the jury found in favor of all seven of the plaintiffs held in Mr. Wirack's lockup on their state-law claims for intentional infliction of emotional distress, awarding punitive as well as compensatory damages. The emotional-distress and equal-protection claims were based on the same facts, and there is no reason to believe that the award would have been greater had the equal protection claim been included.

The defendants seek fees with regard to five defendants for whom we granted summary judgment, Detective Attilio Fiordirosa and Officers David Richert, Jason Stroud, Scott Harris, and Miguel Jimenez. (Defs.' Mot. at 2-4.) We believe there was a reasonable basis for the claims against each of these defendants for the reasons set forth in plaintiffs' response. (Pls.' Resp. at 5-8.) None of these claims can be considered frivolous, and defendants are not entitled to fees for defending them.

Finally, the defendants ask for fees in regard to the six defendants whom the jury found not liable. (Defs.' Mot. at 4-6.) But we denied each of these defendants' motions for directed verdicts and held that the evidence was sufficient to submit to the

- 54 -

jury. No fees will be allowed for the defense of any of these six officers.

Aside from the fact that plaintiffs' unsuccessful claims were not groundless or frivolous, there is another entirely independent reason why no fees can be allowed to the defendants: they have failed to show what time is attributable to the defense of any of the plaintiffs' unsuccessful claims. In fact, the defendants' fee request does not even purport to be limited to time spent defending the plaintiffs' unsuccessful claims. They seek fees for every minute spent defending the entire case, both the unsuccessful and successful claims. Defendants' motion requests the "entry of an order awarding Cicero attorneys' fees in the sum of $1,740,651.50 and nontaxable expenses in the amount of $54,430.45 for the time period ending December 27, 2008." (Defs.' Mot. at 1.) They have submitted in support of their motion three volumes of time records measuring 3.25 inches in height. The records include all time spent on the case by the various attorneys who have represented the individual defendants and the Town throughout the course of the litigation. (Small amounts of time spent on non-litigation matters have been redacted.)

It is difficult to believe that the defendants think they are entitled to fees for the time they spent defending claims on which the plaintiffs succeeded. Assuming they know this would be absurd, perhaps they believe that the court will comb through this

- 55 -

stack of records and attempt to determine what time was spent on claims the defendants successfully defended.  If we were inclined to do that--which, of course, we are not--it would be impossible. This is because the time entries of all of the defendants' attorneys are, for the most part, vague and block-billed.  Recall that the plaintiffs' principal defense of their vague entries and block billing is that the defendants have done the same thing.[16] They certainly have.  But the court is no more able to discern from defendants' records what time would arguably be compensable than it was in dealing with plaintiffs' similar records.

The joint motion of the defendants for an award of fees is denied.

## PLAINTIFFS' COSTS AND EXPENSES

Plaintiffs have filed a First Amended Bill of Costs and a Supplement to the First Amended Bill of Costs.  The two filings seek a total of $157,901.47.  And in their reply, plaintiffs request an additional $3,500.00 for "Forensic Tape Analysis" and an additional $3,000.00 for "Professional Audio Labs," for another $6,500.00,[17] bringing the total to $164,401.47.  (Pls.' Reply in Support of Bill of Costs at 3.)  The Town objects to numerous items

---

[16]    Understandably, in their response to the fee motion, the plaintiffs make no reference to defendant's time records.

[17]    The Town objected to plaintiffs' original requests of $5,000.00 for "Forensic Tape Analysis" and $11,400.00 for "Professional Audio Labs" as "completely excessive."  (Pls.' Reply, Ex. 4, at 5-6.)

and contends that plaintiffs should be awarded only $58,236.68.[18]

Rule 54(d) of the Federal Rules of Civil Procedure provides that costs other than attorney's fees should be awarded to the prevailing party unless "a court order provides otherwise." Six categories of taxable costs are listed as recoverable in 28 U.S.C. § 1920. Some of the Town's objections are directed to the fact that certain of the requested items are not listed in § 1920. Plaintiffs point out that even if an item is not proper under § 1920, it may still be compensable as an expense under 42 U.S.C. § 1988. They are correct, see Henry v. Webermeier, 738 F.2d 188, 192 (7th Cir. 1984), and our discussion will cover both possibilities. If we find that an item is not allowable either as a taxable cost under § 1920 or an expense under § 1988, we will disallow it.[19]

### Expert Witness Fees

The Town objects to a $5,000.00 expert witness fee for Lou Reiter, pointing out that § 1920 allows only an ordinary witness fee for experts. The Town also objects to $590.18 paid to Mr.

---

[18] The Town states in its response, filed on August 8, 2008, that the plaintiffs' costs should be reduced to $58,036.68. The parties' Local Rule 54.3 Joint Statement, filed on May 15, 2009, states that defendants' position is that only $58,236.68 should be awarded.

[19] Plaintiffs note that they are seeking costs and expenses against all defendants found liable, including the individual defendants. The individual defendants have filed no objections to plaintiffs' requested costs and expenses, and the plaintiffs argue that all requested costs and expenses should be assessed against the individual defendants. (Pls.' Reply at 1-2.) If no objections had been filed, plaintiffs might have a point. But we need to rule on the Town's objections, and, to the extent the objections are sustained, it would make no sense to assess the disallowed items against the individual defendants (who presumably would be indemnified by the Town). Therefore, whatever costs and expenses are disallowed will be disallowed as to all of the defendants.

- 57 -

Reiter for his expenses associated with his deposition and his fee of $407.95 for his attendance at his deposition. The basis for the Town's objection to these expenses is that "[n]one of these costs were necessary as Lou Reiter did not testify at trial." (Town's Resp. at 3.) The Town also points out that plaintiffs submit no proof that Mr. Reiter was paid the $5,000.00 fee.

Plaintiffs reply that Mr. Reiter was retained by them to testify in support of their Monell claim, and his deposition was taken at a time when the Town's liability to pay any judgments rendered against the individual defendants was still at issue. Thereafter, the Town stipulated that it would pay any such judgments (as it did), so Mr. Reiter's testimony became unnecessary. The Town's objections to Mr. Reiter's deposition expenses of $590.18 and $407.95 are overruled. However, there is a problem with the $5,000.00 expert witness fee. Apparently it has not been paid, and plaintiffs have submitted nothing to meet their burden of proving that the entire amount was necessary and reasonable. The $5,000.00 is disallowed.

The defendants also object to charges of $1,270.17, $1,245.00 and $801.95 for "Mr. Van Blaircom [sic]," who according to defendants "was in fact Defendants' expert, but [] did not testify at trial." (Town's Resp. at 3.) It appears, however, that plaintiffs are only claiming two charges in relation to Mr. Van Blaricom--his professional fee and related court-reporter fees. As

- 58 -

for the professional fee, plaintiffs' itemized list of "other costs" contains a $1,270.17 charge in relation to Mr. Van Blaricom. However, we can locate only one invoice issued by "D.P. Van Blaricom, Inc." in plaintiffs' bill of costs,[20] and it is in the amount of $1,245.00. Plaintiffs represent that Mr. Van Blaricom was defendants' <u>Monell</u> expert and that they had to pay his expenses for his deposition, so we will allow the $1,245.00 as well as the $801.95 charge for related court-reporter fees because there are corresponding invoices. We will disallow $25.17 ($1,270.17 - $1,245.00) to account for the difference between the amount shown in the invoice and the amount claimed in plaintiffs' itemized list of "other costs."

### Investigation Fees

Plaintiffs have included a $200 charge for unspecified "investigation" performed by Salvatore Castellano, to which the Town objects. Plaintiffs have withdrawn this item, so the $200 will be deducted. (Pls.' Reply at 3.)

### Copying/Printing Fees

The Town complains that the $660.00 charged by Prism Innovative Resources ("Prism") for making copies of CDs and DVDs was unnecessary. (Town's Resp. at 4.) The plaintiffs make an adequate response, explaining that these copies were made for use

---

[20]    Ruling on these cost and expense items is unusually time consuming because it frequently requires a search of voluminous documents to locate the items to which the Town objects. Although the documents are paginated, the Town does not refer to page numbers.

- 59 -

as trial exhibits. (Pls.' Reply at 4.) The objection to this $660.00 is overruled.

The Town also objects to a series of copying charges totaling $1,550.60 on the basis that there is no explanation of why the copying was necessary or whether the price per page was reasonable. The plaintiffs have responded to these objections at Table 1 of their Reply at 2-3. The responses indicate that the copies were appropriate and the prices were reasonable, with one exception. On August 21, 2011, there was a $173.89 charge for copying videotapes "for the criminal trial of the Duran brothers." This is not an appropriate charge in the civil case, and the $173.89 will be deducted.

## Compensation of Interpreters

The plaintiffs request $47,922.50 for compensation of Spanish interpreters, a type of cost expressly recognized by § 1920. The parties disagree about the appropriate amount, arguing in conclusory terms without much analysis.

The Town's entire argument is as follows:

> Of the 78 Spanish-speaking plaintiffs that required the use of an interpreter, either at depositions and/or at trial, 55 of those plaintiffs did not recover in this case. As such, we have reduced this expense by 70% (55/78). The Bill of Costs must be reduced by $33,545.75.

(Town's Resp. at 6.)

In response, the plaintiffs agree that the "real inquiry is whether costs were reasonably incurred in the litigation." (Pls.'

- 60 -

Reply at 5.)  The plaintiffs explain that multiple interpreters were needed for the trial and contend that the "testimony given with the aid of interpreters went to present evidence concerning the core claims of Alejandro and Gonzalo Duran and the other plaintiffs who did prevail."  (Pls.' Reply at 5-6.)

The defendant's percentage reduction based on the number of prevailing plaintiffs is flawed.  And there is only limited merit to the plaintiffs' argument that the testimony offered by unsuccessful plaintiffs, or about unsuccessful plaintiffs, bolstered the claims of at least some of the plaintiffs who did prevail.  The problem is that the plaintiffs offer no examples and our own recollection of the trial testimony given four years ago is insufficient to supply the missing links.

Plaintiffs point out that the Town cites no authority, but neither do the plaintiffs, who seem to assume that it would be impermissible for the court to award less than the $47,922.50 they request.  However, the court has discretion with regard to costs in mixed-result cases, based on the "[u]nless ... a court order provides otherwise" language in Rule 54(d).  See Gavoni v. Dobbs House, Inc., 164 F.3d 1071, (7th Cir. 1999) (affirming denial of costs where plaintiffs recovered only nominal amounts relative to what was sought); In re Corrugated Container Antitrust Litig., 756 F.2d 411, 418 (5th Cir. 1985) (in split-verdict case, the trial court acted within its discretion under Rule 54(d) in directing

- 61 -

each party to bear its own costs); <u>Cornwell Quality Tools Co. v.
CTS Co.</u>, 446 F.2d 825, 833 (9th Cir. 1971) ("[T]he district court
has broad discretion in apportioning and taxing costs where, as
here, neither party completely prevailed.")

We believe plaintiffs are entitled to recover some of their
costs for interpreters, but the Town is also entitled to some
reduction due to its partial success.  Arriving at a precise
percentage reduction based on a rigorous analysis of the evidence
is obviously impossible.  The parties have not attempted it, nor
are we able to do it.  The best we can do is to make what we regard
as a reasonable estimate of the appropriate percentage reduction.
The plaintiffs' costs for interpreters will be reduced by 40
percent, or $19,169.00.

### Fees for Service of Summons and Subpoena

Plaintiffs list $1,365.78 for summons and subpoena fees in
their first amended bill of costs.  The Town objects that the costs
are not adequately explained and that a prevailing party may not
recover service costs that exceed the fees charged by the United
States Marshals Service.  (Town's Resp. at 6, citing <u>Collins v.
Gorman</u>, 96 F.3d 1057, 1060 (7th Cir. 1996).)  The plaintiffs
respond with an explanation at Table 2 of their reply, but they do
not address <u>Collins</u>'s holding that the amount of costs awarded for
process-server fees cannot exceed what the costs would have been
had the Marshals effected service.  The Marshals Service charges by

the hour, and the plaintiffs' process servers apparently charged flat fees for each service. We are unable to tell how many hours were spent on each service. Because plaintiffs have not explained or broken down their service fees to demonstrate how they compare to what the Marshals' fees would have been, we will disallow this $1,365.78 item.

### Moving Expenses

Plaintiffs request $377.60 in expenses for "moving equipment to office from Federal Courthouse." (Pls.' Supplement at 4.) The Town describes these expenses as Mr. Cerda's "costs incurred in moving his offices" and assert that there is no authority for allowing such a cost. (Town's Resp. at 6.) Plaintiffs respond that "[m]oving expenses were charged for moving the large and heavy video equipment used at trial, not for moving Mr. Cerda's office as the Town asserts." (Pls.' Reply at 6.) A credit-card receipt for $377.60 is attached to an invoice from Midway Moving & Storage, Inc., the last exhibit to the Supplement to the First Amended Bill of Costs. It is not a § 1920 item, but we see no reason why it is not a recoverable expense under § 1988. The moving expense for the equipment will be allowed.

### Costs for Which There Is No Supporting Documentation/Invoices

The Town lists three pages of items for which it says there is no supporting documentation. (Town's Resp. at 6-9.) Some of these items have already been discussed under other categories, so

there is some duplication.

The first table, appearing at pages 7-8 of the Town's response, sets forth $19,420.61 in costs that are listed in plaintiffs' First Amended Bill of Costs and to which the Town objects. Plaintiffs' response to these objections is contained at Table 3 of their reply.

The first item, $173.89, has already been disallowed on the basis that it concerned the Durans' criminal case, not the civil case. The ABC Photocopy charge for $16.35 was for the same purpose and will therefore also be disallowed. Plaintiffs state that expenses for $29.90 and $331.80 described as "Copying - David Breed" were for copying plaintiffs' appellate brief on the interlocutory appeal, and those expenses will therefore be allowed. An item of $137.80 described as "Sanchez Daniels Hoffman" is explained by plaintiffs as having been paid by Mr. Cerda to that law firm for use of the firm's copying machine to copy plaintiffs' appellate reply brief. (Mr. Cerda was a tenant of the firm at that time. The firm did not become involved in this case until later.) This item will be allowed. Another "Sanchez Daniels Hoffman" item for $121.50, for making copies of documents required by the court in this case, will be allowed.

Payments of $415.71 and $1,000.00 were made to Prism for transferring video tapes to DVDs, enhancing a video, and making clips, all for use at trial. These costs will be allowed.

- 64 -

A cost of $2,400.00 is claimed for "Paula Cosgrove - for jury consultant services." Plaintiffs' explanation in Table 3 is simply that this "cost was paid by David Cerda using his business account." This is not a § 1920 item, and we see no reason why the plaintiffs needed a jury consultant. It is a frill they do not attempt to justify, and it will be disallowed.

Payments of $2,000.00 and $1,370.00 to "Liticorp - for videotaped deps" are explained as partial payments for the videotaped depositions of defendants or defendants' witnesses, and they will be allowed.

The Town objects to court-reporter fees in the total amount of $5,263.66 on the basis of inadequate documentation. The entries provide the name of the court reporter, the name of the witness, and the amount of the charge. In Table 3, plaintiffs explain each charge, typically stating that the cost was for the deposition of a fact witness who was called as a witness at trial or other transcripts used at trial. Plaintiffs' reply, of which Table 3 is a part, was filed on April 2, 2009. The Town did not seek to file any response to the reply. The explanations in Table 3 seem adequate; therefore, we will allow these court-reporter fees of $5,263.66.

We turn now to the Town's objections to the costs listed in plaintiffs' Supplement to the First Amended Bill of Costs. One cost to which the Town objects is a $471.00 "other cost," which was

- 65 -

not explained in the first version of plaintiffs' Supplement. Plaintiffs now state in Table 3 that it is for "Southwest Airlines – for travel for witnesses Diego Torres and Kassandra Torres." Plaintiffs explain that this is "for the travel expenses from Texas for Diego and Kassandra Torres who testified about the incident at trial." The receipt from Southwest Airlines for $471.00, which shows that tickets were issued to Diego and Kassandra Torres, is attached as an exhibit to plaintiffs' Supplement. The expense will be allowed.

Another objection is lack of supporting documentation or explanation. (Town's Resp. at 8-9.) This group of items includes payments made to court reporters for various transcripts. The total is $767.10. Plaintiffs' explanation in Part 2 of Table 3 is that some of the transcripts (totaling $368.45) pertained to various hearings in the Duran brothers' state-court criminal proceedings used at the trial of this case and that other transcripts (totaling $398.65) were for use at the trial or in connection with post-trial motions. The Town also objects to court-reporter fees "associated with those Plaintiffs that were not successful at trial, and with those Defendants who prevailed during both summary judgment and during trial." (Town's Resp. at 9-10.) The total of these fees is $3,156.44. Plaintiffs' response appears at pages 7 and 8 of their reply. They contend that these transcripts were of depositions of witnesses who were called at

- 66 -

trial.

But these explanations do not address defendant's objection that we cannot tell whether any of the transcripts related to claims that were successful as opposed to claims that were not successful. We believe the appropriate thing to do is to make the same percentage reduction we did with regard to interpreters' fees, namely, 40 percent. Accordingly, the total of $767.10 will be reduced by $306.84, and the total of $3,156.44 will be reduced by $1,262.58.

The Town also objects to $406.80 of Viking Printing's copying fees; plaintiffs have withdrawn this item. (Pls.' Reply at 7.)

## Costs Not Associated With This Case

The Town objects to a $44.40 charge for a transcript of a hearing in another case involving Officer Peslak. Plaintiffs argue that the charge for the Peslak transcript should be allowed because it was reasonably incurred to make the argument that Peslak's prior criminal conviction should be admitted into evidence. Because it was offered in support of an ultimately unsuccessful argument, the transcript (offered only as to Peslak and relevant to no other parties) is not an allowable cost or expense. The $44.40 charge will be deducted.

## Vague or Excessive Expenditures

The Town's final challenge is to several of plaintiffs'

entries that "are vague and/or excessive and thus should either be denied or drastically reduced." (Town's Resp. at 10.)

The first category is a series of court-reporting charges. (Town's Resp. at 11-12.) Plaintiffs respond at Table 4 of their reply and provide a satisfactory explanation for each of these items. (Pls.' Reply, Ex. 4, at 1-2.) No deduction will be made.

The Town lists the next category of allegedly vague or excessive charges as "other costs" at pages 12 and 13 of their response. The items total $32,212.29 ($25,712.29 that is listed in defendants' response, plus $3,500.00 for "Forensic Tape Analysis" and $3,000.00 for "Professional Audio Labs," which are added in plaintiffs' reply and fall into this category). Plaintiffs' response is found at pages 4-8 of their Table 4. Many of the charges are for high-level technical assistance provided to the plaintiffs in their presentation of evidence at the trial. The Town believes that the presentation was extravagant and unnecessary. In presiding over the trial, we thought that this kind of evidence was helpful to the jury and was not overdone. An example of the parties' different points of view appears at page 6 of Table 4 and concerns the fee of Professional Audio Laboratories. Plaintiffs' explanation is convincing.

There are, however, some deductions we will make from the $32,212.29. Starting with the $342.00 charge on September 12, 2002 for Liticorp on page 13 of the Town's objections and running

- 68 -

through the end of that page, all of the charges are for items associated with defendants who were completely successful either on summary judgment or at trial. The plaintiffs argue that these were reasonable expenses at the time they were incurred, Ex. 4 at 7, which may be true. But costs depend upon the outcome of the case, and they are not assessed against a successful party. The sum of $2,575.35 will deducted for these items.

That concludes the analysis of the Town's objections to the items claimed in the plaintiffs' First Amended Bill of Costs and their Supplement to the First Amended Bill of Costs. The total amount of costs and expenses we have disallowed (or that have been withdrawn) comes to $32,946.16. Subtracting this figure from the $164,401.47 in costs and expenses claimed by plaintiffs, the net amount we will allow is $131,455.31. This amount will be taxed against the Town of Cicero and the individual defendants who were found liable.

## COSTS SOUGHT BY THE TOWN OF CICERO

The Town has filed two Bills of Costs. The first is its initial Bill, seeking certain of its costs and expenses incurred in the district court. The second is its Amended Bill, which seeks costs in connection with the appeal taken after the trial.

### The Town's Initial Bill of Costs

The Town seeks $44,047.72 in trial-court costs and expenses. Its theory as to Rule 54(d) (§ 1920) costs is that, as to 55 of the

- 69 -

78 plaintiffs, it is the prevailing party. It also argues that it is entitled to costs under 42 U.S.C. § 1988, citing Hughes, 449 at 15. The Town does not expressly argue that the unsuccessful claims were frivolous, unreasonable or groundless, but the citation of Hughes can only mean that this is its theory.

We will deal first with the Hughes argument. As we have already held, none of the plaintiffs' claims that went to trial and were ultimately unsuccessful were frivolous, unreasonable or groundless. We do not consider whether expenses properly attributable to the claims of the few plaintiffs as to whom the Town was granted summary judgment would be allowable under § 1988 because the Town makes no such argument. Neither has the Town made any effort to allocate any portion of its expenses to those claims. For these reasons, the Town's suggestion that it is entitled to recover costs pursuant to § 1988, as opposed to costs pursuant to Rule 54(d) and § 1920, is rejected.

In fact, most of the items listed on the Town's Bill of Costs do not qualify as § 1920 costs. The initial Bill is unverified and attaches no receipts for the listed expenditures. After plaintiffs pointed this out in their response, the Town filed an unverified reply, to which is attached a number of receipts and an unverified copy of the court's official Bill of Costs form listing its claimed costs, which total $44,047.72. (Town's Reply, Ex. B.)

We will start with the clearest examples of items that are not allowable costs under § 1920. The Town lists $18,437.45 for "Courtroom, Inc. - Jury Consultant." We disallowed this type of charge for plaintiffs, even as a § 1988 expense, and it bears no resemblance to any § 1920 cost. It will be disallowed.

We are unable to match all of the receipts attached to the Town's reply with the items listed on "Exhibit B" (the copy of the court's official form). However, we will make clear what items we are allowing, and everything else is to be considered disallowed.

The first attachment to the Town's reply is a "Fee Rate Schedule" on the letterhead of Douglas A. French, M.D., showing a $550.00 charge for Dr. French's travel expenses and his time in court. The plaintiffs' response states that Dr. French "treated Ignacio Rodriguez" and his "testimony supported [that plaintiff's] substantial recovery." (Pls.' Resp. at 5.) The Town replies: "Dr. French was a necessary defense witness at trial to rebut testimony by certain Plaintiffs . . . ." (Town's Reply at 4.) The Town's explanation does not indicate that this cost should be assessed against any plaintiff other than Ignacio Rodriguez. But Ignacio Rodriguez was a prevailing plaintiff and therefore is not subject to costs. This item is disallowed.

The next attachment is a $315.75 item for the video deposition of Officer Peslak, who was found liable. The item will be disallowed.

- 71 -

The next two attachments are invoices from court reporters in the amounts of $63.05 and $653.40 for portions of the trial transcript. The Town has provided no indication of what issues these transcripts concerned, and we have no way of knowing whether they qualify as "fees for printed or electronically recorded transcripts <u>necessarily</u> obtained for use in the case." 28 U.S.C. § 1920(2) (emphasis added). For all we know, the transcripts were unnecessary and, in any event, there is no indication that they related to any successful defense. The charges will be disallowed.

The next item is an "Expense Form" from one of the Town's attorneys indicating a $30.00 subpoena fee paid to Dr. French. The expense will be disallowed.

Next is another "Expense Form" and canceled checks from the law firm for trial transcripts. The charge is $550.55. Again, there is no showing of necessity. The charge will be disallowed.

Next is a $200.00 "Expense Form" for "Parts for Trial Model." This is part of the larger expense incurred by the Town for the model, and we will postpone discussion of it until we consider the total costs of the model.

The next item is a $409.90 invoice from LitiCorp Ltd. for the video depositions of certain defendants, including Officer Peslak. The plaintiffs point out that Peslak was found liable, but they make no comment about the other defendants (who were not found liable). (Pls.' Resp. at 5.) We will disallow the $75.00 charge

- 72 -

for Officer Peslak but will allow the remainder of $334.90 for the depositions of defendants Reichert, Cruz and Lewandowski.

The next attachment is the four-page $18,437.35 invoice for "Courtroom Sciences, Inc.," jury consultants, which we have already disallowed.

The next few pages round out the total of $3,400.00 the Town paid as its one-half share of the cost of the model of the Duran premises that was used by both sides during the trial. The plaintiffs argue that this is not recoverable as a § 1920 cost item, Pls.' Resp. at 4, but the Town cites the case of Wahl v. Carrier Manufacturing Co., 511 F.2d 209 (7th Cir. 1975), for the proposition that costs for models and charts are allowable. Wahl does support that view. We think this is a case where the cost of the model should be allowed. The court and counsel agreed prior to the trial that a model would be helpful to the jury, and our prediction was correct. Many, if not most of, the witnesses stepped down from the stand to explain their testimony by physically pointing to places on the model where events occurred. The jury followed this testimony closely, and we frequently repositioned the model in relation to the jury box so that the jury could have the best possible view of it. The model was well-done, and the charge for it was reasonable. We will allow this $3,400.00 cost pursuant to § 1920 and assess it against those plaintiffs who went to trial and failed to recover against any defendant.

- 73 -

Next is a $196.80 court reporter charge for a transcript of the trial testimony of Anthony Lewandowski. The Town offers no explanation as to why this transcript was necessary, and the cost will be disallowed.

There is an August 2003 list of time records and "costs" for Edward R. Vrdolyak, Ltd., one of the Town's attorneys, indicating at the bottom of the page a total of $2,749.05 in various "costs" for which no explanations are given. These items will be disallowed.

Finally, we turn to the items listed on the Town's Exhibit B, its Bill of Costs form. It could be that in the foregoing discussion we have disallowed a portion of some of the amounts listed on this official form. At the bottom of the form there is a "SPECIAL NOTE," which reads "Attach to your bill an itemization and documentation for requested costs in all categories." The only attachment to the form itself lists the $550.00 witness fee to Dr. French, which we have disallowed, as well as "Other Costs," which includes the $3,400.00 for the model and the $18,437.45 for "Courtroom Inc. - Jury Consultant." We are not inclined to attempt a verification of any of the other items listed on Exhibit B--e.g., $7,484.92 for "[f]ees for exemplification and copies of papers necessarily obtained for use in the case"--because the Town's submission affords no clue as to how we would go about it.

To summarize, then, we will disallow $23,621.05 of the costs

- 74 -

for which some documentation is attached to the Town's reply, as well as all of the other items listed on Exhibit B, which are not documented at all. We will allow $3,715.00 (for the video depositions of certain defendants and the model used during the trial.) That amount is assessed against the plaintiffs who proceeded to trial and failed to recover on any claim they made against any defendant and in favor of each defendant who prevailed against that plaintiff.

### The Town's Amended Bill of Costs

The Town's Amended Bill of Costs seeks the costs it incurred on the appeal after the trial. The total amount requested is $14,833.80. The plaintiffs do not object to $833.80 of this amount ($455.00 in fees of the clerk and $378.80 assessed by the Court of Appeals for reproduction of briefs), but they do object to the $14,000.00 requested for fees "of the court reporter for all or any part of the transcript necessarily obtained for use in the case" (emphasis added). This $14,000.00 charge was a deposit paid to the court reporter for transcripts of three pre-trial hearings and transcripts of the entire six-week trial. Plaintiffs' position is that the issues involved in the Town's appeal and plaintiffs' own cross-appeal did not require that the Town obtain transcripts of the entire trial. The first copy of the pre-trial and trial transcripts ordered by the Town totaled 3,745 pages at $3.65 per page. Plaintiffs point out that "the issues on appeal did not

- 75 -

address [the] sufficiency of the evidence supporting a verdict, conflicting evidence or other fact-intensive bases for appeal." (Pls.' Resp. to Town's Post-Appeal Am. Bill of Costs at 2.)  This is true.  The sole issue on the Town's appeal was whether the wording of the judgments entered by this court was ambiguous as to whether the prevailing plaintiffs could collect the same amounts from the Town that they collected from the individual defendants, thus permitting a double recovery.  No one contended that a double recovery was intended, and the remedy for the ambiguity was simply to enter amended judgments clarifying the fact that the liability of the Town and the individuals was joint.  The Court of Appeals vacated the judgments we had entered and ordered that amended judgments be substituted:

> On remand the court should clarify that the damages the jury assessed against the Town and the individual officers are not to be aggregated; the judgment should reflect that the Town is jointly liable for a single damages award in favor of each plaintiff who prevailed on a state-law claim.

653 F.3d at 643.  This ruling on the Town's appeal did not require the appellate panel to read the entire transcript of the six-week trial.  How much of the transcript the Court read, of course, is something we do not know.  We can only assume that the judges would not have read more than was necessary to decide the case.  The ambiguity in the judgments was facial rather than something that appeared only in the light of what had occurred at trial.  The Town's brief quoted a number of passages from the transcript

- 76 -

showing quite clearly that this court and the parties had no intention of providing for a double recovery, and the Court's opinion quotes a number of those passages. It was necessary for the Town to file the portions of the transcript that contained those passages, but that would have amounted to relatively few pages. The Town's insistence that the entire transcript was necessary cannot be to reconciled with the position it took during the appeal. In response to the plaintiffs' discussion of jury instructions and verdict forms in the brief they filed as appellees and cross-appellants, the Town stated:

> The issue the Town of Cicero raises on appeal does not arise from the instructions or the verdict forms. The issue on appeal pertains solely to the judgment order the district court entered which did not provide that the judgments entered against the Town of Cicero and the individual defendants were joint.

(Pls.' Resp. to Town's Post-Appeal Am. Bill of Costs, Ex. C, Combined Reply Br. and Resp. to Cross-Appeal by Def.-Appellant/Cross-Appellee Town of Cicero, at 5.)

The Town offers as an additional justification for the $14,000 cost an argument that the transcript was also useful in connection with the issues raised on the cross-appeal. To assess the merit of that argument, we must look at the cross-appeal and how the Court of Appeals dealt with it.

The plaintiffs raised only three issues on their cross-appeal. The first had to do with spoliation of evidence. Luis

- 77 -

Castaneda was a professional videographer hired by the Durans to record the baptism and party. The plaintiffs argued that the police had confiscated Castaneda's camera just before starting to pepper-spray and assault people in the yard, so that no video record was made of the police misconduct. The Seventh Circuit held:

> The district court held that the confiscation of Castaneda's camera and videotape was not evidence of spoliation because it did not involve the destruction of or failure to preserve evidence; at most Castaneda was prevented from *creating* what might have become evidence. This ruling was manifestly correct. . . . Actionable spoliation thus occurs only when the duty to *preserve* existing evidence has been breached. Here, although the police seized the Castaneda videotape, they returned it unaltered. That they interrupted Castaneda's filming is not evidence of spoliation; Illinois does not recognize a spoliation claim based on evidence not yet in existence.

653 F.3d at 644. The ruling was obviously based on what had happened at trial, but it was a ruling as a matter of law. Only a few pages of the transcript would have been necessary to show that Castaneda's recording had been stopped before he had recorded anything that was incriminating to the defendants. A few more pages would have sufficed for the parties' arguments and this court's ruling on the issue.

The second issue on plaintiffs' cross-appeal pertained to Officer Vitalo. Several plaintiffs brought claims against Vitalo; those claims included excessive force, battery, hate crimes, and intentional infliction of emotional distress. Plaintiffs' evidence

- 78 -

tended to show that Vitalo was motivated by ethnic animus. The plaintiffs desired to introduce four complaints from the mid-1990s "accusing Vitalo of verbally abusing minorities, engaging in excessive force, committing false arrest, and falsifying police reports." 653 F.3d at 644. Plaintiffs contended that these complaints were admissible under Federal Rule of Evidence 404(b) "as evidence of Vitalo's bias, motive and intent to harass and harm Latinos." Id. In a pretrial *in limine* ruling, we excluded this evidence. During the trial, the plaintiffs moved for reconsideration of this ruling on the ground that Vitalo had opened the door by testifying that he never used any racial slur and that his wife is "half Mexican." We refused the evidence again on the basis that "the danger of confusion and of unfair prejudice to the other defendants would outweigh the probative value as to the defendant Vitalo." See id. at 645. The Seventh Circuit upheld the ruling:

> The district court was required to balance the probative value of the long-ago complaints against the prejudicial effect of this evidence; we generally do not second-guess this kind of ruling. This was a very complicated case, with many claims, plaintiffs, and defendants. The introduction of several old, unrelated misconduct complaints against a single officer risked creating a sideshow and sending the trial off track. Furthermore, because the misconduct complaints involved allegations of physical and verbal abuse by Vitalo, there was potential for prejudicial "spillover" effect on all the defendants. The judge did not abuse his discretion by maintaining his original ruling.

- 79 -

Id.  As in the case of the spoliation issue, reference to just a small portion of the trial transcript was necessary to argue the issue.  That issue was whether we had abused our discretion in refusing the evidence, and the Court decided the issue by comparing the probative value of the evidence to the obviously greater unfair prejudice to Vitalo and the other defendants had the evidence been received.

The third issue raised by the plaintiffs on their cross-appeal had to do with Officer Peslak.  He had pleaded guilty to a criminal indictment in federal court charging him with using excessive force under color of state law in violation of 18 U.S.C. § 242.  The crime had occurred in connection with a traffic stop where he had grabbed the driver by the back of his head and hit his head forcefully against the car, causing a cut that required five stitches to close.  Peslak received a sentence of five months.  Peslak's co-defendant in the case also pleaded guilty and stated in his plea agreement that Peslak had falsified the police report.  Id. at 646.  We granted Officer Peslak's motion to exclude this evidence in an *in limine* ruling.  The plaintiffs raised the issue again at trial, arguing that the conviction was admissible under Federal Rule of Evidence 609(a)(2) as a crime of dishonesty.  The Seventh Circuit held that we had properly excluded the evidence because the crime of excessive force to which Peslak had pleaded guilty "did not involve acts of dishonesty or false statements."

- 80 -

Id. at 646-47.  Also during the trial, the plaintiffs conducted an examination of Officer Peslak outside the presence of the jury and asked him whether he had prepared false police reports in connection with the incident.  Peslak's attorney objected, and we sustained the objection on the basis that Peslak's privilege against self-incrimination was implicated.  The plaintiffs argued on their cross-appeal that this, too, was error, but the Court rejected the argument, saying "we find no fault with the district court's decision to halt this line of inquiry to protect Peslak's Fifth Amendment right against self-incrimination." Id. at 647 n.5.

Like the two other issues raised on plaintiffs' cross-appeal, the Peslak issue required reference to a small portion of the transcript to determine what evidence was offered and refused; moreover, the Seventh Circuit's ruling was made as a matter of law.

Rule 39(e)(2) of the Federal Rules of Appellate Procedure provides that transcript costs may be taxable "if needed to determine the appeal."  The entire 3,745 pages simply were not needed to determine either the Town's appeal or the plaintiffs' cross-appeal.  How much of the transcript was truly necessary is not easy to calculate and must necessarily be an estimate.  We believe that, at most, 1,000 carefully selected pages could be regarded as necessary to support the Town's appeal and defense of the cross-appeal, and we will allow the sum of $3,650.00 (1,000

- 81 -

pages at $3.65) as the necessary transcript cost.[21] We will also allow the $455.00 fee of the Clerk and the $378.80 in costs as shown on the Mandate of the Court of Appeals, to which plaintiffs do not object.

## QUESTIONS REGARDING PAYMENT

The court will need some help from counsel in apportioning some of the payments we have been discussing. The costs and expenses awarded to the successful plaintiffs will have to be prorated among them in proportion to the amounts that were deducted by counsel from the payments the plaintiffs received from the individual defendants.[22] Also, the $4,483.80 we have awarded to the Town as its appellate costs will need to be apportioned against the cross-appellees on an individual basis.

There is a much more difficult question in regard to the $1,145,550.00 in attorneys fees we have awarded the plaintiffs. The question is, who should receive the money?

The intent of Congress in enacting 42 U.S.C. § 1988 was to shift the attorney's fees of a successful civil rights plaintiff to the person or persons who violated the plaintiff's civil rights.

---

[21]    The court reporter's invoice also includes an $818.10 charge for a "1st copy." This does not appear to be a cost "needed to determine the appeal," and it is disallowed.

[22]    See Defs.' Letter at 1 ("On Friday, July 11, 2008, the Individual Defendants satisfied the judgments in full to the successful Plaintiffs. Sarah Stertz, counsel for Genesis Insurance was present. At this time, Mark Parts represented to the Plaintiffs in front of Sarah Stertz that 40% plus costs would be deducted from each Plaintiff's settlement amount based on their contingency fee agreement.")

- 82 -

The plaintiff would have the benefit of his or her full recovery, without having to pay over a portion of it in fees. Venegas, 495 U.S. at 86. Therefore, it is the plaintiff, not his or her attorneys, who is ordinarily the recipient of the fee award. Id. at 87-88. But it is not always that simple. The Supreme Court has also held that the plaintiff may, by contract with the attorney, agree to pay the attorney a contingent percentage fee and, in addition, to assign to the attorney the § 1988 fee award. Id. at 86-90; Gisbrecht v. Barnhart, 535 U.S. 789, 806 (2002). Such contractual arrangements are allowed on the theory that they may be necessary to ensure that the plaintiffs will be able to retain competent counsel. The agreement can provide not only for a contingent fee and the assignment of the statutory award but, in addition, a flat fee. Pickett, 664 F.3d at 640-41 ($7,500.00 flat fee). Although the justification for such agreements is that they may be necessary to provide competent counsel, no case we are aware of has imposed any requirement that the strength of the plaintiff's case be considered. It is an across-the-board rule, applying both to weak cases and to cases appearing to be so strong that the plaintiff would have no difficulty finding a competent, experienced civil rights lawyer to take it on--for example, cases where later-acquired DNA evidence supports a plaintiff's claim that the police forced him to confess to a crime he did not commit. The result of this contract rule is that the prevailing civil rights plaintiff

- 83 -

does in fact wind up paying his or her own attorney's fees, something the statute was intended to avoid.

In this case, the plaintiffs' attorneys allege that they had an agreement with their clients pursuant to which they are to receive a contingent fee of 40 percent, plus the statutory fee award. They have already received $1.04 million as their claimed 40 percent share of the judgments paid by the individual defendants and, if they receive the statutory award in addition, the total will be $2,185,550.00. This could be a legally permissible outcome.

There is, however, a problem. We are not satisfied that there is an enforceable fee agreement or agreements. Recall that the individual defendants insisted upon seeing the agreement and Mr. Cerda strongly resisted producing it. The issue arose in connection with the individual defendants' consideration of the time records the plaintiffs had produced in connection with their fee petition. The defendants wanted to see the contingent-fee agreement because of their belief that it was relevant to the amount of fees that might be owing. Mr. Cerda took the position that the contingent-fee agreement was irrelevant and refused to produce it. At a hearing on July 23, 2008, Mr. Cerda, in response to the defendants' motion to compel, cited <u>Venegas</u> for the proposition that plaintiffs' attorneys can be entitled to both a contingency fee and a statutory award and argued that he had

- 84 -

disclosed to the defendants that the contingency agreement was for

40 percent. (Tr. of July 23, 2008 at 5.) The following colloquy

then occurred:

> THE COURT: Now, do you want to see the
> contingency agreement because you doubt Mr. Cerda's
> representation as to the amount of the percentage?
> MR. WELCH [representing defendants]: Well.
> THE COURT: I am not saying you have to accept
> his representation, but tell me if that's the
> reason you want to see the actual paper.
> MR. WELCH: Yes, your Honor, that's among the
> reasons.
> MR. CERDA: We could file an affidavit.
> THE COURT: There is no law that says you have to
> accept the other side's representation.
> THE COURT: Let's read this Venegas case, I will
> read it and anything else that might be relevant
> and put this over until next week and I will rule.

(Tr. of July 23, 2008 at 5-6.) On July 30, 2008, we addressed the

matter again. We indicated that we thought the contingency

agreement could be relevant and that the defendants were entitled

to see it. The following colloquy ensued:

> MR. CERDA: Well, pursuant to Section 1983 and
> Section 1988 and we didn't have an opportunity to
> brief this, your Honor, and I did not get Mr.
> Welch's cases until 10:00 this morning.
> THE COURT: What is the matter of life or death
> about producing the contingency fee agreement?
> MR. CERDA: Well, the first argument--
> THE COURT: How would either the plaintiff or--
> plaintiffs or their attorney be damaged by
> producing it?
> MR. CERDA: We had disclosed to the court and to
> defense counsel that the contingency fee agreement
> for this case provides a 40 percent contingency fee
> if the case went to trial, and that's what
> happened.
> THE COURT: I asked Mr. Welch last time whether
> he doubted that, and he said yes. Now, that's the
> unfortunate situation where one lawyer doesn't

- 85 -

believe another and stands before the court and says that. However, that is characteristic of this case during the 15 years or so it's been pending. Nobody believes anybody. So it's really--I won't say it's unique. I have had other cases that are somewhat like this, but very few. So I don't think that one party is bound to accept the representation of the attorney for the other side. They're entitled to verify it.

MR. WELCH: Thank you, your Honor.

MR. CERDA: We could give them an affidavit, your Honor, that the contingency fee agreement is 40 percent.

THE COURT: Give them a copy of the actual document. I am going to order that the plaintiffs turn over to the defendant--the individual defendants a copy of their contingency fee agreement within 7 days.

MR. WELCH: Your Honor, may we ask that it be turned over today? We have been working diligently to respond pursuant to your Honor's direction. By tomorrow we are supposed to tender our objections.

THE COURT: Any reason you can't do it?

MR. CERDA: Yes, your Honor.

THE COURT: Why?

MR. CERDA: <u>The original documents are missing, the original contingency fee agreements are missing.</u>

THE COURT: Now, you see there's--already we've got a glitch.

MR. CERDA: However, your Honor, we can represent to the court again, and I am an officer of the court and I can sign a sworn affidavit, that we have a contingency fee agreement with the plaintiffs that provided for--the original agreement provided for 40 percent contingency. We have executed documents with the disbursements which also contain--may contain attorney-client privilege, but we set forth the disbursements and they are the agreement set forth in writing as 40 percent of the contingency fee.

THE COURT: That is somewhat disquieting that this comes out at this late date. Our discussions thus far have proceeded on the assumption that the document exists, but--

MR. CERDA: There are subsequent writings, your Honor.

THE COURT: What I will do is enter an order

> today requiring plaintiffs' attorneys to file a
> sworn response to the motion of the individual
> defendants for production of the contingency fee
> agreement between plaintiffs and their attorneys.
> In the event the fee agreement cannot be located,
> the attorneys shall explain its absence and recite
> the contents to the best of their recollection, and
> that should be done within 7 days.

(Tr. of July 30, 2008 at 2-5 (emphasis added).)  On August 13,
2008, plaintiffs filed a motion for reconsideration of our order of
July 30, again citing Venegas for the proposition that the "terms
of plaintiffs' contingency fee agreement are not relevant to what
the losing defendants must pay the plaintiffs."  The motion
concluded with a prayer "that this Court vacate its Order requiring
plaintiffs to produce a copy of their contingency fee agreement or
detail its terms and deny defendants' Motion to Compel."  (Pls.'
Mot. for Recons. at 2-3.)  We denied the motion for reconsideration
on August 18.

On September 2, 2008, the plaintiffs filed a response to the
defendants' motion to compel.  The response is signed by Mr. Cerda.
It recites that in September 2000 and again in August 2001, Mr.
Cerda, Mr. De Leon and Mr. Joseph R. Lopez met with various of the
plaintiffs at a church in Cicero and had each of the adult
plaintiffs sign individual contingent-fee contracts.  Counsel were
assisted by Mr. De Leon's assistant, Salvatore Castellano.  (Pls.'
Resp. ¶¶ 2-3.)  Mr. Cerda states that he believes that Mr.
Castellano was assigned the task of copying all of the contracts
and mailing the copies to each of the adult plaintiffs.  He also

- 87 -

believes that the contracts "were gathered into a folder by Mr. Castellano and maintained with Mr. De Leon's files." (Pls.' Resp. ¶ 4.)

The response also states: "In February 2008, certain clients asked for a copy of their contingency fee contract. Apparently, Mr. Castellano has [sic] not mailed copies of the contingency fee contracts to plaintiffs in 2000 and 2001. Mr. Castellano was terminated from Mr. De Leon's employment in 2004." (Pls.' Resp. ¶ 5.)

Neither Mr. Cerda nor Mr. Lopez maintained copies of the contracts, and they believed that Mr. De Leon maintained the originals. In 2004, Mr. Cerda's assistant, Mr. Breed, "updated the Duran folders and index" and "does not recall ever seeing the Duran contingency fee agreements." (Pls.' Resp. ¶ 6.) Paragraph 7 of the response states:

> At this time, Plaintiffs' counsel believes that the folder containing the original contingency fee agreements was misplaced by Mr. Castellano.

It is not clear who is included in the term "Plaintiffs' counsel."

Paragraph 9 of the response states:

> Mr. Cerda believes that the operative terms of the Duran contract are substantially similar to the terms of the next case handled jointly by Mr. Cerda and Mr. De Leon.

This was the first case Messrs. Cerda and De Leon worked on together. The response quotes language from the contract they used in their next case, which provided for a contingent fee of 33.33

- 88 -

percent for amounts recovered prior to the filing of a complaint, 40 percent for amounts recovered after filing, and, in addition, that the "[a]ttorneys will be entitled to receive and recover all attorneys' fees and costs awarded by the court" and that the client would reimburse "all costs and expenses reasonably necessary to the performance of [the attorneys'] services." (Pls.' Resp. ¶ 9.)

Attached to the response are the identically-worded affidavits of Messrs. De Leon, Cerda and Breed. They state:

> The statements in Plaintiffs' Response to Defendants' Motion to Compel attributed to me are true and correct to the best of my knowledge.

(Pls.' Resp., Ex. A.)

Meanwhile, on August 27, 2008, the individual defendants had filed a motion for sanctions against plaintiffs' counsel pursuant to 28 U.S.C. § 1927, claiming that he had unreasonably multiplied the proceedings by failing to state at the outset that written copies of the contingent-fee agreement were missing.

On September 9, 2008, we entered an order directing the plaintiffs to file by September 23, 2008 affidavits from six different plaintiffs regarding their contingency-fee agreements.

On September 23, 2008, Mr. Cerda filed the affidavits of ten plaintiffs.[23] Each affidavit consists of two identically-worded paragraphs:

---

[23] Joel Uribe, Ana Maria Duran, Heriberto Uribe, Armando Duran, Ignacio Rodriguez, Silvia Pineda, Adolfo Duran, Javier Rodriguez, Maria O. Duran, and Alejandro Duran.

- 89 -

> 1. I am one of the plaintiffs in Duran v. Town of
> Cicero. Since September of 2000, I have been
> represented by attorneys John R. De Leon, Joseph R.
> Lopez, and David Cerda. More recently, I have also
> been represented by attorney Mark Parts.
> 2. I have always agreed that my attorneys should
> be entitled to any and all attorneys' fees awarded
> pursuant to 42 U.S.C. § 1983, and my attorneys are
> and have always been authorized to seek recovery of
> these fees. These fees, after all, are paid by the
> defendants to my attorneys. I have never asked my
> attorneys to limit their fees to the forty-percent
> (40%) contingency fee they are also entitled to
> under my contingency fee agreement with them.

(Pls.' Affs., Ex. A.)

This is the evidence the attorneys have submitted to support their claim that they have contingent-fee agreements with the plaintiffs. The evidence was submitted in connection with motions to compel and for sanctions filed by the individual defendants, not by the Town of Cicero.[24] However, the matter of the agreement is also relevant to the dispute between the plaintiffs and the Town concerning plaintiffs' attorneys' fees. As we will explain, we need to deal with the contingent-fee question in order to determine the proper recipient of the fees we are ordering the Town to pay. And because the Town will be making the payment, it has a right to be heard on the question.

So, what difference does it make whether there were written contingent-fee agreements? It is critical to whether the alleged agreements are enforceable. Contingent-fee agreements are regulated by the Rules of Professional Conduct applicable to

---

[24] The sanctions motion is still pending.

- 90 -

attorneys.    Rule  1.5  of  the  version  of  the  Illinois  Rules  of

Professional Conduct in effect in 2000 and 2001 reads in pertinent

part as follows:

> (c)  A fee may be contingent on the outcome of the
> matter for which the service is rendered, except in a
> matter in which a contingent fee is prohibited by
> paragraph (d) or other law.  A contingent fee
> agreement shall be in writing and shall state the
> method by which the fee is to be determined, including
> the percentage or percentages that shall accrue to the
> lawyer in the event of settlement, trial or appeal,
> litigation and other expenses to be deducted from the
> recovery, and whether such expenses are to be deducted
> before or after the contingent fee is calculated.
> Upon conclusion of a contingent fee matter, the lawyer
> shall provide the client with a written statement
> stating the outcome of the matter and, if there is a
> recovery, showing the remittance to the client and the
> method of its determination.
> . . .
> (f) . . . [A] lawyer shall not divide a fee for legal
> services with another lawyer who is not in the same
> firm, unless the client consents to employment of the
> other lawyer by signing a writing which discloses:
>   (1) that a division of fees will be made;
>   (2) the basis upon which the division will be
> made, including the economic benefit to be received by
> the other lawyer as a result of the division; and
>   (3) the responsibility to be assumed by the other
> lawyer for performance of the legal services in
> question.
> . . .
> (h) The total fee of the lawyers shall be reasonable.

These Rules of Professional Conduct have the force of law.  See In

re Vrdolyak, 560 N.E.2d 840, 845 (Ill. 1990) (citation omitted):

> In 1980, this court embarked on a new course when
> it formally adopted the Code. The Code established
> an organized scheme for regulating professional
> conduct.  The Code also enunciated mandatory,
> minimum rules to which attorneys are expected to
> conform. In re Cheronis (1986), 114 Ill.2d 527,
> 535, 104 Ill. Dec. 225, 502 N.E.2d 722 ("It is a

- 91 -

> paramount obligation of each member of the bar to
> study the Code and abide by its terms and
> principles").
> . . . .
> As an exercise of this court's inherent power over
> the bar and as rules of court, the Code operates
> with the force of law. Accordingly, the Code, as a
> binding body of disciplinary rules, has, *sub
> silentio*, overruled prior judicial decisions which
> conflict with its mandates and proscriptions.

In Kaplan v. Pavalon & Gifford, 12 F.3d 87 (1993), the Seventh

Circuit dealt with a fee-sharing agreement that was not in a

writing signed by the client. The Court noted that in its earlier

decision in Cross v. American Country Ins. Co., 875 F.2d 625 (7th

Cir. 1989), it had held that a contingency-fee agreement was

enforceable even though it was not signed by the client and did not

indicate when expenses would be deducted, "thereby failing to meet

the requirements of Rule 2-106(c)(2) [of the Illinois Code of

Professional Responsibility]. A necessary predicate of our

decision was a finding that, under Illinois law, the Code of

Professional Responsibility is not binding on the courts." Id. at

90. The Court continued:

> In 1990, following our decision in Cross, the
> Illinois Supreme Court changed or clarified its
> position regarding the binding effect of the Code
> of Professional Responsibility. In In re Vrdolyak,
> the court made it clear that the Code is now
> binding on the courts as a matter of law.
> . . . .
>     Recognizing that this change in Illinois law
> undermined the premise on which Cross was decided,
> the district court in this case held that Rule 2-
> 107 is binding on the courts and thus "dictates the
> conditions under which fee-sharing agreements will
> be tolerated under law." The district court found

- 92 -

> that the oral fee-sharing agreement violated
> Illinois public policy, as expressed by Rule 2-107.
> We agree with the district court that <u>Cross</u> can no
> longer be considered a valid reflection of Illinois
> law.

Id. at 90-91 (citation omitted); <u>see also</u> <u>Woods v. Southwest</u>

<u>Airlines Co.</u>, 523 F. Supp. 2d 812, 824 (N.D. Ill. 2007) (Kocoras,

J.) ("Fee arrangements that violate Rule 1.5 cannot be enforced .

. . ."); <u>In re</u> <u>Spak</u>, 719 N.E.2d 747, 754-55 (Ill. 1999) ("The

writing requirement of Rule 1.5(c) contains no exception. . . . We

therefore hold that respondent is guilty of misconduct for failing

to reduce a contingent fee to writing in violation of Rule

1.5(c).")

It seems clear that if the alleged contingent-fee agreements

in this case do not comply with Rule 1.5 of the Rules of

Professional Conduct, they cannot be enforced. If there is no

enforceable contingency agreement, a number of questions arise.

What about the 40 percent that the plaintiffs' attorneys deducted

from the judgments collected by each of the successful plaintiffs?

Would those amounts have to be refunded to the plaintiffs? If so,

could this be accomplished by having the Town pay the attorneys'

fees awarded in this case directly to those plaintiffs, with the

plaintiffs' attorneys being responsible to refund to them the

amount by which the 40 percent exceeds the fee award? Would this

court have the authority to order such a refund?

There is a separate question as to Mr. Parts. Because he

did not enter the case until 2007, no one claims that his name was included in any written fee agreement. We do not see how he could claim any fee in addition to the § 1988 award.

The enforceability of the alleged contingent-fee agreements is something the parties have not briefed. (The Town simply argued that as a matter of law, the plaintiffs' attorneys could not collect both a contingent fee and the statutory fee award, an argument we rejected.) At the conclusion of this opinion we will set a briefing schedule. Instead of asking the "plaintiffs" to address the issue, we will give the plaintiffs' <u>attorneys</u> an opportunity to address it. It would seem that on this particular issue, the plaintiffs and their attorneys may now be adverse to each other. (This raises the additional question of whether the plaintiffs should have separate counsel and, if so, how that counsel would be paid.)

Before closing, we will indicate to counsel some of the questions we think are pertinent:

1. Why did Mr. Cerda delay so long in disclosing that the alleged written contracts are "missing?" Was this a lack of candor that affects the credibility of his claim that they ever existed?

2. How likely is it that Mr. De Leon's assistant, Salvatore Castellano, would have "misplaced" the folder containing the original contingency-fee agreements? No one actually says he did. Mr. Cerda merely says that plaintiffs' counsel "believes" that he

did.  Is this mere speculation?  There is no affidavit from Mr. Castellano, and apparently no one has even interviewed him or attempted to interview him.  And what does "misplaced" mean?  Would Mr. De Leon's assistant have put the agreements in a place in the office where they could not be found?  Does it make sense that Mr. Castellano, purportedly having been instructed to mail copies of the originals to each of the plaintiffs, would somehow have thrown them out?

3.  What is the significance of the affidavits of Messrs. De Leon, Cerda and Breed that are attached to the response to the motion to compel?  The affidavits merely say that the statements in the response "attributed to [the affiant] are true and correct to the best of [his] knowledge."  The response contains no statements by any of these three affiants that adds anything to counsel's "belief" that the agreements were misplaced by Mr. Castellano.

4.  What weight is to be given the affidavits of the ten plaintiffs?  Obviously prepared by counsel, they read like legal arguments.  Explaining why they "always agreed" that the attorneys would be entitled to any fees awarded by the court, the affiants state that "[t]hese fees, after all, are paid by the defendants to my attorneys."  There is reason to doubt whether these affiants understood what they were signing.  It is, of course, true that statutory fee awards are "paid by the defendants," but this has

nothing whatsoever to do with who <u>receives</u> them.  In the absence of
an agreement to the contrary, the fees would be paid to the
plaintiffs, not the attorneys.

We realize that it would be improper to reduce the
plaintiffs' lodestar fee award under § 1988 based on the existence
of a contingent-fee agreement.  The § 1988 award is to be based
upon the the attorneys' appropriate market rates for the services
rendered, quite aside from any contingent fee they that may have
contracted for with the clients.  <u>Pickett</u>, 664 F.3d at 640-45.
However, this requirement that the lodestar be determined apart
from any consideration of a contingent fee does not insulate the
contingent fee itself from judicial scrutiny:

> We recognize that this fee agreement, which highly
> compensates Rossiello by requiring Pickett to turn
> over three types of fees, may unfairly take
> advantage of Pickett. Although the Supreme Court
> has recognized that a plaintiff has the freedom "to
> become contractually and personally bound to pay an
> attorney a percentage of the recovery," <u>Venegas</u>,
> 495 U.S. at 88, 110 S. Ct. 1679, this particular
> contract seems to exact too high of a cost on an
> unsophisticated party seeking to vindicate her
> civil rights. We question whether Pickett
> understood the steep compensation arrangement that
> she agreed to. Our suspicions are bolstered by
> Rossiello's apparent disregard for proper "billing
> judgment," as required by <u>Hensley</u>, 461 U.S. at 437,
> 103 S. Ct. 1933, evidenced by his request for hours
> spent on losing claims and hours spent while
> suspended from legal practice. <u>Thus, we emphasize
> that, even though a court cannot exercise its
> supervisory authority to prevent a windfall by
> reducing an otherwise reasonable lodestar, a court
> may exercise this authority by scrutinizing a
> suspect contingent fee agreement, see Rosquist v.
> Soo Line R.R., 692 F.2d 1107, 1111 (7th Cir. 1982).</u>

- 96 -

Id. at 644 n.5 (emphasis added).

We ask that the plaintiffs' attorneys file a memorandum in support of their claim that they have enforceable contingent-fee agreements by May 14, 2012. The Town may respond by June 11, 2012, and the plaintiffs' attorneys may reply by July 2, 2012.

## CONCLUSION

The final determination as to whom the Town of Cicero will be required to make payments in this case is stayed until the court has considered the briefs we have requested.

DATED:        April 16, 2012

ENTER:        _____
              John F. Grady, United States District Judge